1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

7
8

9    JOHN MICHAEL BEAMES,                )    Case No.: 1:10-cv-01429 – AWI
                                         )
10                  Petitioner,          )    <u>DEATH PENALTY CASE</u>
                                         )
11        vs.                            )
                                         )    Order Regarding Merits of Claim 11
12   KEVIN CHAPPELL, as Acting Warden of )    In Petitioner's Federal Petition
     San Quentin State Prison,           )
13                                       )
                                         )
14                  Respondent.          )
     _____ )

15

16        Petitioner John Michael Beames ("Beames") was convicted of capital murder and the torture

17   murder special circumstance for the murder of Cassie McMains, the 15-month-old daughter of

18   Beames' live-in girlfriend, Angelita McMains.  The jury also found Beames guilty of one count of

19   torture, including a finding that he personally inflicted great bodily injury.  At the penalty phase of the

20   trial, the jury returned a verdict of death.  Beames' conviction and sentence were affirmed by the

21   California Supreme Court on March 22, 2007.  *People v. Beames*, 40 Cal. 4th 907 (2007).  Beames

22   filed his initial state habeas petition in the California Supreme Court on June 7, 2007, and it was

23   summarily denied July 28, 2010.  *See* California Supreme Court Case No. S153603.

24        On July 27, 2011, Beames filed his petition for writ of habeas corpus in the Eastern District of

25   California, challenging his conviction and death sentence.  Concurrently, Beames filed a second

26   petition for habeas relief with the California Supreme Court, presenting claims which were included in

27   the federal petition but were unexhausted.  The Court reviewed the petition and in light of the

28   allegations presented in Claim 11 and the possibility that resolution in Beames' favor would result in a

1

1   grant of the writ as to his conviction, ordered merits briefing of Claim 11.  Beames asserts Claim 11 in

2   his federal petition was presented to the California Supreme Court in his first state habeas petition.

3          Pursuant to court order, the Warden filed an answer consistent with Rule 5 of the Rules

4   Governing § 2254 Cases as to Claim 11, responding to the allegations in this claim and framing the

5   issues in dispute.  Subsequently, Claim 11 was found to be exhausted and the exhaustion status of the

6   remaining claims in the federal petition was resolved.  *See* Doc. No. 56.  The parties' briefing

7   addressing the merits of Claim 11 was completed March 22, 2013.

8   **1)  Summary of Federal Claim 11**

9          Beames alleges trial counsel Rothbaum was ineffective for failing to contest the central factual

10  allegation of the prosecutor's case: that Cassie was killed by torture from a blow to her midsection

11  which severed her liver and caused a fatal hemorrhage.  Beames contends the jury never learned that a

12  competent autopsy and forensic analysis would have established a completely different cause of death

13  with very different legal implications.  That is, Cassie died from malnutrition and a systemic infection,

14  not from any act of violence, and that her transected liver and broken ribs were sustained post-mortem,

15  likely as the result of Beames' attempts at resuscitation.  Beames alleges the jury never heard this

16  evidence because Rothbaum failed to obtain and present it; failed to consult a forensic expert

17  regarding cause of death; failed to identify the gross defects in autopsy methodology which

18  contributed to the state's incorrect conclusions; failed to educate himself about autopsy protocol for

19  suspected child abuse homicide cases; and failed to investigate the backgrounds of the state's experts

20  or discover patterns of professional error and incompetence.

21         Beames contends a reasonably competent defense attorney would have consulted and retained

22  a pathology expert, who in turn would have described the sub-standard  methodology of Kern County

23  pathologist Dr. Armand Dollinger, who performed Cassie's autopsy and testified at trial about the

24  cause of her death as well as other signs of severe abuse.  A reputable pediatric pathologist, such as

25  Dr. Janice Ophoven, whose professional opinion Beames presented with his initial state habeas

26  petition and which he includes with his federal petition, would have testified that contrary to Cassie

27  being tortured to death, she in fact was weakened by malnutrition and ultimately succumbed to a

28  massive, systemic infection.  Beames asserts that as such, he is at most guilty of manslaughter.

Further, Beames argues the prejudice resulting from Rothbaum's inadequate defense against the state's assertion of Cassie's cause of death was magnified by the failure to request instructions of lesser included offenses, thereby forcing the jury into an all-or-nothing decision.

Beames summarizes the alleged issues which contributed to Rothbaum's ineffective assistance at trial, supported by declarations from Rothbaum, his ex-wife, his paralegal and his investigator, and a report from Rothbaum's disbarment proceedings: Rothbaum used marijuana and alcohol during the time of Beames' trial; he was obsessed with gambling and taking on more cases than he could handle to support his gambling addiction; he missed court appearances, did no preparation for his cases, and engaged in a course of systematic professional misconduct that ultimately led to his disbarment in 2001; he described his practice at the time of Beames' case as "reckless," "out of control," "Kafkaesque," and "near rudderless;" he was emotionally devastated, depressed and distracted during the trial as his father had just died and his marriage collapsed as a result of his gambling and emotional volatility; he delegated all preparation of the defense to his paralegal and investigator, but refused to give them any guidance, communicate with them, or take their advice; he refused to retain experts recommended by his paralegal or otherwise to prepare for trial;[1] he refused to use the retainer paid to him for experts or anything else; he was emotionally overwhelmed by the facts of Beames' case and did no investigation of the work done by the state's pathologist; he believed the case was unwinnable, so never questioned any aspect of the autopsy, including the cause of death or the timing of injuries; he did no research regarding the methods used by the pathologist, but simply accepted the autopsy report as thorough and accurate; and he was unconvinced by Beames' account that Cassie died when a tool cart fell on her and believes he conveyed this lack of enthusiasm to the jury, but adopted this explanation only because he had no alternative theory of the case. *See* Declaration of Charles Rothbaum, Fed. Ex. 22; Declaration of Melissa Watkins (Rothbaum's ex-wife), Fed. Ex. 18; Psychological Consultation Report prepared in 2004 pursuant to Disbarment Proceedings, Ex. 19; Declaration of Maureen Griffin (Rothbaum's paralegal), Fed. Ex. 21; and Declaration of Clifford Webb (Rothbaum's investigator), Fed. Ex. 26.

---

[1] Rothbaum did employ one expert, Dr. Eugene Couture, a neuropsychologist, to evaluate Beames mental state. *See* Federal Petition, Exhibits 7 (notes) and 93 (letter).

Beames notes Dr. Dollinger was subsequently disciplined by the California Medical Board for misdiagnosing the cause of death for five other infants around the same time as Beames' trial.  *See* Federal Petition, Exhibit 2.  Dr. Ophoven submits that in this case Dr. Dollinger failed to take critical measurements, and failed to create and analyze tissue slides to accurately diagnose the manner of death and the timing of injuries.  Beames asserts that had Rothbaum consulted his own pediatric pathology expert, the result of the trial would have been different since a reasonable doubt would have been raised concerning many of the elements required for first degree torture murder, the torture murder special circumstance, and the substantive crime of torture.

Beames also alleges Rothbaum was ineffective in regard to the prosecution's two other experts, Doctors Thomas Bennett and Boyd Stephens, who testified about injuries Cassie sustained based on a review of Dr. Dollinger's autopsy report and other medical records, and not on an examination of Cassie's body.  Beames argues that had Rothbaum investigated there was readily available evidence to impeach their testimony.

Dr. Boyd Stephens, chief medical examiner for the County of San Francisco, testified based on the multiple injuries Cassie suffered over a period of time, that she had been tortured, but stated the changes in the anus were consistent with decomposition and did not support sodomy or sexual entry.  Beames claims Rothbaum failed to present evidence to undermine Dr. Stephens' conclusion that Cassie was tortured, specifically that he failed to use the defense neuropsychologist's notes of Beames' statement that he attempted to "warm her blood" to revive Cassie.  See Federal Petition, Exhibit 7.

Dr. Thomas Bennett, a forensic pathologist from Iowa and child abuse expert, presented the only testimony that a mark on Cassie's neck indicated she had been hung with a soft ligature for a period of time.  Dr. Bennett testified he was contacted about this case by the District Attorney while at a seminar in San Diego.  Beames argues Rothbaum failed to impeach Dr. Bennett (1) by inquiring how he was recruited from Iowa; (2) by asking why the other experts failed to opine that the mark on Cassie's neck was due to strangulation; (3) regarding his past history, including news articles of alleged mistakes made in mid-1980s (including the mis-identification of a skull and a missed bullet during the autopsy of victim shot more than once) and in 1993 (another expert disputed his opinion

1    that a child was killed by shaken baby syndrome); and (4) regarding prior cases showing he was

2    biased for the prosecution (one where other experts disagreed about a child's cause of death; another

3    alleging his opinion of time of death was based on speculation and conjecture; another discrediting his

4    testimony that levels of potassium related to poisoning could be detected post-mortem).

5    **2)  State Court Proceedings regarding Claim 11**

6        **a)  Factual Findings on Direct Appeal**

7             After Beames moved in with Cassie's mother, Angelita McMains, Cassie experienced several

8    injuries, including a broken leg and various bruises.  Cassie was removed from the home and during

9    the next four months living with her maternal grandparents, she suffered no additional injuries.

10   During this time, Cassie was referred to a pediatric geneticist, who diagnosed her with brittle bone

11   disease, although a pediatric orthopedist disagreed with that diagnosis.

12           Cassie was released back to her mother December 7, 1993, after which family members

13   observed on separate occasions that she had a burn on her finger and black eyes, that she was afraid of

14   Beames, and that Beames squirted liquid into her eyes and roughly shook her when she cried.  The

15   date when Cassie was last seen alive was not established at trial, but Beames' sister said Beames told

16   her on the afternoon of January 19, 1994, that Cassie had died the previous night.  Beames consistently

17   asserted -- to his sister, in a tape recording that he made, and during his testimony at trial -- that

18   Cassie's death was accidental.  Beames stated Cassie had vomited during the night, that he had taken

19   her out of bed and placed her on the floor in order to change the sheets, and that he returned to find a

20   cart with tools on it had fallen over on her, a "pool of blood" around her, and that she had no pulse.

21   Beames' sister asked about taking Cassie to the hospital, or calling law enforcement, but Beames

22   refused, saying to give him a little bit of time.  Beames told a sheriff's officer, who found him early

23   the next morning at a friend's house, that Cassie's body was inside his car.

24           Dr. Dollinger performed the autopsy and determined the cause of death was massive

25   hemorrhage due to a transected liver.  The autopsy revealed that Cassie had not eaten for 24 hours

26   before her death; that she sustained multiple bruises and abrasions on her face, mouth, back of the

27   head, right front scalp, back, neck, left shoulder, right thumb, and knee; that she had five broken ribs

28   on the right side and four broken ribs on the left; that she had dilation of the anal canal and scarring of

the surrounding muscle; that there was a large laceration of the top left side of her head, and that there were various burns to her buttocks, hands and fingers, and feet and toes.

**b) Allegations Presented in State Habeas Petition**

Dr. Janice Ophoven, a pediatric forensic pathologist with over 30 years of experience, reviewed the autopsy and expert reports, tissue slides, autopsy photographs, selected expert and lay testimony, and a variety of other documents from Beames' case, and presented a declaration in support of Beames' state habeas petition. *See* Federal Petition, Exhibit 6. Dr. Ophoven rendered the following opinions:

> Many of the injuries Dr. Dollinger described as pre-mortem were actually inflicted after Cassie's death, including most critically, the wound to her liver which Dr. Dollinger identified as the cause of her death. Cassie's liver showed a deep transection, but the absence of microscopic hemorrhage or necrosis in the liver sections and the shock pattern in the liver which indicates a post-mortem injury. The fluid in the area near Cassie's liver was decomposition fluid, not blood as Dr. Dollinger testified.

> At the time of her death, Cassie had numerous superficial wounds, and there is no doubt that she was handled roughly during her lifetime. Cassie was severely undernourished, as evidenced by focal pneumonia with aspirated debris, profound distension of her abdomen, an empty gastrointestinal tract, and severe body wasting. Cassie's brother Darrian was admitted to the hospital around the time of Cassie's death with complications of severe malnutrition. Both children showed classic signs of abuse and neglect from exposure to household chronic methamphetamine use.

> Rigor mortis appears to have relented at the time of the autopsy, which along with the gas formation, indicated decomposition and that Cassie was likely to have been dead for days prior to the autopsy. Cassie was reported missing the evening of January 19, 1994, and her body was found early in the morning on January 20.[2] The discolorations and apparent superficial abrasions to Cassie's mouth and nose were created post-mortem, as indicated by

---

[2] The autopsy was performed January 20, 1994, at 6:10 pm. Federal Petition, Exhibit 3.

their relatively homogenous color, and suggest post-mortem insect activity, indicating death possibly occurred days before the autopsy.  Tissue samples were not taken of these injuries.

Some of the grid marks/contact burns on Cassie's body were glassy and thus had the appearance of post-mortem burns.  Tissue samples from the burns would have helped to definitively date them, but no such samples were taken.  Further, the injuries to the tips of Cassie's fingers and toes were not burns, but instead appeared to be the result of decomposition and/or mummification.

A section of a rib fracture showed new bone formation, callus formation, and periosteal granulation tissue, all indicating an older, healing injury.   Due to the very poor quality of the films taken of the rib fractures, a competent pediatric forensic pathologist could say no more than that the injury may have been weeks old.  It is not possible to determine how many rib fractures Cassie suffered because of the poor documentation, but some of the rib fractures occurred near the time of death.

There was a large ulcer on Cassie's scalp, which was not a cut, but could possibly have been an infected bedsore, or an accumulation of blood that resulted in pressure which hindered the flow of blood to the area, and created a gangrenous condition.  Microscopic sections of this tissue showed full thickness ulcerations with diffuse scarring and granulation tissue, indicating that this had been present for a significant time period, perhaps weeks.

Cassie had extensive pus in her bloodstream, consistent with a massive, fatal body infection, or terminal septicemia.  Given her malnutrition, Cassie was more susceptible to such a massive infection.  The source of the infection could likely have been the large, gangrenous ulcer on her scalp, but no post mortem analysis for infection was performed.

At Cassie's autopsy there was evidence of fresh rib fractures and a large liver laceration.  The injuries could have resulted from post-mortem compression to the torso if Beames had performed prolonged CPR, especially if he was untrained and frantic.  The evaluation of these injuries was consistent with the liver injury occurring after death.

Cassie died at age fifteen months with evidence of severe malnutrition and probable dehydration.  Cassie had evidence of an empty GI tract, severe body wasting, and pneumonia.

The evidence of diffuse pneumonia suggests Cassie died from infectious complications of chronic malnutrition.

Cassie's weight, at 17 pounds, was well below normal and less than five percent of the population for her age, and her height, at about 2.5 feet, was between twenty-five to fifty percent of the normal height for her age.  Despite being 15 months old, Cassie was closer in size to an average nine-month-old.  At the time of Cassie's death, her younger brother, Darrian, had been admitted to the hospital with complications due to severe malnutrition.  The cause of Cassie's death was consistent with fatal neglect.  Cassie did not bleed to death from a transected liver; she was starved and weakened, succumbing to a massive, fatal infection.

There was no evidence Cassie was tortured.  The medical evidence does not support a finding that Cassie was hung by a ligature, nor that she received a blow to her liver while she was alive.  Many of Cassie's other injuries, such as the abrasions to her mouth and at least some of her burns, did not constitute torture because they appeared to have been sustained post-mortem.  Some injuries likely existed for weeks before January 19 and were more consistent with neglect, such as the gangrenous ulcer on Cassie's scalp.  Malnutrition and dehydration was not adequately considered in the analysis of Cassie's cause of death and standard studies used to evaluate this condition were not performed.  Dr. Dollinger's extensive failures to follow established autopsy protocols undermined his opinions.  Further, autopsy protocols call for standard tests to help determine the time and cause of death, which were not performed.  Cassie's malnutrition made her susceptible to a fatal infection, which was the actual cause of her death.

Dr. Ophoven's opinions in this matter were based on medical information and forensic techniques which existed at the time of Cassie's autopsy in 1994.  Had Dr. Ophoven been called as a witness at Beames' trial, she would have testified consistent with her declaration.

### 3)  Standard of Review Under 28 U.S.C. § 2254(d)

Federal habeas relief may only be granted for a claim that has been adjudicated on the merits in state court if the petitioner shows the state court's decision was "contrary to" or "involved an unreasonable application of" clearly established United States Supreme Court law, or was based on an

1    "unreasonable determination of the facts."  28 U.S.C. § 2254(d)(1) and (d)(2); *Harrington v. Richter*,

2    562 U.S. ___, 131 S. Ct. 770, 785 (2011).

3          Under (d)(1), a state court decision is "contrary to" federal law if it failed to apply the correct

4    controlling Supreme Court authority or came to a different conclusion when presented with materially

5    indistinguishable facts.  It is an "unreasonable application" of Supreme Court law if the correct legal

6    standard was identified but it was applied to the facts in an objectively unreasonable manner.  *Bell v.*

7    *Cone*, 535 U.S. 685, 694 (2002).  A petitioner's challenge under (d)(2) requires the federal court to

8    determine that a state court's factual finding was not merely wrong, but was objectively unreasonable

9    in light of the evidence presented in the state court proceeding.  *Taylor v. Maddox*, 366 F.3d 992, 999

10   (9th Cir. 2004);  *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003);  *Miller-El v. Cockrell*, 537 U.S. 322, 340

11   (2003).

12         A petitioner bears the burden of showing the state court decision meets the requirements of

13   (d)(1) and (d)(2) on the basis of the record that was before the state court.  28 U.S.C. § 2254(d)(2);

14   *Miller-El, supra*;  *Cullen v. Pinholster*, 563 U.S. __, 131 S. Ct. 1388, 1398 (2011).  The standard of

15   § 2254(d) is difficult to meet and highly deferential, as it demands that state court decisions be given

16   the benefit of the doubt.  *Richter*, 131 S. Ct. at 786;  *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)

17   (per curiam).  The question for a federal court is not whether it believes the state court determination

18   was incorrect, but whether it was unreasonable – which is a substantially higher threshold.  *Schriro v.*

19   *Landrigan*, 550 U.S. 465, 473 (2007).

20         Making the "contrary to" or "unreasonable application" determination is impeded where the

21   state court gives no reasoned explanation for its decision.  In that case, a federal habeas court must

22   determine what arguments or theories supported, or could have supported, the state court's decision,

23   and then ask whether it is possible fairminded jurists could disagree that those arguments or theories

24   are inconsistent with the holdings of the United States Supreme Court.  *Richter*, 131 S. Ct. at 786.

25   "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable."

26   *Id.*, (*citing Lockyer*, 538 U.S. at 75).  The petitioner must show the state court's ruling was so lacking

27   in justification the error was "well understood and comprehended in existing law beyond any

28   possibility for fairminded disagreement."  *Id.,* at 786-87.

**4) Application of § 2254(d)**

    **a) The Parties' Arguments**

        **i) Beames' Brief**

Relying on *Nunes v. Mueller*, 350 F.3d 1045 (9th Cir. 2003), Beames contends that when a state court denies a claim for failing to state a prima facie case, the absence of a prima facie case is the determination that must reviewed for reasonableness under § 2254(d). Beames points out that where the California Supreme Court summarily denies habeas relief, the only "merits" determination that has been made is that the petitioner has failed to allege facts, which if true, would entitle him to relief. *In re Clark*, 5 Cal. 4th 750, 770 (1993); *Pinholster*, 131 S. Ct. 1388, 1402 n.12.

Beames observes that under *Pinholster,* this Court must look at what the state court did in light of what the state court knew. *Id.*, 131 S. Ct. at 1399. Beames argues that under (d)(1), no deference is due to a state court's unreasonable decision that a habeas claim fails to state a prima facie case for violation of a federal constitutional right. *Nunes, supra,* 350 F.3d 1045; *accord, Rivera v. Quarterman*, 505 F.3d 349, 357 (5th Cir. 2007) ("Faced only with the threshold question of whether to allow Rivera's claim to proceed, it was unreasonable on the record before the [state court] to reject Rivera's *Atkins* claim as failing to even establish a prima facie case").

Beames asserts state courts are required to review federal claims in accordance with federal law, and this includes the recognition that the existence of a prima facie case for violation of federal rights is a federal question. *Carter v. Texas*, 177 U.S. 442, 447 (1900) (holding the determination of "whether a right or privilege, claimed under the Constitution or laws of the United States was distinctly and sufficiently pleaded and brought to the notice of the state court, is itself a federal question"); *Panetti v. Quarterman*, 551 U.S. 930, 948 (2007) (finding an unreasonable application of federal law when state process for resolving claim was unreasonable); *(Terry) Williams v. Taylor*, 529 U.S. 362, 397 (2000) (finding an unreasonable application of federal law when state court imposed heightened standard for the constitutional violation at issue).

Beames argues that in the context of § 2254(d), "the critical question in determining prejudice [is] whether a fair-minded jurist could fail to acknowledge at least a reasonable probability of a different outcome." *Cannedy v. Adams*, 706 F.3d 1148, 1165 (9th Cir. 2013). Beames asserts when a

reviewing court is faced with a conflict in testimony between two witnesses, either of whom could be believed or disbelieved, a reasonable probability of a different outcome must be acknowledged. "*Strickland* asks whether it is reasonably likely the result would have been different.  This does not require a showing that counsel's actions more likely than not altered the outcome. . . ."  *Richter,* 131 S.Ct. at 792 (internal quotation marks and citation omitted).  In a 'he said, she said' case . . . it would have been objectively unreasonable not to acknowledge the possibility that both outcomes had a reasonable probability of occurring."  *Cannedy, supra,* 706 F.3d at 1165.

California law precludes a state court from making an adverse credibility determination without an evidentiary hearing.  *In re Serrano,* 10 Cal. 4th 447, 456 (1995).  The federal standard is the same.  *Earp v. Cullen*, 623 F.3d 1065, 1069 (9th Cir. 2010).  Beames argues that if the California Supreme Court discounted Dr. Ophoven's declaration as not credible, it violated this principle and it also made an unreasonable factual determination within the meaning of the AEDPA. Evidentiary findings made by a state court without holding a hearing and giving petitioner an opportunity to present evidence, result in a "unreasonable determination of the facts" within the meaning of § 2254(d)(2).  *Taylor, supra,* 366 F.3d at 1001.

Beames contends the California Supreme Court unreasonably failed to apply its own previously announced binding standards by summarily denying his claim.  Beames concludes that deference to the state court decision is not warranted since the California Supreme Court unreasonably denied him the opportunity to prove the allegations in Claim 11, despite the fact that his state petition and exhibits amply met both federal and state law standards for stating a prima facie case.

### ii)  The Warden's Response

The Warden asserts the question under 28 U.S.C. § 2254(d) is not whether the merits denial of this claim by the California Supreme Court was correct, but whether it was unreasonable in light of clearly established United States Supreme Court law.  The Warden disagrees with Beames that in the case of a state summary denial the reviewing court looks to whether the determination of no prima facie case was reasonable, and asserts Beames' view is not supported by the language in § 2254 or by United States Supreme Court precedent.  The Warden contends in the case of a summary denial, as in the instant case, it is impossible for a federal court to determine the precise method of analysis

employed by a state court, or to determine whether the method was reasonable or not.  Instead, the Warden contends a federal court must ask what arguments or theories supported, or could have supported, the state court's decision and then ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior Supreme Court decision.  *Richter*, 131 S. Ct. at 786; *Pinholster*, 131 S. Ct. at 1402.

The Warden argues the various United States Supreme Court cases Beames relies on, which independently reviewed a state court's summary denial of a federal constitutional claim, all pre-date the AEDPA.  The Warden asserts Beames' contention, that a federal court must review the state court's decision-making process to see if its prima facie case determination was reasonable, is fundamentally at odds with the type of analysis required by the AEDPA as conducted in *Richter*, 131 S. Ct. at 786, and *Pinholster*, 131 S. Ct. at 1402.

The Warden also argues Beames' view is at odds with the United States Supreme Court's decision in *Swarthout v. Cooke*, 562 U.S. __, 131 S. Ct. 859, 863 (2011), where federal habeas relief was precluded under the AEDPA.  In that case, two inmates, Cooke and Clay, sought federal habeas relief after their state habeas petitions challenging the denial of their respective parole requests were rejected.  The Ninth Circuit granted both inmates relief.  Regarding Cooke, the Ninth Circuit held that California's parole statute created a constitutionally-protected liberty interest, and that California's "some evidence" requirement was a component of that liberty interest.  *Id.*, at 860.  The Ninth Circuit concluded the state court had made an unreasonable determination of the facts in light of the evidence.  *Id.*, at 860-861.  In Clay's case, the Ninth Circuit concluded the Governor's decision to deny parole was an unreasonable application of California's some evidence rule and was an unreasonable determination of the facts in light of the evidence presented.  *Id.*, at 861.  The United Supreme Court reversed both decisions, determining, among other things, that California's misapplication of its own parole standard was not a justification for granting federal habeas relief.  *Cooke*, 131 S. Ct. at 861-63.  In so concluding, the Court held that whether California's "some evidence" rule of judicial review was correctly applied is not a federal concern.  *Id.*, at 863.  Likewise, the Warden argues in this case it is of no federal concern whether California's prima facie standard for state habeas proceedings was

1    correctly applied, but only whether the state court's ultimate merits rejection was unreasonable in light

2    of clearly established United States Supreme Court law.

3         The Warden contends the state court's summary denial of this claim without a hearing was not

4    an unreasonable factual finding under § 2254(d)(2).  The Warden asserts the state court could have

5    reasonably rejected Beames' ineffectiveness claim even after accepting Dr. Ophoven's declaration at

6    face value, as an evidentiary hearing is not required where, as here, the record on appeal contradicts

7    Beames' factual allegations.  The Warden concludes, irrespective of a state court's interpretation and

8    application of its own prima facie state habeas standard, a claim denied on the merits by a state court

9    must be denied federal habeas relief unless the state court adjudication was "contrary to" or an

10   "unreasonable application" of clearly established Supreme Court law, or an "unreasonable

11   determination of the facts" in light of the evidence presented in the State court proceeding.

12        **iii) Beames' Reply**

13        Beames acknowledges that it was the dissent in *Pinholster* which noted that under § 2254(d),

14   the question arising from a summary denial of a habeas claim under California law is whether the state

15   court reasonably found the lack of a prima face case.  *Pinholster,* 131 S. Ct. at 1426 (Sotomayor, J.,

16   dissenting).  But Beames contends the *Pinholster* majority did not disagree, but instead summarized

17   the California standards, *id.*, at 1402, n.12, and stated that under § 2254(d), the federal courts must

18   look at what the state court did in light of what the state court knew.  *Id.*, at 1399.  Beames rejects the

19   Warden's contention that evaluating the reasonableness of the state court's application of its own

20   standards in adjudicating Beames' federal habeas claims would violate *Estelle v. McGuire, supra,* 502

21   U.S. 62 and *Bradshaw v. Richey, supra,* 546 U.S. 74.  In *McGuire,* the Supreme Court found that the

22   admission of evidence in violation of state law could not provide a substantive ground for federal

23   habeas relief because "a federal court is limited to deciding whether a conviction violated the

24   Constitution, laws, or treaties of the United States."  502 U.S. at 67-68.  Beames argues that in contrast

25   to *Estelle,* he is not seeking relief for violations of state law, but asserting that under § 2254(d),

26   California cannot claim deference for an unreasonable adjudication of his federal rights.  Beames

27   assets a portion of the analysis under § 2254(d) of the state court's reasonableness includes whether

28   the state court provided an opportunity to develop and present evidence in support of federal claims.

Beames argues the Warden has failed to rebut his prima facie showing that Rothbaum rendered deficient performance which prejudiced his case.  Beames contends that if Rothbaum had undertaken the basic work of investigating the prosecution's forensic case, he would have discovered the prosecution expert testimony was grossly flawed, in that Cassie died from neglect not torture, and in that the injuries Dr. Dollinger insisted were the cause of death were caused post-mortem.  This information would have provided Beames with a viable defense, in place of an implausible, belated and self-serving story of the fallen tool cart that Rothbaum himself found unconvincing and did not otherwise support.  Rothbaum's total failure to subject the prosecution's case to meaningful adversarial testing satisfies the first prong of *Strickland v. Washington*, 466 U.S. 668 (1984), establishing deficient performance.  Beames alleges there is a reasonable probability that, had Rothbaum investigated and presented available evidence impeaching the prosecution's experts, there would have been a more favorable outcome.  Beames contends the state court's denial of this claim for failure to satisfy the pleading requirements for deficient performance is unreasonable under § 2254(d).

### b) Analysis of 2254(d) Review

The California Supreme Court, in issuing a summary denial, is assumed to have applied the correct law.  *Visciotti, supra,* 537 U.S. at 24 (holding that state courts know and follow the law).  Therefore, the state court's summary denial of Claim 11 is not "contrary to" clearly established United States Supreme Court law, as it is assumed to have applied the correct Supreme Court precedent.  Nonetheless, a summary denial may involve an "unreasonable application" of clearly established Supreme Court law, that is, the correct legal standard was identified but was applied to the facts in an objectively unreasonable manner, or it may involve an "unreasonable determination of the facts," where the state court's factual finding was objectively unreasonable in light of the evidence presented in the state court proceeding.

California's initial standard for pleading adequate grounds for habeas relief is satisfied where the habeas corpus petition (1) alleges an illegal imprisonment, (2) states fully and with particularity the facts on which relief is sought, and (3) includes copies of reasonably available documentary evidence supporting the claim, such as transcripts, affidavits or declarations.  *People v. Duvall*, 9 Cal. 4th 464, 474 (1995).  Under this authority, the state reviewing court presumes the regularity of the trial

proceedings which resulted in a final judgment, the burden is on the petitioner to establish grounds for his release, and conclusory allegations without any explanation of the basis for the allegations do not warrant relief, let alone provide justification for an evidentiary hearing.  *Id.*

The state court evaluates a petition for habeas corpus by assuming the factual allegations are true and asking whether the petitioner would be entitled to relief.  *Duvall, supra,* 9 Cal. 4th at 474-475. If the petition does not state a prima facie case for relief, it is summarily denied.  *Id.*, at 475.  If, however, the court finds the factual allegations, taken as true, establish a prima facie case for relief, the court will issue an Order to Show Cause ("OSC") why relief should not be granted.  *Id.*

Both parties misapprehend the import of *Nunes, supra,* 350 F.3d 1045, to this case.  Beames asserts the analysis of California's prima facie standard by the Ninth Circuit in *Nunes* should equally apply to his case, but *Nunes* is readily distinguishable from Beames' case.  In *Nunes,* the state court made explicit factual findings and credibility determinations there, while in Beames' case his state habeas petition was denied without explanation.  This Court also cannot accept the Warden's view of how to evaluate the state court's denial of a prima facie case.  Under his reasoning, there would be no end to the speculation federal courts would undertake to uphold unsupported and even contradictory state summary denials.  Moreover, the Supreme Court has clearly set forth the standard to be applied, directing that "§ 2254(d) applies even where there has been a summary denial."  *Pinholster*, 131 S. Ct. at 1402, citing *Richter*, 131 S. Ct. at 786.  Accordingly, this Court will accord AEDPA deference to the state court's decision rejecting Beames' claims on the merits.

In evaluating Beames' claims, this Court examines whether the California Supreme Court's decision to deny his claims without the issuance of an OSC or further factual development constituted an objectively unreasonable application of clearly established federal law or an unreasonable determination of the facts.  This Court agrees with Beames that the determination of reasonableness under § 2254(d) necessarily requires the federal court to look at the decision the state actually made. In this case, that decision was denying an OSC.  Because this Court is aware of the decision made by the California Supreme Court and what information was before the state court, that will be the starting point for this Court's analysis.

Beames' trial counsel had an obligation to undertake a "thorough investigation of the law and facts relevant to plausible options" for a defense. *Strickland*, 466 U.S. at 690.  The allegations of Beames' state habeas petition, accepted as true, are sufficient to establish that Rothbaum provided deficient performance in failing to investigate any possible defense.  Although there was some evidence presented which corroborated or was consistent with Beames' testimony, his account of the fallen tool cart was implausible at best and in light of his prior record, it was unlikely the jury would believe him.  Accepting Dr. Ophoven's definitive assertion that Cassie's death was caused by neglect and not by torture as true, the California Supreme Court's summary rejection of this claim compels the conclusion that it found Dr. Ophoven's opinion irrelevant.  This conclusion is objectively unreasonable.  In light of the questionable defense Rothbaum offered when a much stronger defense was available, the California Supreme Court's conclusion that Beames did not state a prima facie case of ineffective assistance of counsel cannot be reasonable.  Since the state court's summary denial of this claim was objectively unreasonable, 28 U.S.C. § 2254(d) poses no barrier to relief.  It is not possible fairminded jurists would agree that Rothbaum's representation – the  presentation of Beames' account that Cassie was killed by a falling tool cart, in the face of the prosecution's evidence asserting she was killed by a massive blow which tore her liver it in two and caused her to internally bled to death, instead of presenting expert testimony that Cassie was neglected to the point of malnutrition and succumbed to a systemic infection – was consistent with the minimum requirements of *Strickland*. *Richter, supra,* 131 S. Ct. at 786.

**Merits Review**

c)  **The Parties' Arguments**

i)  **Beames' Brief**

Citing *Duvall, supra*, 9 Cal. 4th at 474, and *People v. Romero*, 8 Cal. 4th 728, 737 (1994), Beames asserts the state court's summary rejection of this claim constitutes a holding that, even assuming all of his allegations are true and crediting all the statements of his declarants, Rothbaum's failure to investigate and challenge the accuracy and reliability of the state's forensic evidence was within the range of reasonable performance.  Beames argues that such a holding cannot reasonably be squared with *Strickland*.  Beames asserts that any presumption of a strategic basis for Rothbaum's

failure to contest the cause of death in this case is overcome by the specific allegations that Rothbaum made no investigations and conducted no research on which such a strategic decision could be based. *Id.,* 466 U.S. at 690-91 (entitlement to deference requires reasonable investigations and research as the basis for a strategic decision).  Beames observes Rothbaum's own declaration admits he was distracted by personal problems and overwhelmed by the facts of the case, and did not even consider whether Dr. Dollinger's autopsy and opinion might be vulnerable to challenge.  Beames asserts Rothbaum's admissions, along with, along with the declarations of several percipient witnesses to Rothbaum's handling of the case and his impaired functioning at the time of Beames' trial, supports the allegations of ineffective assistance of counsel.  Beames contends these declarations, which the state court was required to accept as true, overcome any presumption that Rothbaum's decision making was strategic and based on reasonable investigation.

Beames asserts it was absolutely necessary for Rothbaum to consult his own expert concerning the technical, complex pediatric forensic pathology issues in the case because such issues were the crux of the guilt phase, and without the state's experts' testimony, there was only a slight case against him.  Beames observes Rothbaum conceded as much at trial when he argued to the jury that "much of what [the prosecutor] Mr. Gallian is basing his case on is expert evidence . . ."  Vol. 12, RT:1325. Beames alleges Rothbaum did nothing to evaluate the strength of the state's case, did nothing to prepare for cross-examination, and did nothing to present an affirmative defense.  Beames argues had a competent expert testified that Cassie died from neglect and since the state's experts' methodology was incompetent, their conclusions were suspect, and had Rothbaum properly cross-examined the state's experts, there was a reasonable possibility the result would have been different since a reasonable doubt could have been raised concerning many elements of first degree torture murder charge and the torture murder special circumstance.  Beames contends that besides the state's experts, there was little or no evidence to establish any of the elements of the case, but without a defense expert to offer an alternate explanation or to assist Rothbaum in cross-examination, the jury was almost certain to believe the state's experts.

Beames asserts Rothbaum knew or should have known that Beames had told witnesses and police that he performed CPR "for hours" on Cassie, and that Beames was under the influence of

1   methamphetamine at the time.  Trial testimonies of Tammy Beames, Vol. 8, RT:819; Ricky Hager,

2   Vol. 7, RT:637-638; Crystal Williams, Vol. 7, RT:692; and Dr. Eleanor Zorn, Vol. 11, RT:1087-1094.

3   Beames contends methamphetamine's agitating physical effects and mania-inducing mental effects are

4   well known to criminal defense attorneys.  Rothbaum also knew or should have known that Beames

5   reported placing Cassie's body on or near the heating grate as that information was in Dr. Couture's

6   interview notes.  Federal Petition, Exhibit 7.  Had Rothbaum consulted an expert or a medical text on

7   protocols for suspected child abuse autopsies, he would have known that potential postmortem injuries

8   related to resuscitation attempts should be considered and ruled out, especially in the case of injuries

9   to the ribs and/or liver.  Even without research into autopsy protocols or knowledge of

10  methamphetamine's effects, common sense suggests that chest compressions might have something to

11  do with broken ribs and internal organ damage, especially when those compressions may have been

12  performed for an extended period of time.

13          Beames asserts that even though the core of the prosecution's case was the testimonies of

14  experts, Rothbaum did nothing to evaluate the strength of the state's case, to prepare for cross-

15  examination of the state's experts, or to present a defense.  Dr. Ophoven opines the evidence supports

16  a finding that Cassie was severely malnourished and thus vulnerable to massive infection, that she had

17  already been dead for some time when autopsied as her body was already beginning to decompose,

18  and that she lacked hemorrhage in the adjacent tissue to her deeply transected liver, all of which is

19  inconsistent with Dr. Dollinger's conclusion as to cause of death.  Dr. Dollinger misinterpreted the

20  slides he did make of the liver and head injuries, as the slide of the liver clearly indicates a post-

21  mortem wound and the slide of the head injury clearly indicates a wound much older than Dr.

22  Dollinger concluded.  Dr. Ophoven opines a competent pediatric forensic pathologist would have

23  testified the medical evidence does not support that Cassie received a blow to the liver while she was

24  alive, but that the state of Cassie's liver and surrounding tissues, together with her broken ribs, are

25  consistent with post-mortem compression of the torso, specifically with prolonged, untrained and

26  frantic CPR.

27          Dr. Ophoven opines that most of Cassie's other injuries were sustained post-mortem, either

28  from decomposition, mummification, or insect activity, and that Dr. Dollinger failed to take tissue

samples to support his contrary opinion about the cause of these injuries.  Dr. Ophoven also contends Dr. Dollinger totally mischaracterized the nature and timing of the injury to Cassie's scalp, calling it a laceration, when it was in fact a large, gangrenous ulcer that had been present for a significant period of time, which could have been the source of pus in her blood vessels and of the pneumonia.  Dr. Ophoven asserts an experienced forensic pathology expert would have testified the evidence did not support the conclusion Cassie was hung by a ligature, as well as revealed Dr. Dollinger's sub-standard autopsy methodology, which included the failure to perform standard studies to evaluate malnutrition and dehydration, and the failure to take tissue and bodily fluid samples which could have supported the determination of the age of injuries and the time of death.

Beames argues that the indisputable centrality of the autopsy and opinion of the cause of death distinguish his *Strickland* claim from the claim rejected in *Richter, supra,* 131 S. Ct. 770.  The dispositive evidentiary issue in *Richter* was a credibility contest between the defendant and the surviving victim about the circumstances of the exchange of gunfire in which a second victim was killed.  Joshua Richter alleged that his lawyer performed deficiently by failing to retain an expert to test whether a pool of blood at the crime scene was consistent with the his version of events.  The prosecution did not conduct its own testing of the blood prior to trial.  The Supreme Court held the state court's rejection of the claim was not unreasonable, because "[i]t was at least arguable that a reasonable attorney could decide to forgo inquiry" into the forensic evidence at issue.  *Richter*, 131 S. Ct. at 788.  That was so because (1) the blood was a side issue, "distractive from more important duties," and (2) the results of blood testing might just have easily damaged the defense case.  *Richter*, 131 S. Ct. at 789-90 (internal quotation omitted).  The Supreme Court noted "the possibility that [defense] expert testimony could shift attention to esoteric matters of forensic science, distract the jury from whether [the surviving victim] was telling the truth, or transform the case into a battle of the experts."  *Id.,* at 790.

Beames asserts his case is entirely unlike *Richter*.  The prosecution case against Beames was predicated on forensic science, not on percipient witness testimony as in *Richter*.  Pediatric forensic pathology was not a distracting sideshow that could reasonably be avoided, it was the very crux of the case.  *See Elmore v. Ozmint*, 661 F.3d 783, 863 (4th Cir. 2011) ("Here, in stark contrast to *Richter*,

forensic evidence was always and obviously vital to the State's case . . .").  Accordingly, Beames

argues Rothbaum could not possibly have made a reasonable judgment to focus on "more important

duties," as was the case in *Richter*, 131 S. Ct. at 789.  Given the nature of the present case, Beames

asserts there could be no more important duty than testing the accuracy of Dr. Dollinger's conclusions

about what killed Cassie and whether her most horrific injuries -- the severed liver, broken ribs and

burns -- were sustained pre-mortem or post-mortem.  A decision to concede these issues cannot

reasonably have been made without investigation into Dr. Dollinger's methods and conclusions.  The

*Richter* Court recognized that "[c]riminal cases will arise where the only reasonable and available

defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial,

at trial, or both."  *Richter*, 131 S. Ct. at 788.  Beames contends that this is such a case.

In presenting his argument, Beames emphasizes that Dr. Ophoven's opinion was based on

medical information and forensic techniques which existed at the time of Cassie's autopsy.  Had

Rothbaum engaged a qualified forensic pediatric pathologist to review Dr. Dollinger's work, he or she

would have reached the same conclusion as did Dr. Ophoven regarding the cause of Cassie's injuries

and death.

Beames contends the state court was presented with documentary evidence about the

incompetence of the prosecution's experts, Drs. Dollinger, Stephens, and Bennett, as well as

information that could and should have been used to impeach them.  Beames presented evidence in the

state court and in this Court that Dr. Dollinger's errors in this case were similar to serious errors he

made in five other infant death cases in 1995, for which he was disciplined by the California Medical

Board.  In four of those cases, he failed to perform any microscopic examination of the infants' tissues,

and in all five cases, he misdiagnosed the cause of death, and was found grossly negligent in the five

cases.  Exhibit 2 (*In the Matter of the Accusation Against Armand L. Dollinger, M.D.*, Medical Board

of California File).

Beames asserts the state court knew Rothbaum's cross-examination of Dr. Dollinger was brief,

that Rothbaum only questioned him about minor discrepancies, complimented him on the

thoroughness of his autopsy report, and reviewed his opinion of the timing of the various injuries.

Vol. 9, RT:945-958.  Even in the absence of retaining his own expert, had Rothbaum consulted

standardized forensic pathology texts readily available at the time of trial, Beames contends Rothbaum would have discovered numerous steps critical to a suspected child abuse autopsy that were not performed in this case.  These include:  collection of organ and blood samples for bacteriological studies to check for infection; collection of vitreous humor to check for dehydration; collection of urine for metabolic studies; microscopic examination, including use of special stains, of all organs, skin and subcutaneous tissues; recording of post-mortem changes and the extent of putrefaction.  Dr. Dollinger was not cross-examined about these omissions, and was not questioned about whether Cassie's injuries were consistent with resuscitation attempts, even though autopsies in suspected child abuse cases should attempt to distinguish between injuries caused by resuscitation attempts and caused by assault.  Rothbaum also failed to use the medical records of Darrian, specifically his history of malnutrition, infection, and wasting, in cross-examining Dr. Dollinger about whether Darrian's condition was consistent with the theory that he and Cassie were victims of chronic neglect, and that the home environment presented a threat of fatal malnutrition and infection.  Beames maintains that cross-examination on these matters would have revealed many of the errors identified by Dr. Ophoven.

Beames stresses that the California Supreme Court was informed Rothbaum rejected any and all jury instructions on lesser included degrees of homicide, choosing to bet Beames' life on an all-or-nothing choice between capital murder and outright acquittal.  The record reflects Rothbaum gave an unexplained affirmation to the trial judge when asked whether this was a strategic decision.  Vol. 12, RT:1227.  Beames specifically alleged in his state pleadings that this decision was neither strategic nor reasonable, given the weakness of the defense that was presented and Rothbaum's failure to subject the state's forensic evidence to adversarial testing.  Competent counsel would have been armed with the evidence described above, and would have sought instructions on lesser offenses that would not subject Beames to the death penalty.

### (1) IAC relating to Prosecution Experts

Beames claims Rothbaum was ineffective for failing to: (1) adequately cross-examine Dr. Dollinger about his methodology regarding the autopsy, Cassie's overall health at time of death, and Cassie's under-developed size, to advance the theory Cassie died of starvation and a secondary

infection; (2) adequately cross-examine Dr. Dollinger about the timing of Cassie's injuries and about the time of death prior to autopsy; (3) adequately cross-examine Dr. Dollinger about the cause of Cassie's rib and liver injuries to advance the theory they were caused by frantic, untrained attempts at resuscitation and thus were caused post-mortem; (4) adequately cross-examine Dr. Dollinger about injuries to Cassie's mouth to advance the theory they were caused post-mortem by insects; and (5) investigate Dr. Dollinger's background and impeach him about alleged prior unprofessional conduct.[3]

Beames also contends Rothbaum was ineffective for failing to: (1) cross-examine Dr. Stephens with evidence of Beames' statement that he attempted to "warm her blood" to revive Cassie; and (2) impeach Dr. Bennett by inquiring into his recruitment and presenting evidence of his past history, including alleged mistakes and prior cases showing prosecution bias, and by inquiring into why the other experts did not agree the mark on Cassie's neck was due to strangulation.

### (2) Failure to Request Lesser Included Offense Instructions

Beames asserts Rothbaum was ineffective for requesting that no lesser included offense instructions be given on the homicide count, which Beames was entitled to as a matter of law, thus forcing the jury into an all-or-nothing decision. The California Supreme Court refused, on direct appeal, to grant relief on the related claim of trial court error, finding the error was invited by Rothbaum. *People v. Beames, supra*, 40 Cal. 4th at 926-928. Beames argues that in light of how weak Rothbaum's guilt phase defense was, it was not reasonable to decide to forego lesser included homicide instructions. Beames further argues the state's case was weak regarding his premeditation of the intent to inflict extreme pain on a living human for a sadistic purpose (regarding the first degree murder charge) and the intent to kill (for the special circumstance). Had Rothbaum asked for a lesser

---

[3] Dr. Dollinger was disciplined by the Medical Board of California in 2001 pursuant to an investigation into inaccurate causes of death in five infant autopsies which occurred from January through March 1995 (prior to Beames' trial in July, 1995). *See* Federal Petition, Exhibit 2. It is unclear when the investigation into the incorrect diagnoses was initiated, but the error in all five cases was the same, the failure to properly diagnose coarctation of the aorta (narrowing of the blood vessel caused by malformation of tissue that projects into the lumen or channel of the aorta), and all the infants were under six months of age at the time of death. The relevance of these dissimilar cases to the allegations of error in Cassie's autopsy is unclear, even had the incidents been available to be discovered prior to Beames' trial.

included offense instruction, Beames contends it is reasonably probable he would not have been convicted of either first degree murder or the special circumstance.

**ii) Warden's Response**

The Warden observes the primary defense theory at trial was based on Beames' story of what happened: that a tool cart fell on Cassie and her death was accidental.  The Warden argues that had Rothbaum investigated and presented the starvation theory now urged, it would have harmed Beames' credibility and the defense.  The Warden contends Beames' testimony was more consistent with Dr. Dollinger's testimony regarding Cassie's cause of death (massive hemorrhaging due to a transected liver) than with Dr. Ophoven's theory, as Dr. Ophoven's theory does not account for Beames' description of the pool of blood all around Cassie (which was corroborated by evidence of Cassie's blood on clothing, sheets, bedding and towels), nor is it consistent with all of Cassie's physical injuries which circumstantially point to a death caused by violence.  The Warden asserts Beames has failed to demonstrate that Rothbaum was ineffective for failing to adequately investigate and cross-examine the prosecution's experts.

The Warden contends that had all of Rothbaum's alleged failures of been pursued, they would have been inconsistent with Beames' version of the circumstances of Cassie's death as related at trial; that Rothbaum did obtain an admission from Dr. Dollinger that he could not give a precise time of death; that Beames admitted Cassie had injuries to her face prior to her death, making the theory of post-mortem injuries or decomposition incredible given the history of abuse suffered by Cassie and her other injuries; and that Beames fails to cite any known unprofessional conduct by Dr. Dollinger which counsel could have obtained prior to the conclusion of the trial, or that counsel should have known existed, so there was no reason for counsel to investigate his conduct.

The Warden disputes the value of the supposed evidence Beames asserts Rothbaum should have presented to impeach Doctors Stephens and Bennett.  The Warden contends the notes of Beames' statement differ from what Beames suggests, that the notes state he placed Cassie's body <u>by</u> the heater to warm her blood, and the notes also state Cassie crawled across a hot grate burring her hand and foot, which contradicts the argument that most or all of Cassie's burns were inflicted post mortem. The Warden asserts the other experts were not asked about the mark on Cassie's neck and there is no

evidence they disagreed with Dr. Bennett, and that only one account critical of Dr. Bennett's opinion was published at the time of Beames' trial.  The Warden contends the errors asserted in the article published before Beames' trial were not relevant to Dr. Bennett's testimony, and that Rothbaum was not ineffective for failing to present this evidence.

The Warden contends Beames agreed with Rothbaum to not seek lesser included instructions to the murder count, and the inclusion of such instructions would have been inconsistent with Beames' version of Cassie's death.  The Warden asserts that even if Rothbaum was deficient for failing to investigate and present expert pediatric forensic testimony, to cross-examine the state's experts, and to request lesser included instructions, the alleged omissions were not prejudicial.  The Warden contends Cassie's injuries demonstrate she was tortured and murdered, and the burns, which were inflicted within days of her death, suggest an intent to inflict extreme pain and suffering.  The expert opinion that Cassie was tortured was corroborated by the history of abuse she had suffered.  The Warden states it is not reasonably probable the jury would have accepted the starvation theory of Cassie's death in light of her horrific injuries and Beames' own version of the events.

The Warden concludes there is no evidence the California Supreme Court used the improper *Strickland* standard in adjudicating this claim.  Citing *Visciotti, supra*, 537 U.S. 19, he further asserts the state court used the correct test for prejudice despite the inclusion of the "fundamentally unfair" language Beames challenges.  In *Visciotti*, the United States Supreme Court held that occasional use of imprecise language must be given the benefit of the doubt as state courts are presumed to know and follow the law.  537 U.S. at 24.  The Warden argues Beames cannot show an entitlement to federal habeas relief given the totality of the evidence presented in state court.

### iii) Beames' Reply

Beames observes the Warden makes no attempt to rebut the allegations of Rothbaum's deficient performance and does not discuss any of the remarkable details of Rothbaum's actual performance, but instead argues that investigating and presenting evidence consistent with Dr. Ophoven's declaration to contradict the prosecution's forensic evidence would have been inconsistent and unbelievable in light of Beames' account of Cassie's death, and would have harmed rather than helped Beames.

24

1    Beames contends whether or not his version of the facts was true, competent counsel would

2 want to know whether the prosecution's expert witnesses had made mistakes that could be exploited

3 on cross-examination, and whether the experts had a history of incompetent and biased work.  As the

4 prosecutor noted during closing arguments, Dr. Dollinger's testimony was incredibly damaging to

5 Beames and much of his testimony could not be squared with Beames' testimony.  If Beames was to

6 have had any chance of success, he argues it was imperative that the prosecution's experts be

7 vigorously impeached, yet Rothbaum made no effort to do so.  Further, as Beames noted in his state

8 habeas petition, Rothbaum also failed to support his chosen defense.  Rothbaum simply called Beames

9 to the stand and permitted his implausible account to be eviscerated by the prosecutor during cross

10 examination and closing argument.

11    Beames does not contend Rothbaum should have impeached the prosecution's forensic

12 evidence in addition to calling Beames as a witness, but rather, had Rothbaum done a reasonable

13 investigation, Beames would not have testified at trial or been subjected to searing cross examination.

14 He maintains this Court should view Rothbaum's deficient performance in that context.  Beames

15 acknowledges it was perfectly apparent before he testified that he was unable to provide testimony

16 which could be squared with the prosecution's heavily flawed, but unchallenged, scientific testimony.

17 Beames' story was implausible at best and his record was such there was no likelihood the jury was

18 going to believe him.  Even though Rothbaum did not find Beames' story convincing, he made

19 Beames' unsupported testimony the cornerstone of the defense.

20    Beames asserts that despite failing to directly contest the sufficiency of Beames' allegations

21 about the cause of Cassie's death, the Warden makes a number of other arguments about the asserted

22 "implausibility" of Beames' state court allegations.  The Warden notes the alleged contradictions in

23 the state court record between Dr. Ophoven's declaration and testimony of various witnesses regarding

24 the presence of various non-fatal injuries, including burns on Cassie's toes and fingers and injuries

25 around Cassie's nose and mouth.  Beames asserts that to the extent such discrepancies arguably exist,

26 the place to resolve them is through an evidentiary hearing, and they do not provide a basis for

27 summarily rejecting the entirety of Beames' allegations or Dr. Ophoven's declaration.  More

28 importantly, Beames contends any alleged weaknesses in Dr. Ophoven's declaration are not an

appropriate basis for finding that Rothbaum's failure to provide expert testimony on this critical issue lacked prejudicial effect.  Beames notes that a prejudice analysis under *Strickland* should not independently evaluate conflicting expert opinions and reach a factual conclusion about the matter in dispute, but should ask only whether there is a reasonable probability that the expert testimony would have affected the outcome.  *Correll v. Ryan,* 539 F.3d 938, 952 n.6 (9th Cir. 2009).  The question is whether there is a reasonable probability that Dr. Ophoven's testimony would have raised a reasonable doubt in the mind of at least one juror as to Beames' guilt.  *See Duncan v. Ornoski*, 528 F.3d 1222, 1240-41, 1244 (9th Cir. 2008) (question for prejudice purposes is whether defense expert forensic testimony would likely have caused at least one juror to have a reasonable doubt).  If so, Beames argues that confidence in the verdict is undermined.  *Id.*

Beames emphasizes that Dr. Ophoven has identified very significant weaknesses in the testimony of the prosecution experts on the single most critical issue of Beames' trial, that is the cause of Cassie's death.  To the extent the Warden arguably has identified alleged problems with some of the conclusions Dr. Ophoven has drawn, Beames contends these problems should be fleshed out at an evidentiary hearing.  They do not provide a basis for discounting entirely the effect her testimony might have had at trial.  Dr. Ophoven found no evidence of intentional murder and no evidence of torture, but concluded that Cassie died as a result of catastrophic neglect.  A reasonable probability exists that the presentation of this more favorable evidence regarding Cassie's cause of death would have made a difference to the outcome of Beames' case.  Beames concludes there is a reasonable probability that, if Rothbaum had investigated and presented available evidence impeaching the prosecution's experts, he would have obtained a more favorable outcome at trial.  Beames argues habeas relief should be granted on Claim 11.

### d)  Analysis of Merits and Conclusion

To establish a claim of ineffective assistance of counsel, Beames is required to establish both that Rothbaum's actions fell below an objective standard of reasonableness and that the alleged errors resulted in prejudice.  *Strickland, supra*, 466 U.S. at 687-88.  To succeed on the first component, Beames must overcome a "strong presumption" that Rothbaum's performance fell within the "wide range of reasonable professional assistance," that his actions and omissions were part of sound trial

strategy, and that all significant decisions were the result of acceptable professional judgment. *Id.*, 466 U.S. at 689.  The issue is not what Rothbaum could have done, but whether the choices he made were reasonable.  *Id.*, at 690.  This review is "highly deferential," and there is no constitutional violation unless counsel made "errors so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id.*, at 689, 687.

The issue presented by Claim 11 is whether Rothbaum provided ineffective assistance by failing to investigate and present expert testimony to counter the prosecution's forensic evidence, and whether that alternate expert testimony likely would have resulted in a non-capital conviction.  The jury at Beames' trial was presented with evidence and expert opinion that Cassie had been abused in the months before her death, and concluding that she died because Beames hit her so hard her liver was torn in half and she internally bled to death.  If credible evidence had been presented to the jury that Cassie was neglected to the point of malnutrition, that she died from a massive infection which her weakened body was unable to fight off, and that Beames' efforts to revive her caused the tearing to her liver after her death, it is more than reasonably likely the jury would not have returned a verdict of premeditated torture murder.

Where, as here, the entire prosecution case is based on expert testimony, it was not a reasonable strategy for Rothbaum to have failed to consult an expert to adequately evaluate the prosecution's evidence, to prepare for cross-examination, to prepare for and present a defense, or to provide any counter to the prosecution experts' testimonies.  The Warden' argument that the theory by Beames' present expert is inconsistent with Beames' statements at trial ignores the fact that the defense presented at trial was hopelessly unbelievable and weak.  Competent counsel likely would not have presented Beames' account of the toppling tool cart to the jury.  Rather, competent counsel would have presented persuasive, forensically substantial evidence similar to Dr. Ophoven's opinion about Cassie's cause of death.  Accepting as true Dr. Ophoven's declaration stating that Cassie's cause of death was due to neglect, it is impossible to say that Beames would not be entitled to relief.  Beames has presented a colorable claim: that is, he has alleged disputed facts which if proved would entitle him to relief, regarding the ineffective assistance of trial counsel in failing to investigate and present evidence countering the prosecution's evidence regarding Cassie's cause of death.

**5)  Order Granting Factual Development and Evidentiary Hearing**

28 U.S.C. § 2254 governs whether Beames' allegations in Claim 11 "entitle him to relief," so the decision to grant an evidentiary hearing takes into account the limitations of (d)(1) and (d)(2), and the above determination that the California Supreme Court's summary denial of Claim 11 was an unreasonable determination of the facts.  *Landrigan*, 550 U.S. at 474.

The Court anticipates Beames will present evidence consistent with the proffered declaration of Dr. Ophoven, opining that Cassie's cause of death was due to neglect, malnutrition, and infection, and not as a result of torture.  The Court also anticipates the Warden may wish to present his own evidence on the issue of whether trial counsel was constitutionally ineffective.

The Court will consider evidence presented by way of stipulation, record expansion, and testimony to determine whether the allegations in Claim 11 are, in fact, established.  The parties are directed to meet and confer and thereafter file a joint statement within 60 days of the date of this order, setting forth their respective preparations for the hearing, including witnesses to be called, documentary evidence to be introduced, pre-hearing discovery to be conducted, several proposed dates for the evidentiary hearing, and a realistic, efficient time estimate.


IT IS SO ORDERED.


Dated: ___October 22, 2013___.

       ___/s/ Anthony W. Ishii___
       Anthony W. Ishii
       **United States District Judge**