# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN MICHAEL BEAMES, | Case No. 1:10-cv-01429-DAD-SAB |
| Petitioner, | DEATH PENALTY CASE |
| v. | FINDINGS AND RECOMMENDATIONS DENYING CLAIM 11 FOLLOWING LIMITED EVIDENTIARY HEARING |
| RON DAVIS, Warden of San Quentin State Prison, | |
| Respondent. | OBJECTIONS DUE WITHIN SIXTY DAYS |

Petitioner John Michael Beames (hereinafter "Petitioner") is a state prisoner, sentenced to death, proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. He is represented in this action by Harry Simon, Esq., and Matthew Scoble, Esq. of the Office of the Federal Defender.

Respondent Ron Davis (hereinafter "Respondent") is named as warden of San Quentin State Prison. He is represented in this action by Robert Gezi, Esq., and Kevin Quade, Esq. of the Office of the California Attorney General.

Before the Court for a decision is claim 11 which was taken under submission following a limited evidentiary hearing that took place before the undersigned on February 1-3, 2016.[1]

---

[1] The remaining claims 3, 4, 5, 7, 19, 20, 21, 22, 28, 29, 30, 31, 32, 33, 34, 35A-C, 36, 37, 38, 39, 40, 41, 43A-N, 44, 45, 46, 47 and 48 have not been briefed.

Claim 11 alleges that trial counsel, Charles Rothbaum (hereinafter "Rothbaum"), was ineffective by failing to challenge the accuracy of the state pathologist's conclusion that the fifteen month old victim, Cassie McMains (hereinafter "Cassie"), was killed by a blow to the abdomen.

After careful consideration of the parties' briefs and of the state court record as expanded in this proceeding including on evidentiary hearing, the undersigned makes the following findings and recommends that the federal habeas relief be denied as to Petitioner's claim that he received ineffective assistance of counsel as alleged in claim 11.

# I.

## BACKGROUND FACTS

This factual summary is taken from the California Supreme Court's summary of the facts in its March 22, 2007 opinion. See Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004) (limiting 28 U.S.C. § 2254(e)(1) "presumption of correctness" in cases of intrinsic challenge under 28 U.S.C. § 2254(d)(2)); (Doc. No. 70 at 28:2-5).

### A. Guilt Phase

Defendant lived with Angelita McMains and McMains's 15–month–old daughter, Cassie, and her infant son, Darrian. On January 19, 1994, Cassie bled to death due to a transection of her liver; that is, her liver had been hit so hard it was split nearly in two. The evidence at trial included medical testimony concerning the numerous physical injuries Cassie suffered in the weeks, days, hours, and minutes leading up to her death, and testimony from Cassie's natural father, defendant's siblings, McMains's father, and defendant himself.

**1. The Prosecution Case**
Cassie was born on October 3, 1992 to McMains and Ricky Hager. Hager and McMains broke up a few months after Cassie's birth, and Hager did not live with them. In April 1993, defendant moved into McMains's rented home. On or about June 14, 1993, Cassie suffered a broken leg. The location of the break and the degree of separation of the bones were unusual, indicating that a great deal of force created the fracture. When Dr. Joseph Gerardi examined Cassie on June 15, he noticed bruising around her injured leg bone, a large bruise under her chin, and multiple bruises on her upper arms. McMains asked a friend, Cindy Clem, to say that Cassie had been injured at Clem's house. McMains said she did not want defendant implicated in Cassie's injury, because he had taken the blame for a prior incident in which a child had been injured.

When interviewed about Cassie's leg injury by an emergency response investigator from child protective services, defendant claimed he had been out of the vicinity when the injury occurred and had returned on June 15, 1993. Based on the suspicious nature of the injury, the sheriff's office removed Cassie from McMains's home on August 2, 1993. For the next four months, Cassie lived with

McMains's parents and suffered no injuries.

On December 7, 1993, Cassie was released back to the home where McMains and defendant lived. Sometime after December 25, 1993, Hager's niece, Crystal Williams, noticed Cassie had a burn on her finger. In early January 1994, Hager saw Cassie with two "real bad black eyes." In explaining the black eyes, defendant told Hager that Cassie had fallen into a coffee table, but separately told Williams that Cassie had fallen from her crib or something. Also in January 1994, defendant's brother, John Phillip Beames, saw defendant squirt Cassie with liquid from a baby bottle and shake her roughly when she cried. Additionally, defendant's sister, Tammy Beames (Tammy), observed over a period of a few days that Cassie appeared to be afraid of defendant. Because a number of the witnesses share the Beames surname, we refer to defendant's sister as Tammy.

From January 10 to January 14, 1994, McMains's infant son, Darrian, was hospitalized for a cough, difficulty in breathing, and a lack of weight gain. During this time, McMains stayed 24 hours a day with Darrian at the hospital.

On January 19, 1994, at about 9 or 10 a.m., Hager and Williams went to visit McMains and defendant at their house. Hager gave McMains some methamphetamine to take to defendant, who was in a back room of the house. Defendant stayed in the back room, and he yelled at McMains to get Hager and Williams out of the house. Hager asked where Cassie was, and McMains replied she was with defendant. Hager left the house without seeing Cassie.

Sometime before 1 p.m. on January 19, 1994, Royce Hunneman, a neighbor, heard McMains and defendant arguing. At around 1 or 1:30 p.m. that same day, McMains called defendant's sister, Tammy, and told her something was wrong. The two met on the road in their cars, and Tammy followed McMains back to McMains's home. When they got there, a county car was parked in front. McMains did not stop her car, and Tammy followed McMains past the home.

When McMains and Tammy returned to the house a little while later, defendant told Tammy that Cassie was dead. Defendant explained Cassie had gotten sick in her bed at around 4:00 o'clock that morning. He sat Cassie down on the floor while he went to the bathroom to get clean sheets. When he came back, Cassie had fallen over and was lying in a pool of blood. Defendant said he had performed CPR on Cassie for five hours, but she was dead. When Tammy asked about taking Cassie to the hospital, defendant said to give him a little bit of time. Similarly, when Tammy asked about contacting law enforcement, both defendant and McMains said, "No, give us a little bit of time."

Defendant told Tammy to take McMains and Darrian away and to go some place where he could call them later. He said he would describe everything that had happened on a tape recording, which Tammy and McMains could later give to the police. Defendant refused to give Tammy a gun he had, saying he wasn't going to go alive.

Tammy and McMains went back to the house later that night, at a time when defendant was gone. McMains retrieved a tape recorder from the house, and she and Tammy listened to the recording. After McMains tried to erase a portion of the tape that involved a drug deal, they took the tape recorder to the hospital. There they gave the recorder to Deputy Sheriff Michael Strawser. The tape recording included the following statements by defendant: "Angel, I love you very much. Please just try to believe me it was the truth, it was an accident.... I

know this is going to kill you, baby. You know I love this little baby better than anything in the world." Defendant sometimes referred to Angelita McMains as "Angel." Deputy Sheriff Strawser listened to the tape, then went with McMains to her house. Once inside, Strawser saw what appeared to be blood in the bathroom and in the baby's crib.

Early the next morning, on January 20, 1994, Sergeant John Zapalac of the Tulare County Sheriff's Office went to look for defendant at the residence of David Joiner. When Zapalac arrived at the Joiner residence, defendant said he knew Zapalac needed to speak with him because of Cassie. When Zapalac asked where Cassie was, defendant said she was inside the car and handed Zapalac the car keys. Zapalac found Cassie's body inside of a jacket in the back of the car. Later, at the Sheriff's Department, defendant spontaneously stated, "I was the only one with her. I'm responsible. Put me in jail. Put a .45 to my head."

Dr. Armond Dollinger performed an autopsy on Cassie's body. He found nothing in Cassie's stomach, indicating she had not been fed for 24 hours before her death. Dr. Dollinger determined the cause of death was massive hemorrhaging due to a transected liver, and opined that Cassie's back was against a hard surface when she sustained that injury. Other physical injuries Cassie sustained within minutes or at most 24 hours of death included multiple bruises on the face and abrasions on the back, fractures of the ribs, abrasions to the neck and shoulder on the left side, and a bruise and abrasion on the right side of the neck. It was Dr. Thomas Bennett's opinion, based on the character of the neck abrasions, that Cassie had been hung by the neck with a soft ligature for a period of time.

Dr. Dollinger observed numerous other physical injuries, some of which were days or weeks old, including dilation of the anal canal and scarring of the surrounding muscle, five broken ribs on the front right side, four broken ribs on the back left side, a bruise on the right front of the scalp, a large laceration of the top left side of the head, lacerations on the inside lower lip, contusions and abrasions around the nose and mouth, contusions, abrasions, and scratches on the back of the head, contusions, bruises, and abrasions on the back, and bruising on the tip of the tongue, the right thumb, and on the back of the knee.

Dr. Dollinger also saw various sets of burns to Cassie's body. There were burns to the buttocks in a crosshatched linear grid pattern, apparently caused by a floor furnace and occurring when Cassie wore no clothing and her legs were forced wide apart. There also were burns in a grid-like pattern on the back of the right hand, third degree burns on the index and ring finger of the right hand, and burns on the back and ring finger of the left hand. Finally, burns were on the feet and third degree burns were on two of the toes.

## 2. The Defense Case

The defense contended Cassie suffered from osteogenesis imperfecta, a brittle bone disease that caused her to fracture with less trauma than an individual with normal bones. According to the defense, although abuse had occurred in the home, all of Cassie's burns and her fatal liver injury were accidental. The defense also showed that McMains hated and neglected Cassie, while defendant took care of Cassie and fed, changed, and clothed her.

Defendant testified in his own defense. He acknowledged convictions for armed robbery in 1973, receiving stolen property in 1975, and commercial burglary in 1983. He also admitted he used and sold methamphetamine while he was living with McMains, and claimed his and McMains's use of the substance affected their

4

ability to be patient with others.

Defendant testified he was present in the home when Cassie sustained burns from the heating grate on the floor. McMains was not at home, and defendant was in bed when he heard Cassie screaming. She apparently had fallen on the hot grate and was "flopping around." Defendant grabbed Cassie by the shirt and pulled her off the grate as fast as he could. By then, McMains had returned home, and defendant expressed his upset at her for "leaving the baby like that." He placed Cassie in some cool water in the bathtub, and told McMains to go buy some cream and salve for the burns. Defendant claimed this was the only time Cassie got burned by the grate.

Defendant also was present when Cassie died on January 19, 2004. At approximately 4:00 o'clock that morning, defendant heard Cassie crying. She had vomited in her crib, and defendant needed to remove the soiled sheets. He placed Cassie on the floor next to a little cart, so she could hold onto the cart while he changed the sheets. Defendant then went to get a wash rag and some clean sheets and clothes for her. While in the bathroom, he heard the words, "Oh, fuck. Oh, fuck," and some clanging noise. Defendant rushed back to Cassie's room, where he saw McMains and a pool of blood all around Cassie. The cart, which had been laden with tools and propped up with a little pressure washer to keep it upright, had fallen on top of Cassie. Defendant started administering CPR, and McMains went to get a stethoscope. He listened for a heartbeat, but did not hear one.

During the days leading up to Cassie's death, defendant had been using drugs and staying up. He had been up for several days and was not thinking rationally after Cassie died. Although he knew somebody would be in trouble for the death, he did not call the police or an ambulance because there was no telephone in the residence. Defendant left a tape recording because he felt responsible for Cassie's death, having initially sat Cassie on the floor. He also did not want McMains, who he thought was pregnant again, or Darrian, to get into trouble. Defendant claimed he told his sister, Tammy, on the day Cassie died, that a cart of tools had fallen on Cassie. After the incident, defendant told David Joiner he was going to hell for what had happened.

Defendant denied torturing Cassie or breaking her leg. He claimed she fell on the heating grate only once, and he did not recall her having two black eyes prior to her death.

In 1983, defendant pled no contest to a charge of breaking Ricardo McVey's leg, even though he was not absolutely sure he broke it. He admitted, however, that he slapped McVey up against a garage door.

## B. Penalty Phase

### 1. The Prosecution Case
The prosecution relied on the circumstances of the instant crime and evidence of defendant's prior felony convictions. The prosecution also introduced the following evidence of prior violent criminal activity.

On March 25, 1973, defendant robbed the clerk of a Sacramento convenience store at gunpoint.

In 1974, defendant was married to Catherine Scrima. They were married for

5

approximately three years and had a daughter. Defendant was verbally and physically abusive to Scrima. On their wedding anniversary, he had "a fit" about going to Scrima's company party and placed his hands on Scrima's throat and choked her. On a separate occasion, on Christmas day, Scrima was wearing defendant's boots and refused defendant's command to take them off. He hit her in the face twice, causing a fat lip and a black eye. Although defendant threatened he could have Scrima "eliminated" for $10 if she ever left him and Scrima took this threat seriously, she left defendant after the Christmas incident. Scrima remains afraid of defendant.

Ronald Gadberry was defendant's best friend. Gadberry's parents last saw him alive on October 30, 1984. At that time, Gadberry said he was going to defendant's place of business to collect some money that defendant owed him. Defendant owed Gadberry $1,000. In early December 1984, Gadberry's father went looking for Gadberry at defendant's shop. There he saw Gadberry's car parked in front, but defendant claimed he had not seen Gadberry in months. In January 1985, law enforcement officers found Gadberry's body inside the trunk of his car, which was parked in Rodeo, California. He had been shot in the back of the head, and the bullet had lodged in his brain. Defendant told an investigator during a January 1985 interview that he had not seen Gadberry for approximately five or six months. Two witnesses, however, testified that defendant implicated himself in the killing, and two others testified that defendant claimed he used a firearm to shoot a person in self-defense. One latent print lifted from the inside passenger window of Gadberry's car was identified as having been made by defendant's left middle finger, but the age of the print could not be determined.

On one occasion, defendant appeared uninvited at the home of Kristi McVey, the mother of his son. Although McVey and Cheryll Cuslidge pushed a couch up against the front door to block defendant's entrance, he got into the residence through a window. Once inside, he held a knife and pointed it at McVey. Cuslidge did not see the knife, but she did see defendant grab McVey around the neck. The telephone lines had been cut, so Cuslidge had to leave the house to call the police. Defendant had been using methamphetamine around this time period.

During 1982 or 1983, Douglas Shupe stored his paving equipment in defendant's yard, and in exchange paid part of the yard costs. Shupe became concerned that defendant took in a lot of vehicles containing large quantities of methamphetamine, and Shupe attempted to terminate their relationship when defendant told him he was doing it for the "Hell's Angels." When Shupe later tried to get his paving equipment back, defendant held a loaded gun to Shupe's forehead and told him, "You aren't taking anything out of here, you're going to leave it here, you're going to go and I don't want to see you no more." Shupe left and called the sheriff's department. Shupe subsequently recovered his property from defendant when the police were at the yard.

Cassie's grandfather (McMains's father) testified that Cassie's death tore their family apart, and that his wife took the death "very hard." Cassie's half brother and half sister felt bad because they never took the opportunity to see Cassie while she was alive.

## 2. The Defense Case
The defense called a number of witnesses, including defendant's friends, siblings and other relatives, and one former spouse (Connie Bergstrom), who testified that defendant was very kind and playful toward children, that he was protective of children and interacted well with them, and that he was very generous toward

6

others. These witnesses claimed that they never saw defendant abuse or hurt his two older daughters or any other any child, and that they did not believe defendant could have murdered Cassie. They also testified that if defendant were to be executed, it would affect the families of his siblings immensely and devastate them.

People v. Beames, 40 Cal. 4th 907, 912-19 (2007).

## II.

## PROCEDURAL HISTORY

### A.    State Proceedings

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation pursuant to judgment of the Superior Court of California, County of Tulare imposing the death sentence.  See Tulare County Superior Court Case No. 35201.

On January 24, 1994, the District Attorney of Tulare County filed felony murder, torture, child endangerment and sex crime charges against Petitioner and child endangerment charges against McMains arising out of Cassie's death.  (CT 597-602.)[2]  Petitioner's initial counsel, Donald Thommen ("Thommen"), obtained a psychological evaluation and competency hearing for him, suspending criminal proceedings pursuant to Cal. Penal Code section 1368.  The court appointed two experts to evaluate Petitioner.  (CT 5-7.)

On May 24, 1994, counsel Rothbaum, who had been retained by Petitioner's family, replaced Thommen as trial counsel for Petitioner.  (CT 8.)  Petitioner's written consent to Rothbaum's substitution as his attorney was filed on June 16, 1994.  (CT 618.)  On May 31, 1994, Rothbaum submitted the competence issue on basis of expert reports that Petitioner was fit to stand trial, whereupon Petitioner was found competent.  (CT 10.)

On July 29, 1994, Petitioner was arraigned on the noted charges.  He entered a plea of not guilty and denied the special circumstance allegation.  (CT 18.)  On February 16, 1995, Petitioner's motion to sever his trial from that of Ms. McMains was granted.  (CT 37.)  On

---

[2] Unless otherwise indicated, throughout this order, "CT" refers to the Clerk's Transcript on Appeal, "RT" to the Reporter's Transcript on Appeal, "EH" refers to evidentiary hearing held February 1-3, 2016, "EH Ex" refers to a final exhibit at the evidentiary hearing, "EHRT" refers to the EH Reporter's Transcript, "CSC" refers to the California Supreme Court.  Other transcripts are referenced by date.  References to page numbering are to original document pagination except ECF system pagination is used for electronically filed documents and Bates numbering is used for the record.  Any reference to state law is to California law unless otherwise noted.

March 2, 1995, the Tulare County District Attorney filed a second amended information in Tulare County Superior Court case number 35201 charging Petitioner with the following: in count 1, murder of Cassie McMains in violation of California Penal Code section 187; in count 2, torture in violation of California Penal Code section 206; and in count 3, felon in possession of a firearm in violation of California Penal Code section 12021. (CT 587-91.)

Count 1 alleged a special circumstance, that the murder of Cassie was committed by Petitioner intentionally and involved the infliction of torture within the meaning of Penal Code section 190.2(a)(18). Count 2 alleged that Petitioner personally inflicted great bodily injury upon Cassie within the meaning of Penal Code section 12022.7(a). Counts 1 and 2 alleged that Petitioner was previously convicted of a serious felony offense within the meaning of Penal Code section 667(a). (Id.) It was further alleged as to all counts that Petitioner had been previously convicted of at least two felonies within the meaning of Penal Code section 1203(e)(4). On March 3, 1995, Petitioner was again arraigned, entered a plea of not guilty and denied the allegations. (CT 38.)

On July 19, 1995, a third amended information was filed correcting the count 2 offense date. (CT 592-96; see also 7/24/95 RT 5-6.)

Jury trial began on July 31, 1995. (CT 45.) On August 3, 1995, Petitioner admitted the allegations in counts 1 and 2 pertaining to Penal Code sections 667(a), and 1203(e)(4). (CT 48.) Petitioner also withdrew his plea of not guilty and entered a plea of guilty to count 3. (Id.) The jury was impaneled and sworn on August 9, 1995. (CT 55-56.) Testimony in the guilt phase of the trial began on August 10, 1995 (CT 57), and concluded on August 21, 1995 (CT 70).

On August 22, 1995, the jury began its deliberations and that same day found Petitioner guilty of counts 1 and 2. (CT 71-72, 820-21.) The jury found with regard to count 1 that the murder was intentional and involved the infliction of torture. (Id.) The jury also found that Petitioner had personally inflicted great bodily injury upon Cassie in connection with count 2. (Id.)

The penalty phase began on August 28, 1995. (CT 73.) The jury began deliberations on

August 31, 1995. (Doc. No. 18 at 49.) On September 1, 1995, the jury returned a verdict of death. (CT 81-82, 944.)

On October 11, 1995, the court denied Petitioner's motion for a new trial and his motion to modify the verdict. (CT 85-90.) The trial court then pronounced judgment and sentenced Petitioner to death in count 1, and stayed a term of life in prison in count 2. (CT 91-97.) The court also sentenced Petitioner to a prison term of five years for the count 2 enhancement pursuant to Penal Code section 667(a), struck the enhancement pursuant to Penal Code section 12022.7, (see id.), and sentenced Petitioner to two years on count 3 to run concurrently with the count 2 prison term (CT 98-99).

On March 22, 2007, the trial court judgment was affirmed on automatic appeal in Case No. S050455. See People v. Beames, 40 Cal. 4th 907 (2007). Petition for rehearing was denied by the California Supreme Court on May 9, 2007. (Lod. Doc. No. 9.)

On June 7, 2007, Petitioner filed a first state petition for writ of habeas corpus with the California Supreme Court. (Lod. Doc. No. 10.) That petition was denied by the state supreme court on July 28, 2010. (Lod. Doc. No. 14.)

**B.     Federal Proceedings**

On August 9, 2010, Petitioner initiated these federal proceedings. Petitioner, through counsel, filed his federal petition on July 27, 2011.[3] (Doc. No. 18.) On the same day, Petitioner filed a second habeas petition with the California Supreme Court, Case No. S195127. (Lod. Doc. No. 53.)

On August 2, 2011, the Court found claim 11 to be colorable and directed Respondent to answer that claim, (Doc. No. 37), which Respondent did on August 29, 2011, (Doc. No. 38).

On November 23, 2011, the Court determined that claim 11 had been exhausted. (Doc. No. 48).

On May 17, 2012, the Court found that claims 4, 5, (plus 11), 29, 30, 37, 41 and 43M

---

[3] The Court takes judicial notice of the state record on appeal, People v. John Michael Beames, CSC Case No. S050455, and the related state habeas proceedings, In re Beames, CSC Case Nos. S153603, S195127.

were exhausted and that claims 1, 2, 6, 8, 9, 10, 12, 13, 14, 15, 16, 17, 18, 23, 24, 25, 26, 27, 35D, 42 and 49 were unexhausted. (Doc No. 56.) In that same order, the Court directed the parties to brief the merits of claim 11.

On September 14, 2012, Petitioner filed his opening brief on the merits of claim 11. (Doc. 59.) On December 11, 2012, Respondent filed his answering brief on the merits of claim 11. (Doc. No. 64). Petitioner filed a reply to Respondent's brief on March 22, 2013. (Doc. No. 69.)

On October 23, 2013, the Court issued an order granting Petitioner an evidentiary hearing on claim 11, finding that the California Supreme Court's summary denial of that claim was an unreasonable determination of the facts. (Doc. No. 70 at 28:2-5.)

Respondent objected to any proceeding on the mixed petition. Petitioner responded by filing a February 12, 2014 notice with the Court withdrawing the noted unexhausted claims pending before the California Supreme Court in In Re Beames, Case No. S195127. (Doc. No. 78.) However, on March 4, 2014, the Court rejected Petitioner's withdrawal of unexhausted claims and scheduled the evidentiary hearing on claim 11. (Doc. No. 81.)

On December 11, 2014, the Court vacated the evidentiary hearing schedule, with rescheduling to follow the Court's ruling on Respondent's then pending motion to dismiss the mixed petition. (Doc. No. 109.)

On January 28, 2015, the Court ordered the federal petition amended by withdrawal of the noted unexhausted claims. (Doc. No. 112.) On that date, the Court also denied as moot Respondent's motion to dismiss. (Id.)

The evidentiary hearing took place February 1-3, 2016. On April 5, 2016, Petitioner filed his post-hearing brief. (Doc. No. 208.) On July 15, 2016, Respondent filed his post-hearing brief. (Doc. No. 215.) On September 13, 2016, Petitioner filed his brief in reply. (Doc. No. 222.)

**III.**

**JURISDICTION**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. §§ 2241(c)(3), 2254(a); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of Tulare County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. §§ 2241(d), 2254(a).

**IV.**

**APPLICABLE LEGAL STANDARDS**

This action was initiated on August 9, 2010. Because this action was initiated after April 24, 1996, the amendments to 28 U.S.C. § 2254 enacted as part of the Antiterrorism and Effective Death Penalty Act (AEDPA) apply. See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Van Tran v. Lindsey, 212 F.3d 1143, 1148 (9th Cir. 2000), overruled on other grounds by Lockyer v. Andrade, 538 U.S. 63, 71 (2003).

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 98 (2011); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

The Court previously determined that claim 11 passed through the § 2254(d) gateway. (See Doc. No. 70 at 28:2-5.) Accordingly, the Court considers that claim de novo. See Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (when § 2254(d) is satisfied, "[a] federal court must then resolve the claim without the deference AEDPA otherwise requires."); see also Frantz v. Hazey,

11

533 F.3d 724, 737 (9th Cir. 2008) ("where the analysis on federal habeas . . . results in the conclusion that § 2254(d)(1) is satisfied, then federal habeas courts must review the substantive constitutionality of the state custody de novo."); Riel v. Warden, San Quentin State Prison, No. 2:01-CV-0507 MCE DAD, 2015 WL 6690127, at *5 (E.D. Cal. Oct. 30, 2015), citing Panetti, 551 U.S. at 953 (same); Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008) (same).

Here, the rebuttable (by clear and convincing evidence) presumption that the state court factual determinations are correct (see 28 U.S.C. § 2254(e)), is limited to the extent the Court previously found an unreasonable determination of facts in the state court proceedings pursuant to 28 U.S.C. § 2254(d)(2). (See Doc. No. 70 at 28:2-5); Taylor, 366 F.3d at 999-1001) (limiting 28 U.S.C. § 2254(e)(1) "presumption of correctness" in cases of intrinsic challenge under 28 U.S.C. § 2254(d)(2)); cf., Pirtle v. Morgan, 313 F.3d 1160, 1167–68 (9th Cir. 2002) (state court findings of fact are presumed correct under § 2254(e)(1) even if legal review is de novo).

## V.

## REVIEW OF CLAIM 11

Petitioner alleges that Rothbaum was ineffective at the guilt phase by failing to challenge the prosecution's forensic evidence, resulting in a prejudicially inaccurate picture of the manner and cause of Cassie's death, violating Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. (Doc. No. 18 ¶¶ 547-689.)

### A.    Clearly Established Law - Ineffective Assistance of Counsel

The Sixth Amendment right to effective assistance of counsel, applicable to the states through the Due Process Clause of the Fourteenth Amendment, applies through the sentencing phase of a trial. U.S. Const. amend. VI; U.S. Const. amend. XIV, § 1; Gideon v. Wainwright, 372 U.S. 335, 343–45 (1963); Silva v. Woodford, 279 F.3d 825, 836 (9th Cir. 2002); Murray v. Schriro, 745 F.3d 984, 1010-11 (9th Cir. 2014).

The source of clearly established federal law for ineffective assistance of counsel claims is Strickland v. Washington. 466 U.S. 668 (1984). In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the habeas court must consider two factors. Richter,

562 U.S. at 104; <u>Strickland</u>, 466 U.S. at 687; <u>Lowry v. Lewis</u>, 21 F.3d 344, 346 (9th Cir. 1994).

First, the Petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. <u>Strickland</u>, 466 U.S. at 687. More specifically, the Petitioner must show that "counsel's representation fell below an objective standard of reasonableness," and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. <u>Richter</u>, 562 U.S. at 104 (<u>citing</u> <u>Strickland</u>, 466 U.S. at 688); <u>accord</u> <u>United States v. Quintero-Barraza</u>, 78 F.3d 1344, 1348 (9th Cir. 1995). Petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, which <u>Strickland</u> defines as "one whose result is reliable." 466 U.S. at 688. Judicial scrutiny of counsel's performance is highly deferential, and the habeas court must guard against the temptation "to second-guess counsel's assistance after conviction or adverse sentence." <u>Id.</u> at 689. Instead, the habeas court must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." <u>Id.</u>; <u>see</u> <u>also</u> <u>Richter</u>, 562 U.S. at 106-08. A court indulges a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." <u>Richter</u>, 562 U.S. at 104 (<u>quoting</u> <u>Strickland</u>, 466 U.S. at 687); <u>accord</u> <u>Sanders v. Ratelle</u>, 21 F.3d 1446, 1456 (9th Cir. 1994). This presumption of reasonableness means that not only does the court "give the attorneys the benefit of the doubt," but the court must also "affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as they did." <u>Cullen v. Pinholster</u>, 563 U.S. 170, 196 (2011).

The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead ha[s] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003) (<u>quoting</u> <u>Strickland</u>, 466 U.S. at 688). However, "general principles have emerged regarding the duties of criminal defense attorneys that inform [a court's]

view as to the 'objective standard of reasonableness' by which [a court must] assess attorney performance, particularly with respect to the duty to investigate." Summerlin v. Schriro, 427 F.3d 623, 629 (9th Cir. 2005). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690.

However,

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Wiggins, 539 U.S. at 521-22 (quoting Strickland, 466 U.S. at 690–91); see also Thomas v. Chappell, 678 F.3d 1086, 1104 (9th Cir. 2012) (counsel's decision not to call a witness can only be considered tactical if he had "sufficient information with which to make an informed decision"); Reynoso v. Giurbino, 462 F.3d 1099, 1112–1115 (9th Cir. 2006) (counsel's failure to cross-examine witnesses about their knowledge of reward money cannot be considered strategic where counsel did not investigate this avenue of impeachment); Jennings v. Woodford, 290 F.3d 1006, 1016 (9th Cir. 2002) (counsel's choice of alibi defense and rejection of mental health defense not reasonable strategy where counsel failed to investigate possible mental defenses). Accordingly, if defense counsel conducts a reasonable investigation, and nothing put counsel on notice of the existence of certain evidence, counsel cannot be faulted for failing to locate and present such evidence. Babbit v. Calderon, 151 F.3d 1170, 1174 (9th Cir. 1998). In addition, "a lawyer may make reasonable decisions that render particular investigations unnecessary." Id.

Second, the petitioner must demonstrate prejudice, that is, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result . . . would have been different." Strickland, 466 U.S. at 694. A "reasonable probability" is less than a preponderance. Kyles v. Whitley, 514 U.S. 419, 434 (1995); Strickland, 466 U.S. at 693 (petitioner need not "show that counsel's deficient conduct more likely than not altered the

14

outcome in the case").  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Id.

"It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'"  Richter, 562 U.S. at 104 (quoting Strickland, 466 U.S. at 693).  "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'"  Richter, 562 U.S.at 104 (quoting Strickland, 466 U.S. at 687).  Under this standard, the court asks "whether it is 'reasonably likely' the result would have been different."  Richter, 562 U.S. at 112 (quoting Strickland, 466 U.S. at 696).  That is, only when "[t]he likelihood of a different result [is] substantial, not just conceivable," Richter, 562 U.S. at 112, has the defendant met Strickland's demand that defense errors were "so serious as to deprive the defendant of a fair trial. . . ."  Id. at 103-05 (quoting Strickland, 466 U.S. at 687).

In evaluating prejudice, the habeas court must "compare the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently," Bonin v. Calderon, 59 F.3d 815, 834 (9th Cir. 1995), and evaluate whether the difference between what was presented and what could have been presented is sufficient to "undermine confidence in the outcome" of the proceeding, Strickland, 466 U.S. at 694.

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Strickland, 466 U.S. at 697.  Since the defendant must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

Further, because the Strickland rule is a "general" one, courts have "more leeway . . . in reaching outcomes in case-by-case determinations" such that the range of reasonable applications is substantial.  Id. at 123; see also Premo v. Moore, 562 U.S. 115, 122 (2011) (citing Strickland, 466 U.S. at 689-90) ("[T]he Strickland standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve.").

In issuing it decision following the limited evidentiary hearing, the Court "reviews de

novo the evidence elicited through discovery and at the evidentiary hearing in these proceedings and is no longer constrained by the limitations imposed by § 2254(d)." Williams v. Davis, No. CV 00-10637 DOC, 2016 WL 1254149, at *8 (C.D. Cal. Mar. 29, 2016) (citing Frantz, 533 F.3d at 737) ("In sum, where the analysis on federal habeas, in whatever order conducted, results in the conclusion that § 2254(d)(1) is satisfied, then federal habeas courts must review the substantive constitutionality of the state custody de novo."); accord Williams v. Woodford, 859 F.Supp.2d 1154, 1161 (E.D. Cal. 2012).

### B. State Court Direct and Collateral Review

On June 7, 2007, Petitioner filed his first habeas corpus petition with California Supreme Court, CSC Case No. S153603. (Lod. Doc. No. 10.) In claim I thereof, Petitioner included the instant (claim 11) allegation that his Sixth Amendment rights were violated by Rothbaum's failure to challenge the prosecution's forensic evidence regarding the manner of Cassie's death.

On July 28, 2010, the first state petition was summarily denied on the merits without explanation or issuance of an order to show cause. (Lod. Doc. 14.)

Additionally, as discussed below certain allegations in claim 11 also were denied by the California Supreme Court on direct appeal.

As a preliminary matter, the Court is unpersuaded by Petitioner's argument that the state supreme court improperly analyzed prejudice by adding to the Strickland standard a factor from Lockhart v. Fretwell, 506 U.S. 364 (1993), i.e. whether counsel's deficient performance resulted in a trial that was fundamentally unfair or unreliable. The United States Supreme Court has found Fretwell does not modify Strickland. See Lafler v. Cooper, 566 U.S. 156, 166 (2012); Glover v. United States, 531 U.S. 198, 203 (2001). That the state supreme court mentioned Fretwell in addition to Strickland to set out general legal principles does not alone suggest otherwise or show that court improperly relied on Fretwell in rejecting Petitioner's claim 11 allegations. See Woods v. McBride, 430 F.3d 813, 822-23 (7th Cir. 2005) (state court's citation to Fretwell test not contrary to Supreme Court law where court also found that petitioner failed to establish prejudice under Strickland standard). Moreover, the state court is presumed to know

16

1   and follow the law.  See Woodford v. Visciotti, 537 U.S. 19, 24 (2002); Musladin v. Lamarque,

2   555 F.3d 830, 838 n.6 (9th Cir. 2009).

3        **C.**    **Evidentiary Issues**

4        1.    Dr. Dollinger's Disciplinary History

5        At the evidentiary hearing, Petitioner sought to admit evidence that Dr. Dollinger's

6   medical license was the subject of a disciplinary suspension/probation by the Medical Board of

7   California for a period of one year beginning in 2001.  (See EH Ex. 186; see also Doc. No. 162-

8   22 at 150-54; EHRT 14-17, 511-19).  Respondent motioned in limine to exclude this evidence.

9        The basis for the disciplinary action against Dr. Dollinger was pediatric misdiagnoses at

10   five autopsies Dr. Dollinger conducted during January-April 1995, i.e. approximately 12 months

11   after Cassie's autopsy and approximately six months prior to Petitioner's trial.  (See EH Ex.

12   186.)  In those cases, Dr. Dollinger errantly concluded the cause of death related to aortic

13   coarctation, an abnormal narrowing of the major blood vessel circulating blood from the heart.

14   (Id.).

15        Petitioner argued this evidence was relevant to the credibility of Dr. Dollinger's autopsy

16   conclusions in this case.  Respondent argues the evidence involved an issue of pathology not

17   relevant in this case.

18        At the evidentiary hearing, the Court admitted this evidence under Federal Rule of

19   Evidence 703, as bases for expert opinion, but not for the truth of the matter stated, and

20   thereupon denied Petitioner's request to admit the evidence for all purposes, (see n.5, post;

21   EHRT 511-19), for the reasons that follow.[4]

22        Petitioner has not demonstrated that Rothbaum could or should have known of these

23   matters, or of their relevancy to this case.  The underlying misdiagnoses appear unrelated to Dr.

24   Dollinger's findings regarding cause of death and contributing factors in this case.  The

25   misdiagnoses referred to in the disciplinary report involved an aortic anomaly and cause(s) of

26   death unrelated to the pathology evidence and cause of death theories at issue in this case.

27

28   [4] These findings respond to Petitioner requested written ruling on the court's determination not to admit for all purposes petitioner's EH Ex. 186.  (EHRT 519.)

1    Unlike here, in all five of the disciplinary cases, the infants died at less than four months of age.

2    (EH Ex. 186, Ex. 2 (therein) at 52-54.)  The immediate cause of death in three of these cases was

3    cardiac failure.  (Id.).  The immediate cause of death in the other two cases was pulmonary

4    failure.  (Id.).

5          These misdiagnoses, to the extent they implicate Dr. Dollinger's tissue sampling

6    methodology, appear limited to proper sampling in the coarctation cases.  (EH Ex. 186, Ex. 2

7    (therein) at 55.)  To the extent the Medical Board found fault with Dr. Dollinger's failure to

8    assess the extent of the suspected narrowing of the aorta, here Dr. Dollinger did state the amount

9    and nature of the fluid he found in Cassie's abdomen.  (Id.)

10         These five autopsies were somewhat remote in time from Petitioner's trial.  The five

11   autopsies that were the basis for discipline were performed eleven or more months after Dr.

12   Dollinger performed the autopsy on Cassie.  The resulting disciplinary action against Dr.

13   Dollinger was even more remote in time as it was imposed six years after Cassie's autopsy.  (Id.;

14   see also CT 254-55; RT 948-49, 1238; EH Ex. 4.)

15         The Court noted in its October 23, 2013 merits order regarding claim 11 that:

16         Dr. Dollinger was disciplined by the Medical Board of California in 2001
           pursuant to an investigation into inaccurate causes of death in five infant autopsies
17         which occurred from January through March 1995 (prior to Beames' trial in July,
           1995). See Federal Petition, Exhibit 2. It is unclear when the investigation into the
18         incorrect diagnoses was initiated, but the error in all five cases was the same, the
           failure to properly diagnose coarctation of the aorta (narrowing of the blood
19         vessel caused by malformation of tissue that projects into the lumen or channel of
           the aorta), and all the infants were under six months of age at the time of death.
20         The relevance of these dissimilar cases to the allegations of error in Cassie's
           autopsy is unclear, even had the incidents been available to be discovered prior to
21         Beames' trial.

22   (Doc. No. 70 at 22 n.3.)  This remains the case.  (See Doc. No. 178, Ex. GG.)

23         It appears that in May of 2004, Dr. Dollinger completed the term of probation imposed in

24   his disciplinary proceeding and his medical license was restored to clear status.  (EH Ex. GG.)

25         The Court is persuaded that to the extent Dr. Dollinger's disciplinary report has relevance

26   in this case, it goes to testing any concerns of Respondent's expert, Dr. Joseph Cohen, in relying

27   upon Dr. Dollinger's autopsy.  As discussed, post, the parties were allowed to engage Dr. Cohen

28

1  in this regard notwithstanding the limited admissibility of the report.

2     **D.    Analysis of Claim 11[5]**

3        Petitioner claims Rothbaum was ineffective by failure to investigate and present then

4  available evidence contradicting the prosecution's case, and that this deficiency undermines

5  confidence in the jury's determination.   He alleges Rothbaum fell below then prevailing

6  professional norms by failing to (1) investigate and challenge the prosecution's cause of Cassie's

7  death including failure to consult and retain a defense pediatric forensic pathologist regarding

8  development and presentation of an alternative defense that the immediate cause of Cassie's

9  death was neglect; (2) adequately cross-examine the prosecution's medical experts on this

10 subject; (3) request lesser included instructions; and (4) conduct a reasonable investigation with

11 respect to the cause of Cassie's death.  (See Doc. No. 34-10.)  He claims prejudice because:

12         Had a competent expert testified that Cassie died from neglect, that the state's
           experts' methodology was incompetent and their conclusions thereby suspect, and
13         had Mr. Rothbaum properly cross-examined the state's experts, there was a
           reasonable possibility that the result would have been different since counsel
14         could have raised a reasonable doubt concerning many elements of first degree
           torture murder, the torture murder special circumstance, and the substantive crime
15         of torture as charged in Count II. CT 71-72. Besides their experts, the state had
           little or no evidence to establish any of the foregoing elements. There were no
16         confessions to these crimes by Mr. Beames or his co-defendant. There were no
           witnesses to the events. There was only the unchallenged testimony of the state's
17         pathologists.

18

19 (Doc. No. 18 ¶ 677.)  Had competent defense pediatric forensic evidence been offered as noted,

20 ante, Petitioner argues that such testimony would have established that the crime was no more

21 than an involuntary manslaughter, or possibly child endangerment.

22        1.    Investigation, Development and Presentation of the Trial Defense was Not

23 Deficient

24        Petitioner claims Rothbaum's failure to adequately investigate and develop facts relating

25

---

26 [5] The court admitted the following exhibits at the evidentiary hearing: (i) Pages 32 and 33 of Petitioner's Exhibit 5
   (EHRT 260); (ii) Petitioner's Exhibits 122, 123, 124, 124-A, 125, 133, 135, 137, 138, 139, 145, 147, 149, 174, 181,
27 208 and 209 (EHRT 269, 273, 313, 483, 508 and 548); (iii) Respondent's Exhibits A, B, C, D, F, H, I, J, K, L, M, N
   and O (EHRT 260-61, 313, 484, 508-11); (iv) under Federal Rule of Evidence 703, as bases for expert opinion but
28 not for the truth of the matter stated, except as otherwise admitted above, Petitioner's Exhibits 1 through 178 and
   186 to 225 (EHRT 509), and Respondent's Exhibits A through GG.  (See EHRT 508-11.)

to the immediate cause of Cassie's death led him to overlook a more plausible defense of death by neglect and present a less probable defense of death by accidental trauma.

However, for the reasons discussed below, Petitioner has not demonstrated that Rothbaum failed to "prompt[ly] investigat[e] … the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction …. 1 <u>ABA Standards for Criminal Justice</u> 4-4.1 (2d ed. 1982 Supp.) ("<u>ABA Standards</u>)." <u>Rompilla v. Beard</u>, 545 U.S. 374, 387 (2005).

**a.     The Prosecution Case**

The prosecution theory was that Petitioner, a felon with a history of child abuse, intentionally tortured Cassie (by hanging her with a neck ligature and striking or stomping on her) and killed her on January 19, 1994 by a sudden blow to the midsection, lacerating her liver. (<u>See</u> CT 86-90; Reporter's Transcript of Proceedings on October 11, 1995 at 28-29.)

i.     <u>Dr. Dollinger's autopsy</u>

The prosecution presented the testimony of Dr. Armand Dollinger, who performed the autopsy on Cassie. (<u>See, e.g.</u>, RT 920-63; Doc. No. 18 Ex. 3). Dr. Dollinger was then certified by the American Board of Pathology in clinical, anatomical and forensic pathology and was also certified by the American Board of Forensic Examiners. (RT 920.) He had been practicing forensic pathology since 1963. (<u>Id.</u>)

Dr. Dollinger concluded the cause of Cassie's death was internal hemorrhage from a transected (i.e., "torn in two") liver caused by a massive blow to her torso. (RT 922, 924-42.) He testified that he had seen this type of injury before and that it required a "tremendous amount of force." (RT 923.)

Dr. Dollinger also found that Cassie had not eaten in 24 hours before her death. (EH Ex. 4 at 11.)

Dr. Dollinger identified a large number of injuries, including broken ribs and pattern burns from the noted heating grate on her hands, feet and buttocks, that in his opinion had been sustained between December 19, 1993 and the date of Cassie's death, January 19, 1994.

Specifically, Dr. Dollinger testified at trial that the following injuries had been sustained in the final month of Cassie's life:

1.   Anal dilation and scarring, sustained sometime between December 19 and January 19;
2.   Multiple rib fractures front and back, sustained between January 5 and January 9, with 4 fractures on her left back;
3.   A bruise on the right front of the scalp, sustained between January 9 and January 15;
4.   Eleven sets of burns including left hand and third degree burns to her right hand (multiple occasions), third degree burns to the left and right foot, and buttocks, in a grid pattern similar to the floor furnace grate, and re the buttocks burns consistent with being held without clothes and with her buttocks exposed on the floor furnace grate, sustained between January 12 and January 15;
5.   A large laceration on the left front of the scalp, and lacerations and abrasions to the nose and mouth areas, sustained when something struck her three to five days prior to death;
6.   Additional lacerations to the mouth and abrasions to the back and head, sustained less than 72 hours prior to death;
7.   A bruise on the tongue, right thumb and a bruise on the right leg, sustained 48 hours prior to death;
8.   Multiple bruises and abrasions of the face, right side neck and torso, liver bruises and hemorrhage, and 5 broken ribs on her right front, sustained within 24 hours prior to death;
9.   Laceration of the liver and bruising and abrasion of the neck, sustained within minutes prior to death.

(RT 924-42, 960-61; see CT 63; EH Ex. A; Doc. No. 59 at 33:10-34:3); see also Beames, 40 Cal. 4th at 929-30.

### ii.   Prosecution trial experts

#### 1)   Dr. Bennett

Dr. Thomas Bennett, a forensic pathologist and expert in child abuse who was then the Iowa state medical examiner, had performed over four thousand forensic autopsies and had previously qualified as an expert in the area of child abuse.  (RT 970-73.)

Dr. Bennett testified that an autopsy photo of a mark on Cassie's neck indicated that she had been hung by a "soft" ligature – that she had been hung by her neck for some period of time. (RT 973-74.)  He opined that an item of clothing or something flexible could have been used – not surrounding her entire neck.  (RT 975-79.)  The prosecution used Dr. Bennett's testimony to argue the intent to kill prong of the torture special circumstance.  (RT 1348; see also EH Ex. A at 22-24.)

### 2) Dr. Stephens

Dr. Boyd Stephens, a specialist in pediatric injuries who was then the chief medical examiner for City and County of San Francisco (RT 986-88), reviewed the case including the autopsy report, photographs, and microscopic and slide samples and testified to his opinion that Cassie had suffered torture from the multiple injuries over time. (RT 988-89.)

Dr. Stephens opined that Cassie's burns were intentionally inflicted (RT 989-95), and that the injuries to Cassie's nose and mouth were caused by blunt force trauma (RT 994-95). Dr. Stephens' conclusions were based on review of the autopsy record photographs, microscopic and slide analysis (RT 988), and Cassie's resected anus (RT 989). Dr. Stephens did not examine the body and was not present at the autopsy, (see Doc. No. 64 at 44:16-20).

Dr. Stephens opined that Cassie, based on her injuries, was tortured over a period of time. (RT 989-92.) He opined that her burn injuries were not typical of accidental injury, for example Cassie's legs were splayed open prior to being burned. (RT 991-1003.) He opined that the injuries to her mouth were from blunt force trauma (id.). He found no evidence of sodomy (id.).

Dr. Stephens also took note of Cassie's low body weight and lack of body fat. (RT 996.) He conceded that the injuries around anus were not a result of sexual abuse. (RT 996.)

### b. Petitioner's Case

Petitioner consistently maintained before and during trial that the tool cart kept in Cassie's room accidentally fell on her resulting in her death, notwithstanding his administration of "some CPR." (RT 1141-46.) Petitioner testified at trial that McMains was present immediately after the tool cart allegedly fell on Cassie and that he provided resuscitation. (Id.)

McMains's statements and testimony in her separate proceeding are consistent with Petitioner's statements regarding the tool cart accident and subsequent resuscitation efforts, but differ to the extent McMains asserts she was not present during these events.

According to McMains, at 1:00 a.m. on January 19, 1994, the morning the prosecution says Cassie died, she saw that Petitioner had just finished changing Cassie and was putting on

her pants (EH Ex. 208 at 1445), as Cassie was lying across Petitioner's lap (id. at 1446). The record is unclear whether Cassie was alive at this time. (Cf., EH Ex. F at 1353 and EH Ex. 209 at 61, 116-18.)

At 8:00 a.m. that same morning, McMains saw Petitioner rocking Cassie, who was covered with a blanket; Petitioner stated Cassie had been sick all night, yelled at McMains to leave the room and slammed the door. (EH Ex. F at 1354-55; EH Ex. 208 at 1454-55.)

McMains left to take Darrian to a previously scheduled doctor's appointment. (Id.) When McMains returned home around noon, Petitioner told her that Cassie was "gone", that she was dead. (Id. at 1357; EH Ex. 208 at 1471.) He had Cassie completely wrapped up in a sheet; she was not moving; Petitioner refused to allow McMains to see Cassie. (EH Ex. F at 1156-57; EH Ex. 208 at 1474.) He told her that earlier that morning, he had placed Cassie outside her crib to change the bedding after she had thrown up and a tool cart or object fell on her, leaving her not breathing and without a pulse. (EH Ex. 208 at 1475; EH Ex. F, June 17, 2015 interview at 73, 1330; see also RT 1146.) He told her that he had tried giving Cassie "mouth to mouth" but that she was "gone." (EH Ex. 208 at 1471; EH Ex. F at 1329-31.)

According to McMains's statements to authorities shortly before Cassie's body was found, Petitioner told her only that he administered "mouth to mouth" for several hours; McMains did not mention that Petitioner performed CPR or chest compressions. (EH Ex. F at 1331-32, 1356-57.)

Petitioner testified at his trial that he did not call an ambulance or police because he was not rational (RT 1147-48), and that:

> It wasn't no murder, I'm telling you right now. There was no murder. The cart right there fell on the baby. I know, I'm the one that picked her up. I picked the tools up off her, I know, I was there.

(RT 1149.)

### c. The Defense Investigation

Petitioner was originally represented in the trial court by appointed counsel Donald Thommen ("Thommen"), who initiated the defense investigation. (See EH Ex. 226 at 35-43.)

Maureen Griffin ("Griffin") (aka Maureen Greene), worked as Thommen's paralegal in this case and assisted with the defense investigation. (Id.) Griffin interviewed Petitioner and witnesses, attended the preliminary hearing, assisted with discovery, prepared notes of her investigatory activities and consulted with counsel about these matters. (Id.; see also Doc. No. 225 at 79-80.) As discussed, post, Griffin continued on the case as paralegal after Rothbaum substituted-in following his retainer by Petitioner's family in May of 1994.

In March of 1994, Danny Wells ("Wells"), the investigator for attorney Thommen, also began to investigate the case. Wells reviewed police reports and Petitioner's pre-arrest tape recorded statement and interviewed Petitioner. (See Doc. No. 171 at 14-58; Doc. No. 225 at 122.) Wells also visited the crime scene; reviewed the autopsy report and consulted with pathologist Dr. Sharon Van Meter about the autopsy report (EH Ex. 41).

Wells also consulted with Dr. Richard Blak who conducted a psychological (competency) evaluation of Petitioner. (See Doc. No. 225 at 13-29, 117-164.)

Upon Rothbaum's substitution into the case on May 24, 1994, attorney Thommen provide him with all the defense case files and briefed him on same. (Id. at 158.)

Rothbaum for his part testified that he applied for and received state court (Penal Code section 987.9) funds for defense investigators and experts (EHRT 550-51), and that there were no upper limits on the amount of such funding he could have requested (id.; cf. Hinton v. Alabama, 134 S.Ct. 1081, 1088-89 (2014) (defense counsel unreasonable in belief state investigatory funding was unavailable).

It appears that Rothbaum's defense team received state funding for continued investigation and preparation of the trial defense including for review of information and discovery provided by the prosecution and Thommen, including as to mental health and pathology experts (Doc. No. 225 at 16-34, 79-80); obtaining mental health interviews by experts; consulting with medical and engineering experts regarding substantiation of Petitioner's statements about the tool cart and heating grate (id. at 61, 79-80, 108-11, 160, 172, 211-12, 224, 238-40; Doc. No. 171 at 59-65); reviewing the crime scene and case evidence and obtaining

forensic testing of the tool cart and heating grate (Doc. No. 225 at 61, 104-05, 162, 209-13); consulting with Petitioner and locating and interviewing witnesses (id. at 61, 134); and reviewing family and criminal background (id. at 227-28, 244-55).

Rothbaum also retained neuropsychologist Eugene Couture to assess Petitioner for mental state defenses. (See Doc. No. 18 at 305.) Dr. Couture prepared a neurological and psychological evaluation report that found no organic brain factors or factors in mitigation not already known to the defense. (See Doc. No. 25-2 at 3; Doc. No. 225 at 172-197.) Rothbaum did not preclude the possibility that he personally reviewed this report before trial. (EH Ex. 181 at ¶ 22.)

Cliff Webb ("Webb"), Rothbaum's investigator, worked on this case. (EHRT 551-52, 591, 639-44.) Webb testified at the evidentiary hearing that Rothbaum, consistent with his practice, provided little if any direction on case assignments including in this case (EHRT 641-43); to the point that in Webb's mind Rothbaum had nearly abandoned his practice (EHRT 641-43). However, Webb had worked with Rothbaum on hundreds of other cases (id.) and knew that Rothbaum routinely allowed him autonomy in conducting the investigation. (EHRT 645.)

Webb testified that he typically interviewed potential witnesses; located potential experts; sought out defense evidence; and provided reports on such matters to Rothbaum. (EHRT 553-66, 592.) He did the same in this case. (EHRT 646.) The record reflects that Webb met with Petitioner in jail "a lot" to discuss this case. (EHRT 592, 646.) Webb testified that he read the case file and the discovery; interviewed the percipient witnesses; and obtained the noted tool cart, tools and floor heating grate for forensic testing and later presentation as evidence at the trial. (EHRT 552, 592, 641-48; Doc. No. 225 at 203-34.)

Webb located and in some cases interviewed family, social and criminal history witnesses (Doc. No. 225 at 243-48, 254-55, 261); he reviewed Petitioner's school record, trial file, court files, and law enforcement files; he interviewed Petitioner (repeatedly) and potential witnesses (id. at 49, 52, 96, 191, 194, 215); and he consulted with Rothbaum and the defense team in these regards (id.).

1    Webb researched pathology experts and had a pre-retainer consult with a pathologist in

2    September of 1994.  (Doc. 222 at 96.)  Notably, Webb testified that Rothbaum would not meet

3    with him to discuss retaining an expert on forensic pathology for the trial.  (EHRT 642-44.)

4        Griffin worked on preparing and presenting the defense in this case.  (EHRT 556-57.)

5    Griffin was highly experienced in criminal defense (EHRT 556, 589), having worked with

6    Rothbaum "on and off" for seven or eight years (EH Ex. 226 at 5), including on many capital

7    cases (id. at 30-31).  Griffin testified that in this case she assisted with jury selection, preparation

8    of trial summaries and notebooks (EHRT 556-57); met with Petitioner; summarized discovery

9    and related matters (Doc. No. 225 at 166-69); assisted with preparation of the penalty phase

10   defense (id. at 238-40); and consulted with petitioner and his family and the defense team as to

11   these matters (Doc. No. 225 at 166-69, 238-40, 250-51, 257-58, 264).

12       Griffin consulted with experts in the case.  (See id. at 226.)  For example, Griffin testified

13   in her deposition that she researched, located and discussed with Rothbaum possible retainer of a

14   methamphetamine addiction expert.  (EH Ex. 226 at 16-17.)  She testified that initially

15   Rothbaum was reluctant to do so (id.), and that ultimately Rothbaum decided not to retain the

16   expert because Rothbaum felt petitioner's drug use could not be justified and the jury would not

17   be persuaded by such an expert (id. at 17-19).

18       Griffin also testified that she assisted with post-conviction motions in the trial court.

19   (Doc. No. 225 at 270-71.)

20       **d.    Habeas Experts Disagree on Immediate Cause of Cassie's Death**

21            i.    Petitioner's experts - death caused by neglect

22       Petitioner relies upon the expert opinions of i) Dr. Janice Ophoven, a pediatric forensic

23   pathologist who has conducted numerous autopsies and participated in the care of children and

24   young adults (Doc. No. 18 Ex. 6 at 102; EH Ex. 2 ¶¶ 1-4; EHRT 20-186); and ii) Dr. Robert

25   Bux, a forensic pathologist and chief medical examiner for the County of El Paso, Colorado (EH

26   Ex. 175 ¶¶ 1-7; EHRT 187-331).

27       These experts opine that Cassie died from chronic neglect (EHRT 71-72, 200, 250-51,

28

274), resulting in a combination of: (1) dehydration and malnutrition (EHRT 43-46), (2) aspirational early pneumonia with evidence of aspirated vomit (EHRT 53-56, 224-32, 246-47), and (3) bacterial infection of the blood, i.e., sepsis (EHRT 61), likely caused by bacteria from the noted scalp wound (see EHRT 57-60; EH Ex. A at 28-31; EHRT 250-51).

These experts further opine that the liver laceration was not caused by a mortal blow to Cassie's abdomen (EHRT 70-72, 91-92, 107-08, 167, 219-20, 235-38, 250-52, 274-75, 281, 330-31), but rather was the result of Petitioner's post-mortem resuscitation efforts. They point in support to the absence of red blood cells, fibrin and inflammatory cells in the liver tissue samples taken by Dr. Dollinger. (Id.; Doc. No. 208 at 8:19-20, citing Doc. No. 70 at 2; Doc. No. 222 at 23.)

Dr. Ophoven goes on to suggest that Cassie and her brother Darrian fit the mold of "meth orphans." (EHRT 33-47, 201.) She suggests that the malnutrition and failure to thrive seen in Darrian (RT 758) and for which Darrian was hospitalized just prior to Cassie's death, also occurred with Cassie (EHRT 199-203, 379, 425-26, 440, 474).

### 1) Liver laceration occurred after death

Drs. Ophoven and Bux note the liver tissue samples from the autopsy show no "vital reaction" in the form of "red blood cells, fibrin, or inflammatory cells" responding to the injured area of the liver. (EHRT 70, 91, 167, 219-20, 236-38, 251, 274, 301-02, 331,371, 372, 452, 458, 459.) This suggests to them that the liver damage occurred after Cassie was dead (EHRT 301), because a vital reaction of fibrin deposition should start as soon as eight minutes after injury with inflammatory cells present at the injury site within fifty minutes (EHRT 300). The absence of a vital reaction in Cassie's case, they argue is consistent with a post-mortem liver laceration because a vital reaction would not occur after death. (EHRT 301; but cf. EHRT 180-84, 233-34, 300-01, where Ophoven and Bux appear to argue in the alternative that fibrin deposition can occur from post-mortem handling.)

These experts further note the absence of blood visible in the area of the liver laceration, suggesting to them that the injury occurred after death. (EHRT 70-71, 81, 167.)

### 2) Abdominal fluid aggregated after death

Drs. Ophoven and Bux opine that the fluid Dr. Dollinger found in Cassie's abdominal cavity may not have been blood hemorrhaged by an ante-mortem liver laceration, but rather fluid other than whole blood. (EHRT 217-18.) They argue, and prosecution habeas expert Dr. Cohen acknowledges that Dr. Dollinger could be criticized for not specifying precisely the means used to measure the approximately 250 milliliters of liquid blood and the approximately 30 grams of clot material he stated was found in Cassie's abdomen. (EH Ex. 4 at 4; EHRT 304, 393-94, 434-39, 500.)

Drs. Ophoven and Bux also suggest that contrary to Dollinger's findings, the liquid in Cassie's abdomen may have been non-blood, such as "ascites" secondary to malnutrition, or decompositional fluid. (EHRT 217.) They note in support Dr. Dollinger's failure to perform a hematocrit test for the presence of red blood cells. (EHRT 77, 322-23, 329, 446-47.)

Even if the fluid was blood, Dr. Bux testified that CPR, effectively administered would mechanically pump blood through a liver laceration into the peritoneal cavity. (EHRT 222-224.) Dr. Ophoven agreed with Bux in this regard. (EHRT 74.)

### 3) Abdominal injuries from resuscitation performed after death

Drs. Ophoven and Bux opine that Cassie's liver and rib injuries are consistent with untrained, prolonged, post-mortem CPR by Petitioner. (EHRT 69, 102, 146, 251-52, 274-75.) These experts opine that pediatric liver injuries can occur from CPR (EHRT 69-71, 145-46, 148-50, 214, 221, 427), especially prolonged untrained CPR (EHRT 71, 145, 214, 222; EH Ex. 174 at 60), by an individual such as Petitioner who allegedly was then under the stimulating influence of methamphetamine (EHRT 71, 98-99; RT 1147-50; EH Ex.'s 51, 86, 98, 211), and upon a child such as Cassie who was previously diagnosed with type one osteogenesis imperfecta, a brittle bone disease (EHRT 73, 215).

Specifically, Petitioner alleges that Rothbaum should have investigated evidence that Petitioner may have then been intoxicated with methamphetamine and caused Cassie's abdominal injuries after her death when he performed CPR "for hours" on her; especially so

given Cassie's OI (EHRT 36, 141-44, 197-98, which Petitioner contends could have caused her ribs to break more easily than is normally the case (RT 637-38, 692, 819, 1087-94; 1146, 1147, 1150, 1167, 1185, 1191).

        ii.    <u>Respondent's expert - death caused by blow to the abdomen</u>

Respondent relies upon the expert opinion of forensic pathologist Dr. Cohen, who has performed over 7000 autopsies. (EHRT 332-336.) Dr. Cohen agrees that Cassie was probably malnourished and dehydrated, possibly septic and suffered from aspirational pneumonia; conditions he concedes would have been fatal if left untreated. (EHRT 381-82, 409-10, 382, 460-61, 474-77, 479.)

However, Dr. Cohen concludes that before any of these conditions could have killed Cassie, she was intentionally tortured and then killed by a sudden blow to the midsection, breaking ribs and lacerating her liver resulting in 45% of her total blood volume being lost into her abdomen and fatal hemorrhagic shock. (EHRT 387-401; EH Ex. C at 7-8; EH Ex. D at 2; EHRT 377-78, 493-95; EH Ex.'s C at 5 and D at 2, 5; <u>see</u> EHRT 331-544; CT 87; Reporter's Transcript of Proceedings on October 11, 1995 at 28; <u>see also</u> EH Ex. A at 38-39.)

        **1)**    **Fatal liver laceration occurred prior to death**

Dr. Cohen testified that Cassie's liver was lacerated by a blow to the abdomen, not by CPR. (EHRT 3367-77, 387, 397, 427-28, 532-33.) He points in support to the relatively large volume of blood Dr. Dollinger reported in Cassie's abdomen (EHRT 439-40), and the size of the liver laceration (EHRT 397). Upon considering all of Cassie's noted potentially fatal conditions, Dr. Cohen concluded, as did Dr. Dollinger that Cassie bled to death from the liver laceration. (EHRT 364-400, 531-32; EH Ex. A at 38-39, Ex. C at 7; Ex. D at 4; <u>see also</u> EH Ex. 174, Ex. 11 (therein) at 127-28.)

Dr. Cohen believes Cassie's heart was pumping when the liver laceration occurred. (<u>Id.</u> at 387-88, 399-401.) He testified the liver laceration clearly injured at least medium sized blood vessels in the liver such that bleeding would have been substantial. (EHRT 366.) He testified that the liver laceration was a fatal injury, with death from hypovolemic shock following in a

couple hours from time of injury.  (EHRT 367.)

As to the autopsied liver tissue (i.e., histology) analysis, Dr. Cohen testified that a vital reaction would not immediately occur at the liver laceration site (EHRT 228, 302, 372, 490; see also EHRT 78-79), but could take up to an hour for fibrin deposition (EHRT 453-58, 490) and the better part of a day for inflammatory cell response (EHRT 372-73).  Especially so here, given Cassie's weakened condition (EHRT 82-84), and the fact that generally a liver laceration can kill rather quickly (EHRT 240, 489-90; see also EH Ex. 174 at 123, 127-28, 131).  Dr. Cohen believes Cassie died within minutes to a couple hours of her liver being lacerated.  (EHRT 366-72.)  [Significantly, Drs. Ophoven and Bux do not disagree with this assessment, assuming Cassie was alive when a major blood vessel in her liver was lacerated.  (EHRT 83-84; EH Ex. K at 9 ¶ 17.)  However, Drs. Ophoven and Bux go on to suggest that where a major vessel in the liver is not torn by a laceration, the patient might survive for hours or days.  (EHRT 166, 240-41.)]

Dr. Cohen also suggests that assessing a vital reaction in the liver can be impacted by the generally hemorrhagic appearance of that organ (EHRT 371-72), and the sufficiency of the tissue sampling (EHRT 372-73, 490; EH Ex. 174 at 129).  [Dr. Bux seems to agree that a fibrin reaction would take "a while" (EHRT 302), but Dr. Bux disagreed with Dr. Cohen that sampling the liver in areas distal to the laceration would provide relevant results (EHRT 235-36).  Dr. Ophoven concurs with Dr. Bux in these regards.  (EHRT 78-79, 228).]  In any event, Dr. Cohen testified that he did not see evidence of vital reaction in the liver slide histology from Cassie's autopsy.  (EHRT 371-72.)

2)    **Blood pooling in abdomen prior to death**

Dr. Cohen opined that the fluid Dr. Dollinger found in Cassie's abdominal cavity was blood hemorrhaged by an ante-mortem liver laceration.  He points in support to the lack of liver mortis (i.e., pooling of blood in the liver after death) seen in autopsy photographs; and the quantity of blood and clot material Dr. Dollinger reportedly found in Cassie's abdominal cavity, which as noted Dr. Cohen places at approximately 45% of Cassie's total blood volume by

weight.  (EHRT 379-401; EH Ex. C at 8.)

Dr. Cohen also opined the liver laceration would have caused Cassie to suffer immediate and substantial pain.  (EHRT 391, 401-02, 532-33; EH Ex. D at 5.)

Dr. Cohen testified that in reaching his conclusions, he specifically relied upon the amount of blood and clot material Dr. Dollinger reported finding at autopsy.  (EHRT 442.)  Dr. Cohen testified that measuring abdominal blood is not tricky.  (EHRT 486.)  He testified that here, the fluid was blood because it contained clotted material.  (EHRT 396, 446.)

In this regard, Dr. Cohen testified that he considered the statements made by Dr. Dollinger's former laboratory assistant, Matthew Bowers ("Bowers"), during a November 19, 2015 interview by Respondent's investigator, Mr. Hernandez.  (See Doc. No. 187 at Ex. A.)  Mr. Bowers was present during Cassie's autopsy.  Mr. Bowers stated during his interview that he did not recall specifically how Dr. Dollinger measured the amount of blood in Cassie's abdomen, but that Dr. Dollinger normally would measure using a syringe and collection bottle.  (Id. at 4.)  Dr. Cohen testified that Mr. Bowers' comments would not change his opinions in this case.  (EHRT 402.)[6]

### 3)     Resuscitation not responsible for abdominal injuries

Dr. Cohen discounts the possibility that post-mortem CPR caused Cassie's abdominal and liver injuries.  (See e.g., EH Ex.'s M & N.)  He testified that in his experience, post-mortem CPR would not produce the volume of blood product found in Cassie's abdomen.  (EHRT 387-88, 448-49, 489.)  He testified that in those rare instances where CPR causes a liver laceration, the laceration typically occurs in an area of the liver different from where Cassie's liver was lacerated (EHRT 488), and results in a laceration smaller than Cassie's laceration (id.).  (See also EH Ex. 174 at 166.)

Dr. Cohen noted a further injury to Cassie's liver, a subcapsular hematoma, i.e. bleeding just under the surface of the liver.  (EHRT 367.)  He suggests this liver injury occurred prior to death.  (EHRT 371, 491-92.)  He disagrees with Dr. Ophoven's suggestion that the liver

---

[6] The Court denied Petitioner's motion to strike the Bowers's interview.  (EHRT 395, 505-06.)

hematoma likely resulted from post-mortem handling.  (EHRT 178-79, 184, 371.)

Dr. Cohen also opined that the intestinal gas noted in the autopsy photographs is a product of decomposition.  (EHRT 364.)  He discounts the suggestion by Petitioner's experts that the gas resulted from Petitioner's alleged efforts at CPR.  (Id.)

**e.  Rothbaum was Reasonable in Foregoing Investigation of Alternative Cause of Death**

Petitioner claims that Rothbaum unreasonably acquiesced in the prosecution's cause of death, (see, e.g., RT 949-50), and that he unreasonably failed to obtain expert pathology consultation prior to developing the trial defense.  He faults Rothbaum for failing to investigate the possibility that Cassie died from the noted conditions of neglect: malnutrition, dehydration, a blood borne infection, and pneumonia.  He complains that Rothbaum, who had no medical training (EHRT 562-63), did not retain or consult with a pathologist (EHRT 562), but nevertheless took as true Dollinger's autopsy report.  (EHRT 560-61, 564-65, 576, 597, 618, 629-30); see Hinton, 134 S.Ct. at 1088 ("[C]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence.).

Petitioner points to Rothbaum's December 20, 2006 habeas declaration in which Rothbaum concedes that he did not make further forensic investigation; did not retain trial experts; did not investigate the background of prosecution experts; did not consider the possibility that Cassie's rib and liver injuries resulted from Petitioner giving Cassie CPR and Cassie's pre-existing OI; did not consider that Cassie's burn injuries might have occurred when Petitioner allegedly tried to "warm" her blood as part of his alleged efforts at resuscitation; and did not consider the possibility of a cause of death alternative to that found by Dr. Dollinger. (See EH Ex. 181, ¶¶ 16-19.)

However, there is no constitutional duty to investigate, but only to provide reasonable representation.  Pinholster, 563 U.S. at 180-81.  The duty to investigate is dependent on the facts known.  See Wiggins, 539 U.S. at 521-22.  For example, the Supreme Court has never required

counsel to investigate where the client manifests objection; nor has it ever required an investigation to ensure that a client's objection is informed and knowing. Schriro, 550 U.S. at 479. The relevant inquiry is not what could have been pursued, but whether the choices made were reasonable. Siripongs v. Calderon, 133 F.3d 732, 736 (9th Cir. 1998). Speculation is an inadequate basis on which to find an inadequate investigation. Hall v. Head, 310 F.3d 683, 704-05 (11th Cir. 2002).

A petitioner must show that counsel was somehow put on notice to investigate a particular matter. Hensley v. Christ, 67 F.3d 181, 186 (9th Cir. 1995) (insanity); Dyer v. Calderon, 113 F.3d 927, 941 (9th Cir. 1997), opinion vacated on other grounds 151 F.3d 970 (9th Cir. 1998) (petitioner never told counsel petitioner smoked PCP and no doctors were told so no need to investigate at the time despite current declarations). For example, a failure to investigate is justified where there is no reason to suspect the petitioner suffers from a mental defect. Barnard v. Collins, 958 F.2d 634, 642 (5th Cir. 1992).

Petitioner's contention (Doc. No. 222 at 8-9) and Rothbaum concession (EHRT 562) that the pathology experts contacted and interviewed by the Thommen and Rothbaum defense teams never personally consulted with Rothbaum, does not alone suggest a deficient investigation on the facts of this case. The failure to consult with an expert is not deficient conduct where, as here, the entirety of the defense investigation made available to Rothbaum, including the preliminary conclusions of Dr. Van Meter, reasonably suggests further consultation is not needed. See Rompilla, 545 U.S. at 383 (counsel drew a reasonable line because "they [had] good reason to think further investigation would be a waste."). Especially so where the decision not to further investigate a defense can be rationalized on a tactical ground, such as the trial defense in this case. See Stankewitz v. Wong, 698 F.3d 1163, 1172–73 (9th Cir. 2012).

For the reasons stated in this memorandum, Rothbaum was reasonable in foregoing further defense investigation. It appears his decision to develop the tool cart defense was reasonably premised in the defense investigation including Petitioner's statements and conduct. This does not appear to be a case where counsel failed to promptly explore all avenues for

developing facts relevant to the merits of the case for purposes of the noted <u>ABA Standards</u>. In any event, these <u>ABA Standards</u> serve only as a "guide" for determining whether an attorney's performance is adequate. <u>Jeffries v. Blodgett</u>, 5 F.3d 1180, 1198 (9th Cir. 1993). A failure to follow <u>ABA Standards</u> "does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel." <u>Nix v. Whiteside</u>, 475 U.S. 157, 165 (1986).

i.    <u>Rothbaum not reasonably on notice of alternative cause of death</u>

Petitioner claims that a reasonable defense investigation would have resulted in development of an alternative defense that Cassie died from neglect rather than blunt force trauma.

However, the defense team's investigation of the case did not reasonably put Rothbaum on notice that the immediate cause of Cassie's death was other than that consistently stated by Petitioner, accidental trauma.

The record does not suggest that at any point Petitioner told Rothbaum that the tool cart did not fall on Cassie (EHRT 561-65), or that he caused injury to Cassie after her death (<u>id.</u>; EHRT 619, 622). <u>See</u> <u>Richter</u>, 562 U.S. at 107-08 (defense counsel need not pursue expert testimony that might be harmful to the defense). In this regard, Rothbaum testified that had Petitioner told him the injuries occurred through CPR and not by the falling tool cart, he would have sought a forensic opinion (EHRT 564), but that at the time of trial he had no basis for making such a request (EHRT 565).

**1)    Petitioner's statements and testimony**

Petitioner, prior to and at trial consistently stated that Cassie was killed accidentally by a falling tool cart. Petitioner repeatedly told Rothbaum that a tool cart fell on Cassie and killed her. (EHRT 552, 598, 607-08, 646; <u>see also</u> RT 552-57, 560-61, 564; 1141-42, 1145-46, 1324-25, 1340; Doc. No. 18 Ex. 22 at 431; <u>id.</u>, Ex. 26 at 454.) Petitioner stated he knew this because he was present when it happened early in the morning of January 19, 1994. (RT 1137-45, 1166.)

Specifically, Petitioner testified at trial that he was present when Cassie was killed between 0400 and 0500 on January 19, 1994. (<u>See</u> RT 1137-45, 1166.) He testified that he

1  heard Cassie crying and saw she had vomited in her crib.  (RT 1138, 1140.)  He testified that he

2  put Cassie on the floor and told her to hold on to the tool cart that was stored in her bedroom.

3  (RT 555-57, 560-61, 564, 1138-41, 1324-25.)  The tool cart was unstable.  (RT 1142-43.)

4  Petitioner testified that he went to get clean clothes and bedding for Cassie, went to the

5  bathroom and heard a clanging noise and McMains scream "oh fuck, oh fuck."  (RT 1145.)  He

6  testified that he returned and saw that the tool cart had fallen on Cassie.  (Id.)  He testified that he

7  pulled the cart and tools off Cassie (RT 1145-46), who at that point had no pulse and was

8  surrounded by a pool of blood (RT 1146, 1149), and began CPR (RT 819 1146-50).  He testified

9  that he listened for a heartbeat with a stethoscope McMains had retrieved at his request, heard

10  none and knew at that point that Cassie was dead.  (RT 1146-47; see also Doc. No. 59 at 35:18-

11  19.)

12  It appears that Petitioner "insisted [to Rothbaum] that a tool cart had fallen on the victim

13  and that her death was accidental."  (Doc. No. 18 Ex. 22 at 431.)  Petitioner testified that he

14  administered CPR for hours.  (RT 818-19, 1146-48; see also Doc. No. 59 at 35:18-19.)

15  Petitioner reaffirmed this version of events in a tape recording he made shortly after Cassie's

16  death and prior to his arrest, requesting therein that McMains "believe [him] . . . it was an

17  accident."  Beames, 40 Cal. 4th at 914.

18  Petitioner repeatedly and consistently told the same story to defense investigator Webb

19  during their numerous meetings in the jail.  (EHRT 598-99, 646; Doc. No. 18 at Ex. 26 at 454.)

20  In this regard, Rothbaum acknowledged he would have been unable to prevent Petitioner from

21  taking the stand to assert this tool cart defense.  (EHRT 605.)

22  Petitioner's argument that he did not insist upon any specific defense, (see Doc. No. 222

23  at 15; EHRT 631), seems to ignore the fact Petitioner was insistent the tool cart fell on Cassie

24  causing her death.  Rothbaum could reasonably have believed that Petitioner would object to any

25  alternative defense inconsistent with Petitioner's statements of events surrounding Cassie's

26  death.

27  Furthermore, the record does not appear to demonstrate that Petitioner ever stated or

28

testified he saw Cassie nonresponsive for any significant time prior to the tool cart falling on her. (See, e.g., EH Ex. F at 1331.) In this regard, McMains reported to Tulare County Sheriff detective Gutierrez that she thought she saw Cassie alive and moving at 1 a.m. on January 19, 1994. (EH Ex. 174 at Ex. 1 at 1; see also EH Ex. 208 at 1446; EH Ex. F at 1353; EH Ex. 209 at 66.) At 8 a.m. on that same day, McMains's noticed that Cassie was no longer moving; Petitioner refused to allow McMains to get close to Cassie. (EH Ex. F at 1354.) By mid-afternoon on that same day, Petitioner informed McMains and his sister Tammy that Cassie was dead. (Id. at 1357, 1364; see also EH Ex. 211 at 2.)

This is significant because the alternative defense presupposes that Cassie was in a reduced state of consciousness, referred to by the experts as an "obtunded" state, prior to her death. (EHRT 492.) Dr. Cohen appears to concede that Cassie may have been obtunded to some extent for up to 12 hours or more prior to her death (EHRT 460-68), and that an injury while obtunded would result in a vital reaction assuming a sufficient time for the vital reaction to occur (EHRT 464-65). However, the record does not appear to demonstrate that Cassie was obtunded to the level of nonresponsiveness prior to the apparent time of death.

Any suggestion by Dr. Ophoven, in support of an alternative defense that Cassie may have died before January 19, 1994, (EHRT 35; EH Ex. 2 at ¶ 15; EH Ex. 91 at ¶ 41), appears to be directly contrary to Petitioner's own testimony, (RT 921, 1147-48). Similarly, Dr. Ophoven's theory that the scalp laceration had been neglected for days allowing a blood borne infection to spread is contrary to Petitioner's testimony where he insists that he first saw this scalp laceration on the day of Cassie's death. (RT 1164-65.)

### 2) Crime scene evidence

Petitioner claims the trial defense that the tool cart fell on Cassie is inconsistent with evidence found at the crime scene.

Rothbaum testified that he believed the mechanism of Cassie's death was blunt force trauma to her abdomen. (EHRT 599-601.) Rothbaum called Petitioner to testify at trial because he found Petitioner's consistently asserted tool cart defense at least plausible on the facts of this

case (EHRT 599-03), if not entirely persuasive. (EHRT 572, 598, 601, 630.)

The record reflects there was a tool cart with tools at the crime scene and it was heavy. (RT 1044-45, 1054-55; EHRT 592, 627.) Cassie's blood was present on various items at the crime scene. (RT 792-97.) Notably, the alternative theory asserted by Petitioner on habeas that the immediate cause of death was neglect does not appear to account for the crime scene blood evidence.

Although Rothbaum may have felt that a conviction and death sentence were inevitable (EHRT 594), he seemingly was not aware of facts demonstrating that a defense based on Petitioner's version of events involving the falling tool cart was either inconsistent with Dollinger's autopsy, or false (EHRT 601); cf. Gimenez v. Ochoa, 821 F.3d 1136, 1145 (9th Cir. 2016) (apart from allegedly flawed expert testimony of relating to shaken baby syndrome, a reasonable juror could have found the baby was shaken to death based on her numerous suspicious injuries, petitioner's inconsistent statements regarding those injuries and his admitted violent behavior in a case applying the "clear and convincing" standard applicable to successive petitions under 28 U.S.C. § 2244(b)(2)(B)(ii)).

Defense investigator Webb stated in his habeas declaration that "I recall early on in the case, I was able to locate the 'tool cart' and some of the 'tools', which had been removed from the crime scene, and were the items that [Petitioner] said, had accidentally fallen on the child causing her death." (Doc. No. 18 at Ex. 26 at 454; EHRT 592.) Petitioner's testimony at trial was consistent with this theory and he identified the cart in court. (See RT 1138-47.)

It appears that Petitioner did not specifically mention the tool cart when on January 19, 1994, he told his sister Tammy about Cassie's death (RT 1305); and that the tool cart was not seen in the crime scene video taken by the police on January 19, 1994 (RT 1341). However, these facts alone do not suggest Rothbaum was unreasonable in presenting the tool cart defense given the noted events surrounding Cassie's death as related by Petitioner, and the evidentiary record discussed ante and post.

Petitioner points out that a state criminalist testified at trial that the tool cart tested

negative for blood and hair.  (RT 1347; <u>see also</u> Doc. No. 59 at 28:14-18.)  But the record does not demonstrate that Petitioner claimed the tool cart impacted Cassie's head, or that it had blood on it.  The failure to find blood and hair on the tool cart does not alone suggest that presentation of the tool cart defense was unreasonable.

Petitioner's testimony that he found Cassie in a "pool of blood" after the cart fell on her (RT 1146), finds some support in the noted blood evidence found at the crime scene including Cassie's  baby clothing, sheets, bedding and a wash towel and rag (RT 793-97.)  The suggestion by Petitioner's experts Drs. Ophoven and Bux that the tool cart defense was implausible because the crime scene evidence does not suggest a pool of blood, (<u>see</u> EHRT 59, 95-96,  274, 302-03; EH Ex. J at 8, ¶ 21), seems to ignore this bloody evidence.

Additionally, Dr. Ophoven testified to the scalp wound, an injury possibly from a sharp metal edge in the days before she died (EHRT 59, 133-35); and she noted the possibility of a bloody purge from the nose and mouth (EHRT 95-97) – suggesting a possible basis for the pool of blood.  Dr. Cohen also suggested a possible explanation for the blood by noting the multiplicity of pre-mortem injuries Cassie suffered including an inch and a half bruise on the top of her skull with associated bleeding (EHRT 363); injuries he believes were the result of blunt force trauma (<u>id.</u>).

At the end of the day, Rothbaum knew Petitioner's account of Cassie's death and believed Cassie died from blunt force trauma to her abdomen.  (EHRT 599-601.)  He reasonably believed Petitioner's steadfast assertion of the tool cart defense was plausible on the circumstances facing him and the evidence before him (EHRT 599-603), even though Rothbaum himself may not have been entirely persuaded (EHRT 572, 598-99, 601, 630.)  Significantly, Rothbaum acknowledged the risk that would have been inherent in putting on a defense not consistent with defendant's statements and testimony.  (EHRT 608.)

Especially so in the absence of facts suggesting any more plausible defense.  Rothbaum was unaware of facts, crime scene or otherwise showing the tool cart defense was false.  (<u>Id.</u>)  He was aware that Petitioner, the only witness to Cassie's death (EHRT 604), consistently embraced

the tool cart defense. Notably, McMains in her 2015 interview by Respondent's counsel, though denying she was present when the tool cart fell on Cassie, stated that she thought it plausible that the tool cart had fallen on Cassie as Petitioner contended; that there were definitely tools in Cassie's room on January 19, 1994. (EH Ex. 209 at 112.) Counsel was dealt with a defense supplied in part by his client. Petitioner does not address how a reasonable defense could have been presented had counsel taken the alternative defense that Petitioner now suggests and addressed the cause of death and other actions as told by Petitioner and others, prior to his retention.

### 3) Evidence of neglect – malnutrition and dehydration

Petitioner claims Rothbaum was deficient by failing to investigate and develop Cassie's state of malnutrition and dehydration.

Dr. Dollinger specifically found at autopsy that Cassie had no food in the twenty-four hours prior to her death. (EH Ex. 4 at 11.) The habeas experts, Drs. Ophoven, Bux and Cohen, all seem to agree that at the time of her death, Cassie was malnourished; had ingested no food in the prior twenty-four hours; and was dehydrated. (EHRT 44, 200, 250-51, 274, 381, 410, 474; see also EH Ex. 4 at 11.)

However, Rothbaum seems not reasonably chargeable with notice that Cassie suffered from these conditions due to neglect. Rothbaum presumptively was aware of McMains testimony in her prior separate proceeding that from January 3, 1994 until Cassie's death, she (McMains) prepared food for Cassie and Petitioner fed Cassie; McMains did not notice Cassie getting thinner during this period; and during this time Cassie was sick with the flu, throwing up and having diarrhea. (EH Ex. 208 at 1574-76.)

As to fluids, the record does not suggest Cassie was denied fluid intake. For example, Petitioner testified to giving Cassie Kool-Aid the night before her death. (RT 1137.) Her bedding at the crime scene appears to have been stained with vomited cherry Kool-Aid. (RT 1138-40.)

### 4) Reliance upon Dr. Dollinger's autopsy

Petitioner claims that Rothbaum was deficient in relying upon Dr. Dollinger's allegedly insufficient autopsy report in developing his trial defense. (EHRT 560-65, 576, 596-97, 618, 629-30.) He points to a variety of areas at autopsy, where Dr. Dollinger allegedly fell short.

However, for the reasons stated, it does not appear that Dr. Dollinger's methods at autopsy were such as to reasonably call into question his findings as to the manner and cause of Cassie's death.

Significantly, Dr. Cohen testified that Dr. Dollinger's autopsy report was "a pretty good report", though it "has its weaknesses." (EHRT 485.) As to these weaknesses, Dr. Cohen acknowledged that Dr. Dollinger erred in finding at autopsy that Cassie was "fairly well nourished." (EHRT 440.) He acknowledged that Dr. Dollinger did not photograph the fluid in Cassie's abdomen. (EHRT 394.) He acknowledged that Dr. Dollinger did not draw vitreous fluid, a practice Dr. Cohen considers to be standard at autopsy. (EHRT 482-83; EH Ex. 174 at 22-23.)

Dr. Cohen nonetheless felt that Dr. Dollinger adequately documented Cassie's injuries and that the autopsy report was sufficient as to the manner and cause of Cassie's death. (EHRT 443.)

### 5)   Cassie's injuries not inconsistent with falling tool cart

Petitioner claims the falling tool cart theory was contrary to Dr. Dollinger's autopsy findings. Petitioner notes that Dr. Dollinger testified that in his opinion the falling cart could not have caused Cassie's lacerated liver because there was no external bruising and injuries consistent with the cart having fallen on her. (RT 1233-48, 1238, 1346-48.)

However, it appears Dr. Dollinger went on to concede during cross-examination that an object could have fallen on Cassie without leaving a mark on her skin, as shown by the following colloquy:

> Q: Let me ask you this: If something was to fall on that infant, fall over on that infant from a distance of about three or four feet, how much weight would that have to carry in order to inflict this kind of an injury?
> A: That would be hard to answer, depending on what the object is, over how large an area. If it's a flat thing like a refrigerator, obviously, that would do it, but a piece of

1  five-inch metal pipe, large piece of concrete, or an adult individual falling on them
   with a knee or a leg across the abdomen.
2  Q: Could a very heavy pouch of tools fallen [sic] from four feet or so do that?
   A: 'Very heavy' is sort of a nebulous definition, but I'd say probably or possibly."

3  (RT 1238-39; see also RT 948-49, 962, CT 254-55.)  Furthermore, Dr. Dollinger opined that

4  Cassie's liver would have been lacerated had the tool cart admitted in evidence at trial fallen on

5  her.  (RT 1238-39.)  Dr. Bux similarly testified that the tool cart could have fallen on Cassie

6  without leaving external bruising or abrasions.  (EHRT 274.)

7       As noted, the record supports Petitioner keeping tools in the residence.  (RT 1044-45,

8  1054-55.)

9       **6)      Pre-existing Osteogenesis Imperfecta**

10      Petitioner claims Rothbaum was deficient by failing to investigate and develop evidence

11  of Cassie's pre-existing Osteogensis Imperfecta (hereinafter "OI"), a genetic disorder

12  characterized by bones that break easily.

13      However, the evidence of Cassie's OI appears somewhat conflicted.  Dr. Eleanor Zorn, a

14  genetics specialist, reviewed Cassie's case history and test results and opined that Cassie

15  probably had a mild form of OI.  (RT 601, 616, 1090-1100, 1101 1104-1105.)  But Dr. Joseph

16  Gerardi, the pediatric orthopedic surgeon who treated Cassie's broken leg seven months before

17  her death, was of the opinion that Cassie may not have had OI at all.  (RT 604, 606, 620.)  Dr.

18  John Smith, a pediatric radiologist, X-rayed and examined Cassie and opined that Cassie's bones

19  appeared to be of normal density, normal context, and he saw no evidence of any bone disease.

20  (RT 581-83.)  Dr. Dollinger testified he found no evidence of OI at autopsy.  (RT 943.)

21      Even if Cassie had OI, Drs. Ophoven and Bux seem to concede she had the least severe

22  form of OI, type one; and they concede that this disorder would not make Cassie more readily

23  disposed to the liver laceration or burn injuries seen here.  (EHRT 141-44.)  Furthermore, the

24  record is uncertain whether OI could have been a factor in Cassie's multiple abdominal rib

25  fractures.  Dr. Cohen noted the possibility that Cassie had type one OI, but opined that with type

26  one, it is uncommon to see multiple fractures.  (EHRT 344-45.)

27

28

### 7) Petitioner's use of methamphetamine

Petitioner claims Rothbaum was deficient by discounting the impact habitual methamphetamine use may have had on Petitioner at the time of Cassie's death and during his alleged resuscitation attempts.

Dr. Ophoven testified that methamphetamine can make people violent and aggressive. (EHRT 99.) But she did not offer anything more than her common sense opinion regarding any effect of methamphetamine on CPR. (EHRT 71, 99.)

At the evidentiary hearing, Rothbaum testified that he knew Petitioner was an habitual methamphetamine user and that methamphetamine can affect the user's ability to accurately perceive events. (EHRT 579.)

However, Petitioner has not pointed to facts in evidence demonstrating that Petitioner was under the influence of methamphetamine at the time Cassie died and when he allegedly attempted to resuscitate her. (EHRT 98-99.) Petitioner testified at trial only that he had done some drugs in the several days leading up to January 18, 1994 (the day before Cassie was killed according to Petitioner's testimony). (RT 1148.) Rothbaum was presumably aware of McMains's testimony in her separate proceeding that Rick Hager dropped off some methamphetamine for Petitioner [on January 19, 1994,] and that she left it sitting on a table (EH Ex. 208 at 1518-19), but that Petitioner was not doing drugs at the time Cassie died (id.).

### ii. The experts disagree on alternative cause of death

As noted, Drs. Ophoven, Bux and Cohen all appear to agree that to some extent Cassie was malnourished, dehydrated, possibly septic, (EHRT 33, 44-46, 57-61, 100, 133-37, 199-200, 202, 241-51, 379, 381, 410, 425-26, 474-75, 493-95), and showed signed of aspirational pneumonia (EHRT 53-56, 224-32, 382, 443, 460-61, 474-79). They further agree that these conditions, left untreated and absent intervening cause, would ultimately have led to Cassie's death. (EHRT 72, 200, 250-51, 274, 409, 475-96.)

But as discussed, ante, these experts do not agree that neglect was the immediate cause of Cassie's death. The differing expert opinions are not alone a sufficient basis to find Rothbaum's

conduct to be constitutionally deficient, see e.g., Toler v. Troutt, 2015 WL 1408490 at *9 (W.D. Okla., Feb. 20, 2015) (medical difference of opinion not actionable under the Eighth Amendment), or demonstrate that one expert or the other is unqualified, id.; cf. Jennings, 290 F.3d at 1013-14 (holding that counsel's failure to consult expert and investigate mental health defenses constituted deficient performance).

Notably, Dr. Ophoven concedes that the type of liver injury Cassie suffered, if incurred during her lifetime as found by Dr. Dollinger, and given her contributing conditions, could have quickly caused death.  (EHRT 81, 84.)

Furthermore, the alternative cause of death theory asserted on habeas contemplates the abdominal injuries were caused by CPR.  Yet Petitioner's experts appear to concede the probability of liver injury from CPR is low.  (EHRT 149-150, 292.)  Dr. Ophoven testified that based on Dollinger's report, she could not say that any of the anterior rib fractures occurred post-mortem.  (EHRT 111.)

Drs. Ophoven and Bux do not appear to suggest that CPR would likely have fractured ribs in Cassie's back.  Yet such fractures were noted at autopsy.  (See EH Ex. 4 at 10.)  Dr. Cohen testified that CPR would not have fractured the posterior ribcage.  (EHRT 112, 291, 369.)

iii.    The tool cart defense was reasonable

Petitioner claims that Rothbaum was deficient by presenting the tool cart defense at trial.  (CT 61, 863; RT 1280-81, 1348.)  He argues the tool cart defense was unreasonable and uninformed and Rothbaum would have realized this had he consulted with a defense pathologist.  See Bemore v. Chappell, 788 F.3d 1151, 1162 (9th Cir. 2015) (counsel ineffective by "presenting an unprepared, uncorroborated, and uninvestigated alibi defense.").

Petitioner points out that Rothbaum, who concededly had no medical background (EHRT 563), accepted Dr. Dollinger's findings and testimony as true in determining to present the tool cart defense at trial.  (EHRT 560-61, 564-65, 576, 597, 618, 629-30).  He argues Rothbaum "disregarded [his] professional obligation to investigate critical prosecution evidence." Elmore v. Ozmint, 661 F.3d 783, 861 (4th Cir. 2011), citing Strickland, 466 U.S. at 696.  He argues

Rothbaum should have seen weaknesses in the tool cart defense (see Doc. No. 208 at 17), weaknesses that made it an unreasonable defense at trial (see Doc. No. 222 at 8:6-7, citing Bemore, 788 F.3d at 1166-67).

Petitioner points out that Rothbaum was himself uncertain the tool cart defense would be successful. (EHRT 572, 594, 598, 601, 630.) He points out that this Court, in finding claim 11 colorable stated that "[a]lthough there was some evidence presented which corroborated or was consistent with [Petitioner's] testimony, his account of the fallen tool cart was implausible at best and in light of his prior record, it was unlikely the jury would believe him." (Doc. No. 70 at 16:4-7.)

However, considering the record as now developed and for the same reasons discussed ante and post, Rothbaum was not objectively unreasonable in presenting the tool cart defense at trial given the facts and circumstances with which he was presented. In particular, Petitioner's statements and actions considered in the context of the record do not demonstrate the tool cart defense was unreasonable. See Richter, 562 U.S. at 104. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." Strickland, 466 U.S. 668, 691; see also Bean v. Calderon, 163 F.3d 1073, 1082 (9th Cir. 1998) (counsel's decision to not pursue a diminished capacity defense was reasonable because it conflicted with an alibi theory which was based on his client's representations); Phillips v. Ornoski, 673 F.3d 1168, 1180-81 (9th Cir. 2012) (counsel not ineffective by presenting an improbable alibi defense urged by his client without investigating any alternative defenses); cf. Johnson v. Baldwin, 114 F.3d 835, 838-40 (9th Cir. 1997) (defense counsel was ineffective for failing to investigate and discredit his client's "incredibly lame" story that he was not present at the scene of the charged rape).

That the trial defense failed is not alone a basis to find deficient trial strategy. Strickland, 466 U.S. at 699 (trial counsel's defense, though unsuccessful, was nonetheless the result of reasonable professional judgment).

        iv.    Decision not to consult with defense pathologist was reasonable

44

Petitioner claims that Rothbaum was deficient by failing to consult with a forensic pathologist and thereupon present an alternative defense to the tool cart defense. (EHRT 599-601); see, e.g., Elmore, 661 F.3d at 804-29, 861-62 (defense counsel ineffective by failing to investigate exculpatory forensic evidence potentially consistent with defendant's statements that he did not commit the crimes).

Petitioner alleges that Rothbaum "failed to conduct an investigation sufficient to make an informed judgment as to defense strategy. "Cannedy v. Adams, 706 F.3d 1148, 1162 (9th Cir. 2013), quoting Correll v. Ryan, 549 F.3d 938, 951 (9th Cir. 2008). He argues that Rothbaum did not retain an expert pathologist because Rothbaum disliked expert testimony as easily opposed. (EHRT 586, 611, 621 and 626.)

However, in determining whether counsel made reasonable tactical decisions about certain evidence, a court focuses on whether the investigation supporting counsel's decision to introduce or omit certain evidence was itself reasonable. Wiggins, 539 U.S. at 523.

Here, Rothbaum's decision to present the tool cart defense was supported by a reasonable defense investigation. Dr. Dollinger's autopsy findings that the cause of death was "exsanguination; transecting laceration of the liver; blunt force trauma" with contributing conditions of "multiple contusions, abrasions, lacerations, burns and rib fractures of varying age", (see EH Ex. 4 at 12), appear reasonably consistent with statements by Petitioner and others regarding the tool cart falling on Cassie, and inconsistent with death by neglect for the reasons discussed. See Soffar v. Dretke, 368 F.3d 441, 473 (2004) ("The scope of a defense counsel's pretrial investigation necessarily follows from the decision as to what the theory of defense will be."); Hinton, 134 S. Ct. 1081 (failure to secure expert witness on scientific issue prejudicial if "there is a reasonable probability that . . . [the] expert . . . would have instilled in the jury a reasonable doubt as to [his client's] guilt. . . .")

Defense investigator Wells noted in his report regarding a March 31, 1994 interview with pathologist Dr. Van Meter, her preliminary belief - based upon review of Cassie's medical records and the autopsy report of Dr. Dollinger and crime scene and autopsy photographs and the

OI laboratory reports - that the liver laceration was not caused by a broken rib, but rather by a blow from a fist, club or punch. (EH Ex. 41.) Dr. Van Meter also suggested Cassie's other injuries were pre-existing, days to weeks old. (Id.) Dr. Van Meter's noted conclusions reasonably appear inconsistent with an alternative defense of liver laceration secondary to CPR induced rib fracture. Dr. Van Meter's noted conclusions reasonably appear consistent with Dr. Dollinger's finding the cause of death was blunt force trauma causing the liver laceration and subsequent exsanguination. (Id.; EH Ex. 4 at 12.) As noted, Rothbaum was presumptively updated on Dr Van Meter's statements by Thommen when Rothbaum substituted into the case.

Although Richter recognized that "[c]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence", id. at 788, Petitioner has not demonstrated that this is such a case.

Additionally, Rothbaum presumably would have been aware from Dollinger's autopsy report that Cassie had not eaten within 24 hours of her death and that she suffered early aspirational pneumonia, (see EH Ex. 4 at 11), suggesting he saw no strategic advantage in investigating such matters, given the other circumstances in the record. The court "need not determine the actual explanation for trial counsel's [strategic choices,] so long as his [strategic choices] . . . fall[] within the range of reasonable representation." Morris v. State of California, 966 F.2d 448, 456 (9th Cir. 1991).

Significantly, Rothbaum testified at the evidentiary hearing that it was unimaginable to him, given what he knew at trial, that Cassie's injuries were incurred post-mortem; noting that "the man stuffed the child in a wheel well of the car and took off afterwards, it was just like insane behavior." (EHRT 618, 622.)

Rothbaum also testified at the evidentiary hearing that he felt differing opinions among experts simply tended to cancel out, which was why he tended not to use experts. (EHRT 621.) He testified at the hearing that he put on the best defense he had based on the evidence at trial. (EHRT 624.) He testified that he did not see the need for a forensic expert based on the evidence before him. (Id.); see also Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) ("[T]his Court has

never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success."); Wiggins, 539 U.S. at 536 ("In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."); Gonzalez v. Wong, 667 F.3d 965, 992 n.14 ("Just because counsel did not come up with all potential ways to prove the case does not make the counsel's performance ineffective.").

Rothbaum was not required to retain an expert in the absence of reasonable necessity for doing so. It is settled that:

> Strickland does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense. In many instances cross-examination will be sufficient to expose defects in an expert's presentation. When defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict. And while in some instances "even an isolated error" can support an ineffective-assistance claim if it is "sufficiently egregious and prejudicial," Murray v. Carrier, 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy."

Richter, 562 U.S. at 111.

Petitioner's reliance upon Couch v. Booker is unavailing. 632 F.3d 241 (6th Cir. 2011); (see also Doc. No. 59 at 50:11-15). In Couch, counsel was found ineffective for failure to provide a defense forensic expert with information supporting Petitioner's claimed cause of death. But in Couch, unlike here, the overall prosecution case was weak. Here, the substantive evidence against Petitioner included his own testimony, statements, and conduct suggesting consciousness of guilt that appear to be inconsistent with Petitioner's posited alternative cause of death. Given Petitioner's insistence that the cause of death was the tool cart falling on Cassie and the evidence that death was caused by the liver laceration, counsel's decision not to consult with a defense pathologist for alternate causes of death was reasonable.

2. Rothbaum's Cross-Examination of Trial Experts was not Deficient

Petitioner claims that Rothbaum was deficient by failing to adequately cross-examine

1  prosecution experts, Drs. Dollinger, Bennett and Stephens, relating to the cause of Cassie's

2  death.  He notes the prosecutor emphasized the unrebutted testimony of these trial experts in

3  closing argument.  (See RT 1319-1322; RT 1341-1343.)

4      The specific matters as to which Petitioner alleges Rothbaum failed to impeach these

5  experts are discussed below.

6      **a.    Dr. Dollinger's Autopsy Methodology**

7      Petitioner claims that Rothbaum failed to impeach Dr. Dollinger for his failure to follow

8  autopsy procedures appropriate for a child abuse death, as follows.  (See, e.g., EH Ex. 2 ¶¶ 30-

9  31; see also RT 941-54; Doc. No. 208 at 19-27.)

10      i.    Documentation of and support for injuries noted at autopsy

11      Petitioner claims Dr. Dollinger should have been impeached regarding his failure to

12  properly and fully document the injuries that he described in his autopsy report (EHRT 58, 113,

13  168, 211-13, 310-12, 317, 411-14, 419, 423); take adequate vitreous, blood and tissue samples

14  and x-rays (EHRT 50-53, 384, 393-94, 406, 434-39, 483, 500); document the quantity of

15  abdominal blood that he described (EHRT 62-66, 75, 115-16, 119-20, 122-24, 130, 132, 169,

16  205-10); and provide documentary evidence supporting wound by wound time estimates of the

17  noted injuries (Doc. No. 222 at 24).  Petitioner suggests such impeachment would have called

18  into question the very foundation of the trial defense – that Cassie died from accidental blunt

19  force trauma - and supported an alternative defense that Cassie died from neglect and that her

20  abdominal injuries were caused post-mortem.

21      As noted, Drs. Ophoven, Bux and Cohen all appear to agree that Dr. Dollinger's autopsy

22  procedure fell short in some respects.  Dr. Dollinger apparently did not draw vitreous fluid, (see

23  EH Ex. 4; EHRT 383), which could have suggested the degree to which Cassie suffered from

24  conditions Petitioner ascribes to neglect – malnourishment and dehydration.  Doing a vitreous

25  draw was then and is now standard autopsy procedure, (EHRT 50-52, 203, 385), and something

26  Dr. Dollinger typically did at that time, according to Bowers.

27      It appears that Dr. Dollinger also could have taken additional tissue and bone samples

28

and better documented the ones he did take. Doing so could have assisted in determining more precisely the age of Cassie's various multiple contusions, abrasions, lacerations, burns and anterior and posterior rib fractures. In these regards, Dr. Cohen conceded he would have documented the abdominal blood and clot by taking a photograph (EHRT 434), and that Dollinger apparently did not do so (id.).

Nonetheless, it is not clear that Rothbaum could and should have impeached Dr. Dollinger as to manner and cause of death, i.e., exsanguination secondary to the liver laceration.

Of the noted shortcomings, only the measurement and character of abdominal blood appear to implicate Dr. Dollinger's stated cause of death. While Dr. Ophoven testified that the abdominal fluid should have been measured (EHRT 75, 216), Petitioner's other habeas expert, Dr. Bux testified that documenting the fluid and clot measurements, though good practice, was not necessarily required (EHRT 216). Dr. Dollinger, an experienced pathologist did in fact estimate the quantity of fluid. Nothing in the record appears to demonstrate that he erred.

Furthermore, Dr. Dollinger's failure to take the hematocrit of the abdominal fluid (see EHRT 77), to determine whether it was in fact blood rather than "ascites" fluid secondary to malnutrition or decomposition (EHRT 205), was not necessarily an impeachable issue. Dr. Bux testified that the hematocrit was an available but not commonly used test at autopsy in 1994. (EHRT 324.) Also, as noted, Dr. Cohen was comfortable in opining the fluid was in fact blood because it clotted. (EHRT 396, 446.)

For the reasons discussed, it is not clear that Dr. Dollinger otherwise could have been successfully impeached as to the liver laceration and manner and cause of death. Significantly, Dr. Cohen testified that Petitioner's preferred alternative cause of death was not the immediate cause of Cassie's death. (EHRT 380-84.) He testified that although the vitreous draw should have been done, it would not have shed light on the manner and immediate cause of Cassie's death. (EHRT 384.)

Petitioner goes on to suggest that Dr. Dollinger's gross anatomic diagnosis of slight cerebral edema (EH Ex. 4 at 4, 11), is a condition consistent with the asserted alternative

defense, suggesting malnutrition and dehydration (EHRT 211). However, Dr. Cohen testified that cerebral edema is not necessarily inconsistent with Dollinger's conclusion that the immediate cause of death was exsanguination. (EHRT 385.)

Dr. Dollinger's finding that blunt force trauma was a cause of death (EH Ex. 4 at 12), is not necessarily impeachable with information that CPR might cause liver injuries (EHRT 221). Dr. Cohen testified that it would be very rare for CPR to cause a liver laceration, as suggested by the alternative cause of death theory. (EHRT 387.)

Any attempted impeachment of Dr. Dollinger as to matters other than the manner and cause of death would not likely have furthered the alternative defense. Dr. Dollinger's findings as to the nature and age of Cassie's various multiple contusions, abrasions, lacerations, burns and anterior and posterior rib fractures are not undocumented or devoid of support in the record. Moreover, such attempted impeachment likely would have been unproductive given the defense reasonably presented by Rothbaum at trial.

Additionally, impeaching Dr. Dollinger's credibility as to his autopsy findings other than manner and cause of death would not have furthered the trial defense.

ii.    Findings at autopsy

**1)    Immediate cause of death**

Petitioner claims Dr. Dollinger should have been impeached regarding his findings at autopsy that Cassie was "fairly well nourished"; that her lungs were "unremarkable"; that her pneumonia was not a condition contributing to her death; and that her liver laceration occurred during life and resulted in fatal internal bleeding.

Again, Drs. Ophoven, Bux and Cohen all agree that Cassie was malnourished, dehydrated, possibly septic, and suffered early pneumonia at the time of her death. (EHRT 43, 202, 381-82, 409-10, 382, 460-61, 474-77, 479.) For the reasons stated, Petitioner has not demonstrated the existence of these conditions provides a basis to impeach Dr. Dollinger's conclusion that the immediate cause of Cassie's death was exsanguination secondary to the liver laceration and blunt force trauma.

Moreover, Dr. Dollinger did note Cassie's "early aspiration pneumonia" (EH Ex. 4 at 11), notwithstanding his gross assessment of her lungs as "unremarkable." (EHRT 443.) Petitioner does not show how Dr. Dollinger could have been impeached on grounds pneumonia was the cause of death. (See RT 945-57.)

### 2) Aging of burns and other injuries

Petitioner claims that Dr. Dollinger should have been impeached regarding his findings at autopsy that certain of Cassie's burns and other injuries were incurred during her lifetime. Petitioner points out that Dr. Dollinger failed to take x-rays and samples necessary to precisely age Cassie's burns and other injuries. (EHRT 62-66, 115-16, 119-20, 130-32, 205-210.)

However, Petitioner's testimony at trial was consistent with burn injuries suffered while Cassie was alive. Petitioner testified that the burns to Cassie's buttocks were incurred prior to her death – when he saw Cassie seated on the floor heating grate "flopping around" without a diaper. (RT 1129-33.) He testified that he pulled her off the grate by the shirt (id.).

His additional uncontroverted testimony at trial suggests serious burns to Cassie's fingers and toes also occurred during her lifetime – at least one such burn had a bandage on it when Cassie's body was found. (RT 913, 1129-33, 1160, 1172; EHRT 347-48; see also EH Ex. A at 7-13.)

Contrary to Petitioner's own trial testimony, Dr. Ophoven testified the burns to Cassie's buttocks and possibly on her inner thighs were incurred post-mortem, perhaps when Petitioner allegedly attempted to "warm [Cassie's] blood" in an effort to resuscitate her. (EHRT 64-65, 122.) Dr. Ophoven concedes some burns to Cassie's feet and toes and right hand/fingers may have occurred prior to death. (EHRT 93-94, 115-21; EH Ex. I at 6.)

Dr. Bux appeared uncertain in these regards when he testified at the evidentiary hearing. (EHRT 299.) He noted insufficient tissue sampling (EHRT 317), and that post-mortem burns are very unusual (EHRT 327.) Significantly, in his declaration he appeared to characterize these burns as apparently healing second degree burns. (EH Ex. K at 7-8.)

As to aging of Cassie's various other injuries, Drs. Ophoven and Bux suggest Dr.

Dollinger's deficient sampling and testing prevent precise aging. (EHRT 62-66, 115-16, 119-20, 122-24, 130, 132, 169, 205-10.) Dr. Ophoven testified that Dr. Dollinger's visual aging of injuries (including burn injuries) is inherently uncertain (EHRT 66), and that microscopic examination adds certitude (EHRT 62), and was the standard in 1994 (id.).

Dr. Cohen disagreed, opining Cassie's burns were incurred during her lifetime and that this is apparent even to his naked eye. (See EHRT 346-51; cf., EHRT 115-21, 310; see also EH Ex. A at 4-16, 27.) He notes the burns to Cassie's buttocks and peri-anal area are in a grid pattern and show scabbing and healing. (Id.) Dr. Cohen testified that given the location and number of burns, that all these burns were intentionally caused (EHRT 51-52), and would have been extremely painful to Cassie (EHRT 391).

Dr. Cohen further opines that most of the burn and other injuries were the result of inflicted trauma and susceptible to dating consistent with Dollinger's report. (EHRT 346-57, 522-24.) He opines that Dr. Dollinger's dating of these injuries is supported by his autopsy photographs. (Id.)

Notably, nothing in Petitioner's statements and testimony suggests Cassie was burned after he said the tool cart fell on her (RT 1137-50; Doc. No. 18 at Ex. 7), or explains why Cassie suffered burns while her legs were splayed open, and to only on select parts of her body (id.; see also RT 1002, 1129; EH Ex. A at 1-16, 27). Even if one were to credit Petitioner's noted pre-trial statement to defense neuropsychologist Dr. Couture, that Petitioner tried to revive Cassie by "warming her blood", Petitioner stated only that he placed Cassie "by" the heating grate – not on it (Doc. No. 18 at Ex. 7 at 113) - leaving unexplained Cassie's grid pattern burns.

Additionally, if Petitioner had burned Cassie's body after her death, he would then have had to dress her in the clothes she had on when her body was recovered from the trunk of his car; nothing in the record, or in logic suggests he did so. (See EHRT 326.)

Rothbaum, for his part testified at the evidentiary hearing that based on the facts before him at trial, it was "inconceivable" to him that the burns were inflicted upon Cassie after her death. (EHRT 561.) Moreover, Rothbaum's cross-examination of Dr. Dollinger regarding the

timing of Cassie's injuries reflects as much, and appears largely consistent with Petitioner's noted testimony on such matters and with the trial defense.  (See, e.g., RT 950-57.)

**3)     Rib injuries**

Petitioner claims that Dr. Dollinger should have been impeached regarding his findings at autopsy as to the nature and timing of injuries to Cassie's ribs, and as to whether OI and post-mortem CPR might have been factors.

Petitioner's noted testimony at trial was consistent with rib injuries incurred during Cassie's lifetime.  Nonetheless, his experts Drs. Ophoven and Bux appear to suggest otherwise.

Dr. Ophoven, while conceding that Cassie was handled "roughly" during her life (EHRT at 105, 107, 282, 315), suggests that some of her rib injuries may have been the result of brittle bones due to OI (EHRT 73, 106-11, 143, 170, 284, 287), and post-mortem CPR by Petitioner (EHRT 73, 109-14).  At the same time, Dr. Ophoven testified that she could not be certain whether Cassie's anterior rib fractures occurred after her death.  (EHRT 168.)  Dr. Ophoven appears to concede that ribs fractures from pediatric CPR are indeed rare in the medical literature.  (EHRT 149-50.)

Dr. Cohen conceded that Dr. Dollinger's work on assessing rib fractures was not excellent, but he found it satisfactory for the purpose of death certification.  (EH Ex. 174 at 46.) He testified that OI would be an uncommon and unreasonable explanation for Cassie's rib injuries given their number and location.  (EHRT 344, 369-70.)   While agreeing with Dr. Ophoven that rib injuries would be more likely in the presence of OI and lay (untrained) CPR (EHRT 377, 421), he opined that pediatric CPR related injuries to the abdomen nonetheless occur with very low frequency (EHRT 374-75, 418-24; see also EH Ex.'s M, O; cf. EHRT 146-50, 292).

Dr. Cohen discerned in Cassie's case both healing (more than two weeks old) posterior (i.e., back) rib fractures (EHRT 368), and new (inflicted at time of death or minutes before) anterior (chest area) rib fractures (EHRT 368-69, 418).

Dr. Cohen opined that fractures to the back (paraspinal) ribs, such as present in Cassie's

case do not typically result from CPR (EHRT 369), but instead can be a hallmark of child abuse (id.).  Significantly in this regard, Dr. Ophoven testified that she has never seen a paraspinal rib fracture from CPR.  (EHRT 112.)  Dr. Bux testified such paraspinal fractures could occur, albeit infrequently.  (EHRT 290-91.)

Dr. Cohen testified Cassie's fractured ribs would have caused Cassie substantial pain. (EHRT 3 at 91.)

### 4)    Bruising and abrasions

Petitioner claims that Dr. Dollinger should have been impeached regarding his findings at autopsy as to the nature and timing of Cassie's apparent bruises, contusions and abrasions. Petitioner alleges that some of these injuries were non-traumatic and occurred post-mortem.

Petitioner's testimony is consistent with these injuries having a traumatic origin during Cassie's lifetime.  Significantly, prosecution trial expert, Dr. Stephens, opined the injuries to Cassie's mouth were caused by trauma.  (RT 994-95.)

Drs. Ophoven and Bux suggest otherwise by opining that some of Cassie's apparent facial injuries are due to post-mortem insect activity (see EHRT 160; EH Ex. J ¶ 32), or a bacterial skin condition called impetigo (EH Ex. J ¶ 32; EH Ex. K ¶ 27; EHRT 303; see also EH Ex. F at 1447-48; cf., RT 937-38); Beames, 40 Cal. 4th at 913.  Nonetheless, Dr. Bux appears to concede that Cassie suffered at least some blunt force trauma to her face and the inside of her mouth in the days or weeks leading up to her death.  (EHRT 303-04.)

Dr. Cohen opines that these injuries were traumatic and incurred during Cassie's lifetime. He testified the abrasions to Cassie's lips and nose were caused by blunt force and likely while Cassie was alive.  (EHRT 354-55; see also EH Ex. A at 18.)  He suggests the lacerations to Cassie's lip and the bruise to her tongue were caused by blunt force – he discounts Petitioner's suggestion that bystander "mouth to mouth" was involved.  (EHRT 355-57; see also EH Ex. A at 19.)  He suggests a bruise to Cassie's skull was the result of blunt force.  (EHRT 362-63; see also EH Ex. A at 34.)

Dr. Cohen further opines that the bruising and abrasions to Cassie's back, buttocks and

1  upper/lower extremities were intentionally inflicted during Cassie's lifetime (EHRT 352-53,

2  523-24; EH Ex. A at 15); especially so upon consideration of the number and location of

3  Cassie's other injuries (id.; EHRT 353-54).

4        **b.    Dr. Dollinger's Disciplinary History**

5        Petitioner claims that Dr. Dollinger could and should have been impeached with his noted

6  misdiagnoses in other cases which led to a 2001 disciplinary suspension of his medical license.

7  As discussed above, Dr. Dollinger's disciplinary record was admitted in this proceeding solely as

8  a basis for expert opinion.

9        Petitioner alleges that in forming his opinions, prosecution habeas expert Dr. Cohen (1)

10 was unaware that Dr. Dollinger had misdiagnosed coarctation of the aorta in five other cases

11 around the time of Petitioner's trial, and (2) did not know that Dr. Dollinger's medical license

12 was suspended for a year and that he was placed on probation for three years – such that those

13 facts could cause him concern and might make him hesitate to take Dr. Dollinger's autopsy

14 report in this case at face value.  (EH Ex. 174 at 157-58, Doc. 162-20 at 158-59.)

15       However, Dr. Cohen, a board certified forensic pathologist who has performed

16 approximately 7,000 autopsies, (EHRT 332-41), testified at the evidentiary hearing that he was

17 aware of the misdiagnoses and 2001 discipline (EHRT 519).   He testified that though

18 concerning, the misdiagnoses involved a specific practice area, aortic coarctation, not present in

19 this case.  (EHRT 485-86.)  He testified that this disciplinary information did not change his

20 opinions in this case (EHRT 472, 519, 537-41), or his reliance upon Dr. Dollinger's findings

21 regarding the amount of blood and clot material in Cassie's abdomen (EHRT 387, 393-95, 397-

22 401, 434-35, 439).

23       Petitioner's suggestion that the coarctation misdiagnoses should be concerning in relation

24 to an alleged failure by Dr. Dollinger to conduct microscopic tissue examination in this case (see

25 Doc. No. 18 at Ex. 2; Doc. No. 59 at 44:22-26), appears similarly unpersuasive.  Dr. Cohen

26 testified at the evidentiary hearing that he felt Dr. Dollinger had adequately documented Cassie's

27 injuries.  (EHRT 443.)

28

### c. Dr. Bennett's Testimony

Petitioner claims that Rothbaum failed to adequately cross-examine prosecution child abuse expert and forensic pathologist, Dr. Thomas Bennett, on matters relating to the ligature mark on Cassie's neck, and Dr. Bennett's allegedly questionable cause of death findings in other cases.

#### i. Ligature injury

Petitioner alleges that Rothbaum was deficient by failing to impeach Dr. Bennett on grounds Dr. Bennett relied upon Dr. Dollinger's questionable autopsy report and its supporting materials. (RT 976-85.)

Dr. Bennett testified at Petitioner's trial in support of the torture murder special circumstance. He opined that an autopsy photograph showed that Cassie had been hung by a soft ligature, clothing or other fabric, for some period of time. (RT 971-74.) The prosecutor relied on Dr. Bennett's opinion and Dr. Dollinger's autopsy findings during closing argument, telling the jury that Cassie was hanged by a soft ligature minutes before her death. (RT 1348.)

The record reflects Dr. Dollinger's autopsy report notes that on external examination of Cassie, there was apparent a "minutes old" (EH Ex. 4 at 11), "horizontally oriented linear contusion abrasion pattern on the right side of the neck with a widened area near the midline" (EH Ex. 4 at 2). Dr. Dollinger's microscopic examination of the respiratory system showed "no bruising or injury of the soft issues of the throat. . . ." (Id. at 5.)

However, Petitioner has not demonstrated on the record a basis for impeaching Dr. Bennett regarding the neck injury. Petitioner has not shown that Dr. Dollinger's autopsy was deficient as to any of his above noted findings regarding the right side neck injury. Drs. Ophoven, Bux and Cohen all appear to characterize the mark on the right side of Cassie's neck fairly consistently with Dr. Dollinger, as a non-strangulating injury. (See EHRT 67, 128-29, 252-53, 297, 358-59.)

Specifically, Drs. Ophoven and Bux opined that the neck mark was non-suffocating and could have resulted from Cassie being picked up by her clothing; Dr. Ophoven also suggested

the mark could have been caused by vomit under Cassie's neckline.  (EHRT 67; 129-30, 252-53, 297; EH Ex. 91 at ¶¶ 16, 29.)

Dr. Cohen, in his August 21, 2015 report viewed the neck mark as perimortem or post-mortem abrasion only, with no underlying subcutaneous injury.  (See EH Ex. 174 at Ex. 1 at 10; EHRT 358-59.)  Dr. Cohen goes on to agree with Dr. Dollinger's finding of no underlying subcutaneous injury.  (See EH Ex. 174 at Ex. 1 at 10.)

Furthermore, Rothbaum does not appear deficient by failing to impeach Dr. Bennett on grounds the other trial experts did not find any strangulation (hanging) type injury.  As noted, Dr. Dollinger's report does not demonstrate he found a strangulating injury, rather only that he found no injury to the soft tissues of the throat.

In sum, Petitioner does not point to anything in the record suggesting trial experts Drs. Dollinger and Stephens were qualified to and would have disagreed with Dr. Bennett's opinion regarding a suspension or hanging by soft ligature.  (RT 973-74.)

Additionally, Petitioner has not demonstrated Dr. Dollinger's conclusion that Cassie's injuries were "at the hands of another", (id. at 11), provides a basis for impeachment of Dr. Bennett's testimony.

ii.     Findings in other cases

Petitioner alleges that Dr. Bennett should have been impeached because certain of his cause of death opinions in other cases, largely involving shaken baby syndrome, were the subject of a series of newspaper articles suggesting misdiagnoses and pro-prosecution bias.  (See Doc. No. 18 at Ex.'s 5, 10; Doc. No. 64 at 68:2-10; EH Ex.'s 187-196.)

However, only one of Petitioner's cited articles was published prior to the conclusion of Petitioner's trial.  The sole article that was arguably available to Rothbaum at the time of trial, (see Doc. No. 18 at Ex. 10 at 228-30), involved matters relating to Dr. Bennett's alleged circa 1980's mis-identification of a skull; failure to locate a bullet in a multiple gunshot wound victim; and disagreement by another expert with Dr. Bennett's finding a death resulted from shaken baby syndrome.  Such matters are seemingly unrelated to Dr. Bennett's noted opinions in this

1 case.

2        Petitioner's argument that the following cases involving Dr. Bennett could and should

3 have been used for impeachment is similarly unpersuasive: <u>Iowa v. Weaver</u>, 554 N.W.2d 240

4 (Iowa 1996), <u>Shortridge v. State</u>, 682 N.W.2d 81 (Iowa App. 2004), <u>Iowa v. Morales</u> (2002 -

5 unpublished), <u>Matter of Sybers</u>, 583 N.W.2d 890 (Iowa 1998). At most, these cases appear to

6 suggest simple disagreement among experts and/or relate to events occurring after Petitioner's

7 trial.

8        Petitioner's other cited cases relating to Dr. Bennett appear to center upon allegedly

9 misdiagnosed shaken baby syndrome and/or pro-prosecution bias issues, again issues not present

10 in this case. (EH Ex.'s 187, 190, 196.) Moreover, apart from Dr. Bennett's 1995 deposition in

11 <u>State of Iowa v. Van Skike</u> (see EH Ex. 190), the cited decisions were filed years after

12 Petitioner's trial. (<u>See</u> EH Ex. 187, 196.)

13        Petitioner's passing suggestion, relying upon a deposition in <u>Van Skike</u>, that Rothbaum

14 should have impeached Dr. Bennett as a prosecutorial "zealot" (Doc. 18, at 178; <u>see</u> <u>also</u> Doc.

15 No. 18 at Ex. 11 at 251; EH Ex. 190), appears based only upon surmise and lacks evidentiary

16 support.

17        Additionally, Rothbaum was able to essentially make the point of these arguments during

18 cross-examination. Dr. Bennett, in response to Rothbaum's questions testified that in "several"

19 previous cases experts of comparable stature to his had disagreed with his opinions. (RT 981-

20 83.)

21       **d.**    **Dr. Stephens Testimony**

22        Petitioner claims that Rothbaum was deficient by failing to cross-examine Dr. Boyd

23 Stephens on his opinions relative to the timing and cause of Cassie's injuries. As noted, Dr.

24 Stephens provided testimony in support of the torture murder special circumstance. (RT 988-

25 1008.)

26        Specifically, Petitioner points to a statement he (Petitioner) apparently made during a

27 March 1, 1995 interview with neuropsychologist Dr. Eugene Couture, suggesting at least some

28

of Cassie's burns were post-mortem, i.e., that Petitioner put Cassie's body "by" the floor heater grate to warm her blood during his noted resuscitation efforts.  (See Doc. No. 18 at 212; Doc. No. 18 at Ex. 7 at 113; see also EH Ex. 116.)

However, this statement alone is not necessarily impeaching of Dr. Stephen's opinions that Cassie's burns were incurred intentionally during her lifetime.  (RT 989-95.)  Dr. Stephens testified that Cassie's burns were not typical (RT 989); that her legs were splayed open prior to being burned (RT 991-1003); that some of the pattern burns on Cassie's anal and genital areas and foot were healing burns (RT 992-93); that burns were incurred to both the palm and back of Cassie's hand (RT 993); and that the burns were to selected areas not typical of an accident (RT 991-97).

As discussed above, Drs. Ophoven, Bux and Cohen disagree whether Cassie's burns or some of them were incurred after her death.  This disagreement alone does not appear to suggest Rothbaum was deficient by failing to impeach Dr. Stephens on the issue of aging Cassie's burns and in particular as to alleged post-mortem burns.

As to whether the burns or some of them could have been incurred accidentally, Rothbaum explored this very possibility during his cross-examination and re-cross-examination including with regard to Petitioner's testimony that at one point he had pulled Cassie off the heating grate by her clothing.  (RT 997-1002, 1004-1006, 1008.)

3.    Rothbaum Not Deficient by Failing to Request Lesser Included Instructions

Petitioner claims that Rothbaum was deficient by failing to request instructions on lesser included offenses to the (count 1) first degree murder charge.  (Doc. No. 18 ¶¶ 631-639.)

The state supreme court rejected this same allegation on direct appeal, as follows:

> Defendant contends the trial court's erroneous failure to instruct the jury on the lesser included offenses of second degree murder and involuntary manslaughter deprived him of his federal constitutional rights to a fair trial, due process of law, trial by jury, and a reliable penalty determination. With regard to this claim, we understand defendant to argue the trial court should have instructed on all three theories of second degree murder, that is, unpremeditated murder with express malice, implied malice murder, and second degree felony murder.

> A court must generally instruct the jury on lesser included offenses whenever the evidence warrants the instructions, whether or not the parties want it to do so.

[Citation] [T]he sua sponte duty to instruct on lesser included offenses, unlike the duty to instruct on mere defenses, arises even against the defendant's wishes, and regardless of the trial theories or tactics the defendant has actually pursued. [Citation] Here, however, we need not decide whether the evidence warranted instructions on second degree murder and involuntary manslaughter, because we find any error both invited and harmless.

After defendant testified at the guilt phase, the trial court and the parties discussed proposed guilt phase jury instructions. With the agreement of both sides, the court stated it would instruct the jury with the applicable versions of CALJIC Nos. 8.00 (homicide—defined), 8.10 (murder—defined), 8.11 ("malice aforethought"— defined), 8.24 (murder by torture), 8.30 (unpremeditated murder of the second degree), and 8.31 (second degree murder—killing resulting from unlawful act dangerous to life). The court then asked the defense whether it wanted the jury instructed on the lesser included offense of second degree murder, based on the second degree felony-murder rule, pursuant to CALJIC No. 8.32 (second degree felony murder). At this hearing, there was discussion of a second degree felony murder instruction with child abuse serving as the underlying felony. On appeal, defendant does not contend the failure to give such an instruction was error; rather, he asserts that, at the time of the crimes, second degree felony murder based on the predicate felony of torture (§ 206) constituted a lesser included offense of first degree murder by torture, and that instruction on this theory was required. Without deciding the merits of this theory [Citation], we accept it for purposes of addressing defendant's contentions on appeal. Defense counsel said no. In doing so, counsel expressed his understanding that instructions on second degree murder as a lesser included offense of first degree murder were required sua sponte.

Shortly thereafter, the trial court assented to the defense's request for instructions on the lesser included offense of involuntary manslaughter pursuant to CALJIC Nos. 8.45 (involuntary manslaughter—defined), 8.46 (due caution and circumspection—defined), 8.50 (murder and manslaughter distinguished), and 8.51 (murder and manslaughter distinguished—nature of act involved). Subsequently, however, defense counsel asserted: "If it turns out I don't want involuntary manslaughter, this isn't something that you have to give if I waive it." The court agreed the defense could waive instructions on this lesser included offense, but cautioned counsel that "if you do wish to do so, you have to make it clear on the record, and I'll go over that very thoroughly." The next court day, counsel informed the court that the defense was not requesting any instructions on the lesser included charges of second degree murder and involuntary manslaughter in connection with the murder count. In response to the court's inquiry, counsel represented his decision was "a matter of trial strategy." Counsel clarified, however, that the defense wanted the court to instruct on the lesser related offense of child endangerment (CALJIC No. 9.37), with regard to the torture count.

After all the evidence was presented and both sides rested, defense counsel expressed concern that the testimony of the prosecution's rebuttal witness, Dr. Dollinger, "might necessitate giving the lesser of the second." Counsel asked for some time to discuss the issue privately with defendant, which the trial court permitted. When the proceedings reconvened, counsel stated: "We don't want any lessers given with Count 1. I discussed it with John. I told him the reasons lawyers often want to do that, it gives them a chance to compromise if they feel like somebody did something wrong. He explains to me none of the actual legal theory this a second or involuntary could be based on the truth that he did not kill

60

this baby, the cart fell on it. We don't want the lessers." In accordance with the defense's requests, the trial court did not instruct the jury on any theory of second degree murder or involuntary manslaughter.

[A] defendant may not invoke a trial court's failure to instruct on a lesser included offense as a basis on which to reverse a conviction when, for tactical reasons, the defendant persuades a trial court not to instruct on a lesser included offense supported by the evidence. [Citations] In that situation, the doctrine of invited error bars the defendant from challenging on appeal the trial court's failure to give the instruction. [Citation] Here, the record clearly reflects that defendant and his counsel expressed a deliberate tactical purpose in resisting instructions on second degree murder and involuntary manslaughter, the very instructions he now complains should have been given. [W]e find that any error on these theories was invited, and that defendant therefore is barred from invoking such error as a basis for reversing his conviction….

In any event, again assuming error with regard to any or all of the omitted instructions, it also was harmless. As our decisions explain, "[e]rror in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions." [Citation] Here, the jury was properly instructed that a torture-murder special circumstance requires the intent to kill. (See § 190.2, subd. (a)(18); [Citation] The court instructed: "[¶] To find that the special circumstance referred to in these instructions as murder involving infliction of torture is true, each of the following facts must be proved: [¶] One, the defendant intended to kill, or with intent to kill, aided and abetted in the killing of a human being. [¶] Two, the defendant intended to inflict extreme cruel physical pain and suffering upon a living human being for the purpose of revenge, extortion, persuasion or for any sadistic purpose. [¶] And, three, the defendant did inflict extreme cruel physical pain and suffering upon a living human being no matter how long its duration. [¶] Awareness of pain by the deceased is not a necessary element of torture." When the jury found this special circumstance true, it necessarily determined that defendant intended to kill Cassie when he tortured her. Thus, there was no prejudice resulting from any erroneous failure to instruct on second degree felony murder [Citation] or involuntary manslaughter [Citation] Likewise, in finding the killing was intentional, the jury necessarily found express, not implied, malice. [Citation] Accordingly, any error in failing to instruct on implied-malice second degree murder also was harmless.

Defendant contends the jury's true finding on the torture-murder special-circumstance allegation did not render the failure to instruct on second degree felony murder harmless because the finding left open certain factual questions posed by the omitted second degree felony-murder instruction. This contention fails to warrant a reversal.

If a jury is not satisfied that a defendant acted with either express or implied malice, it may find the defendant guilty of *second degree* murder on a felony murder theory. [Citation] Here, as indicated, the true finding on the torture-murder special-circumstance allegation shows that the jury was satisfied defendant acted with express malice, and that it necessarily rejected any theory that defendant intended only to torture Cassie and not to kill her. In view of these circumstances, any error in failing to instruct on second degree felony murder was harmless. [Citation]

Additionally, we conclude that any error in failing to instruct on the second

61

degree murder theory of unpremeditated murder with express malice (CALJIC No. 8.30) was harmless. As the record discloses, the evidence supporting the jury's verdict of guilt of first degree murder by torture was so relatively strong, and the evidence supporting a different outcome was so comparatively weak, that there is no reasonable probability that the claimed error affected the result. [Citation] Here, the evidence supporting the guilt verdict included medical testimony establishing that a number of Cassie's injuries were inflicted only hours or minutes before her death, including multiple facial bruises, rib fractures, and abrasions to the shoulder and back. More significantly, the evidence showed that a soft ligature was used to hang Cassie by the neck for a period of time before she was killed, and that Cassie survived this ordeal but then died from a final blow of such immense force and impact that it split her liver in two. The number, character, and successive nature of the injuries leading up to and culminating in Cassie's death provided strong evidence that defendant acted with premeditation both in torturing and in killing her.

By contrast, there was no evidence showing that defendant acted without premeditation at the time of the killing; instead, defendant maintained throughout the trial that he was out of the room when a tool-laden cart fell on Cassie. On appeal, defendant points to the evidence of his intolerance of crying children, and argues it supported an inference that "he could well have snapped when Cassie started crying." But any inference that Cassie died of an impulsive act would have been seriously undercut by the evidence that Cassie, who was a mere 15 months old, suffered a multitude of injuries and was hung by the neck in the minutes and hours before the fatal blow that transected her liver. Also undermining such an inference was the backdrop of other evidence showing that, in the prior days, weeks, and months, Cassie was constantly injured while living in the home with defendant. Her black eyes, multiple sets of burns, broken leg, broken ribs, and numerous bruises, contusions, lacerations, and abrasions all strongly indicated a pattern of conduct that was consistent with what occurred on the day of the killing. Given the relative strength of the evidence of first degree murder, and the relative weakness of the evidence to the contrary, we do not find it reasonably probable that had the jury been instructed on this theory of express malice second degree murder, it would have concluded defendant intended to kill Cassie without premeditation or deliberation.

Finally, defendant contends <u>Beck v. Alabama</u> (1980) 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392, and its progeny have established a rule of constitutional law that, where the evidence supports instructions on lesser included offenses in a capital case, the trial court cannot refuse them and a defendant cannot waive them. As we have explained, however, "<u>Beck</u> does not prohibit a criminal defendant [in a capital case] from choosing to forgo such instructions for strategic reasons...." [Citation] Moreover, and in any event, <u>Beck's</u> principles are not violated where, as here, the jury was provided with the noncapital option of first degree murder without special circumstances. [Citation]

We find no reversible state or constitutional error at the guilt phase.

<u>Beames</u>, 40 Cal. 4th at 925-30.

Here, for the reasons discussed, Rothbaum reasonably made the tactical decision not to seek lesser included instructions. Doing so would have been inconsistent with Petitioner's noted

statements and testimony and the trial defense theory that Cassie's death was accidental trauma occurring when Petitioner was not present. (See, e.g., RT 1137-47, 1153, 1155, 1160-61, 1163-65.) In these regards, it appears that Petitioner's decision, in consultation with counsel, not to request lesser included instructions was indeed tactical given that he did not kill Cassie, rather the tool cart fell on her. See Beames, 40 Cal. 4th at 927; (see also RT 1137-47, 1153, 1155, 1160-61, and 1163-66).

Petitioner reaffirmed as much in his January 19, 1994 tape recording, stating that "believe me . . . it was an accident." (CT 1092); see also Beames, 40 Cal. 4th at 914. Rothbaum could reasonably have understood that Petitioner did not want lesser included offenses because "he did not kill this baby, the cart fell on it." Beames, 40 Cal. 4th at 928; see also Butcher v. Marquez, 758 F.2d 373, 376-77 (9th Cir. 1985) (counsel was not ineffective for choosing to forego voluntary manslaughter instruction, because the defense theory was that defendant did not commit the charged act, not that he committed it under provocation); People v. Rodrigues, 8 Cal.4th 1060, 1140 n.44 (1994) (rejecting claim of ineffective assistance of counsel for failing to request instruction because "[c]ounsel's omission was consistent with the defense strategy . . . and thus appears to have resulted from an informed tactical choice within the range of reasonable competence").

Additionally, as to the instructions given, Petitioner appears to concede that the elements of the charged offenses were specifically defined in the jury instructions on the count for murder and the murder torture special circumstance. (Doc. No. 18 at ¶ 678, citing RT 1279-1281; Doc. No. 18 at ¶ 679, citing RT 1281-1284; see also CT 858-67.)

Significantly, Rothbaum did not testify as to his reasoning underlying these matters.

For the reasons stated, Rothbaum's refusal of second degree murder, second degree felony murder, and involuntary manslaughter instruction(s) (see RT 1198-1222), was not unreasonable.

4.     Rothbaum Not Deficient Due to His Personal Problems

Petitioner claims that the same personal problems that led to Rothbaum's disbarment on

November 9, 2001, (six years after Petitioner's trial) prevented his formulation of a strategic defense during Petitioner's trial and resulted in deficient investigation and presentation of the trial defense.

Petitioner points to the death of Rothbaum's father shortly before Rothbaum was appointed as Petitioner's counsel; the failure of Rothbaum's marriage shortly before trial; Rothbaum's regular gambling and trips to Las Vegas; Rothbaum's substance abuse; and Rothbaum's chronic inattention to this practice. (See Doc. No. 18 at Ex.'s 1, 18-26; EH Ex. 226 at 7, 16-25, 47, 57; EHRT 571-79, 641-44.)

Petitioner suggests Rothbaum's noted personal problems began around the time of Petitioner's trial (EHRT 639-52), and in combination with Rothbaum's "shoot from the hip" style (EH Ex. 226, Ex. 1 at 1), and the facts of this case, quickly overwhelmed him (EH Ex. 181 ¶ 16; EHRT 545-638). This, according to Petitioner, caused Rothbaum to essentially delegate preparation of Petitioner's trial defense to paralegal Griffin and investigator Webb. (EH Ex. 181 at ¶¶ 10-11, 15; EHRT 645-46; EH Ex. 226 at 8-9, 12-22.)[7]

The record and the discussion above reflect the extent to which Griffin and Webb were involved in the investigation and preparation of Petitioner's defense. Griffin worked on the case both for Rothbaum's predecessor, Mr. Thommen, and Rothbaum. (EH Ex. 226 at 35, 41.) She interviewed Petitioner in jail, made notes of the interviews for counsel and conferred with counsel regarding these interviews. (Id. at 36-44.)

Webb testified that Rothbaum's practice style generally and in capital cases was to allow the defense team "quite a bit of autonomy" (EHRT 645), and that this style resulted in at least one acquittal in a capital case (EHRT 646). Both Griffin and Webb suggest Rothbaum's problems caused him to neglect Petitioner's case. (EH Ex. 226 at 21; EHRT 641.) Albeit, Griffin's testimony was somewhat uncertain whether Rothbaum was actively gambling on sports during Petitioner's case. (EH Ex. 226 at 25, 53.)

---

[7] Ms. Griffin admitted at the evidentiary hearing a March 1986 conviction for embezzlement unrelated to Petitioner's case. (EHRT 6.)

1    In any event, for the reasons stated, Petitioner has not demonstrated on the record that

2 Rothbaum's noted problems prevented him from making informed and strategic defense

3 decisions in Petitioner's case. Rothbaum, in his December 20, 2006 habeas declaration,

4 suggested that his personal issues and heavy caseload distracted him from Petitioner's case. (EH

5 Ex. 181 at ¶¶ 4-6, 26-31; EHRT 547-49, 556-69, 635.) However, at the evidentiary hearing,

6 Rothbaum questioned such statements, noting that he was in a fragile mental state in 2006 and

7 motivated primarily to prevent Petitioner's execution. (See EHRT 547-75, 628-37.)

8    Rothbaum testified that around the time of Petitioner's trial he was having marital

9 difficulties and was distressed over the death of his father (EHRT 570-76; EH Ex. 181 at ¶¶ 26-

10 30), and gambled regularly in Las Vegas (EHRT 570, 576). Rothbaum testified he could not

11 recall specifically the extent to which he was going to Las Vegas to gamble during Petitioner's

12 trial.[8] (EHRT 577; see also CT 45-82; Doc. No. 172 at 2, 92-95.)

13    However, the record reflects that at the time he represented Petitioner, Rothbaum was an

14 experienced criminal defense attorney. He successfully practiced law in Tulare County from

15 1988-2002 (EHRT 583), winning acquittals prior to and after Petitioner's case in nine other

16 homicide cases (EHRT 581-85; see also EH Ex. 181 at 1), including acquittal in one capital case

17 and a sentence of life without parole in two other capital cases (EHRT 583-85).

18    Rothbaum specifically testified at the evidentiary hearing that any gambling and marital

19 problems he may have had, as well as his caseload in general, did not affect his performance at

20 Petitioner's trial. (EHRT 5 at 67-76, 630-31.) Moreover, it appears that Rothbaum met with

21 Webb and Griffin regarding their respective work on the case with some regularity during the

22 course of preparation of Petitioner's defense and trial. (See e.g., Doc. No. 225 at 61, 64, 79-80,

23 111-12, 167-68, 227, 238-39, 244, 248, 250-51, 254-55, 257-58, 264, 270-71; see also EH Ex.

24 226 at 38-45.)

25    It appears that neither Griffin nor Webb informed the court or the state bar of

26 Rothbaum's noted personal problems and both continued to work for him after the conclusion of

27

28 [8] The Court takes judicial notice of the football schedules appended to Doc. No. 172 as Exhibits 2-4.

Petitioner's case. (EHRT 648-49; EH Ex. 226 at 49.)

Although Griffin testified that Rothbaum's reputation with the local bench and bar was variously very good and very bad (EH Ex. 226 at 59-60), Rothbaum apparently continued to receive court-appointed criminal cases after Petitioner's trial (id. at 60).

Significantly, for the reasons stated Rothbaum's trial defense was not objectively unreasonable and Rothbaum was not deficient.

5.     No Prejudice under Strickland

Petitioner claims that absent Rothbaum's allegedly deficient conduct, there is a reasonable probably that at least one juror would have found the prosecution failed to prove Petitioner's guilt of torture murder beyond a reasonable doubt. (Doc. No. 18 at 246:19-23; Doc. No. 222 at 12-26.)

The prejudice determination requires the Court to consider counsel's errors against "the totality of the evidence - both that adduced at trial, and the evidence adduced in the habeas proceeding[s]." Wiggins, 539 U.S. at 536; Strickland, 466 U.S. at 668, 695. Here, this means that the Court is to consider all of the relevant defense and prosecution evidence that the jury would have had heard, had the noted alternative defense been asserted at trial. See Wong v. Belmontes, 558 U.S. 15, 19-20 (2009). The Supreme Court has explained that a petitioner's "reasonable probability" showing must be "substantial, not just conceivable." Richter, 562 U.S. at 111–12 (citing Strickland, 466 U.S. at 693).

For the reasons that follow, Petitioner has failed to demonstrate prejudice under Strickland.

a.     **Petitioner's Criminal and Child Abuse Background**

The jury was aware of evidence calling into question the credibility of Petitioner's statements that he attempted to resuscitate Cassie with the intent to save her life.

i.     Criminal background

The prosecution introduced evidence of Petitioner's prior criminal convictions. Petitioner admitted during his testimony at trial that he has a March 25, 1973 conviction

1  for armed robbery; an April 24, 1975 conviction for receiving stolen property; and a June 1, 1983

2  conviction for second degree burglary.  (RT 1135-36, 1153.)

3      ii.    Petitioner's physically abusive conduct

4      The prosecution introduced evidence of Petitioner's history of abusive behavior as well

5  as his ongoing physical abuse of Cassie continuing to within minutes of her death.  (See, e.g., RT

6  927-43, 973-74, 989, 991-95); see also Beames, 40 Cal. 4th at 929-30 ("[T]he number, character,

7  and successive nature of the injuries leading up to and culminating in Cassie's death provided

8  strong evidence that defendant acted with premeditation both in torturing and in killing her.").

9      **1)    Petitioner's history of child abuse and aggressive conduct**

10     The prosecution presented evidence of Petitioner's 1983 no contest plea to a felony

11  charge he broke the leg of Ricardo M., the four-year-old child of his former girlfriend Kristi

12  McVey.  (RT 711-713, 715, 729-34, 1162, 1182-84; EHRT 151; see also Doc. No. 171 at 67-75.)

13  The record reflects that Petitioner grabbed Ricardo, threw him across the room and slapped him

14  on the face.  (RT 729-34.)  Ricardo's leg injury seems not dissimilar to Cassie's noted femur

15  fracture.

16     Relatedly, McMains stated in testimony in her separate proceeding that Petitioner's

17  mother had warned her about leaving her children with Petitioner, that "you shouldn't leave your

18  kids with my son … you just don't know him…."  (EH Ex. 208 at 1391; see also Doc. No. 171 at

19  77.)

20     Significantly, it appears that Dr. Ophoven did not consider the 1983 Ricardo McVey

21  incident when she opined on the alternative defense.  (EHRT 150-51.)

22     Drs. Ophoven and Bux also seem not to have considered statements to law enforcement

23  by Shirlee Riley, McMains's landlady, that McMains once told her Petitioner once put a loaded

24  gun to McMains's head and was going to shoot her in the head if she allowed her parents to enter

25  the home.  (EH Ex. 225 at 8.)

26     Additionally, the prosecution presented testimony about Petitioner's abusive behavior by

27  McMains's neighbors: Royce Hunneman who testified that he heard Petitioner brag to his friends

28

about hitting McMains (RT 762-67); and Ms. Riley, who testified that Petitioner yelled at McMains and that she believed there was abuse happening at McMains's household (RT 771-72).

### 2) Injuries to Cassie when Petitioner was alone with her

The Prosecution presented evidence of the multitude of serious and substantially painful injuries Cassie suffered when Petitioner was alone with her.

Shortly after Petitioner, who was neither McMains's spouse nor Cassie's father (EH Ex. 209 at 5-6), came into Cassie's life in late April 1993 (RT 769-70), she began to suffer injuries.

Cassie suffered a broken femur with bruising when she was eight months old.  (See EHRT 593-98; EH Ex. F at 1371-75; EH Ex. 209 at 31-32; see also EHRT 283.)  McMains, seemingly aware of Petitioner's noted 1983 event involving Ricardo McVey, asked a friend, Cindy Clem, to say that Cassie had been injured at Clem's house because McMains did not want Petitioner involved in Cassie's injury.  (EHRT 658-65.)

However, McMains later acknowledged that around the time that Cassie had suffered the broken leg, Petitioner swung her by the legs and caught her upside down in her car seat.  (EH Ex. F at 1371-75.)  An event McMains suspected may have caused Cassie's leg injury.  (Id.; EH Ex. 209 at 31-32.)

Petitioner denied breaking Cassie's leg when he was interviewed by an emergency response investigator from child protective services.  (EHRT 681-83; see also Doc. No. 59 at 36:21-26.)  Nonetheless, the injury was suspicious enough that the county sheriff removed Cassie to the care of McMains's parents for several months (EHRT 684-85), during which time Cassie was uninjured (See EH Ex. 209 at 35-42; EH Ex. 208 at 1313); Beames, 40 Cal. 4th at 913.

Cassie was reunited with Petitioner and McMains in December 1993.  (EH Ex.'s 208 at 1552, 209 at 43.)  Petitioner, apparently by his own design became Cassie's sole caretaker.  (EH Ex. F at 1441-42; EH Ex. 208 at 1331-32, 1335; EH Ex. 209 at 42-45.)  Cassie then sustained a string of injuries when Petitioner was alone with her.  She hit her nose and sustained two black

eyes. (EH Ex. F at 1447-48.) She suffered the burns discussed above (RT 927-33, 989-94, 999; EH Ex. F at 1379-80; 1416 EH Ex. 208 at 1408; EH Ex. 209 at 50-52), which Petitioner attributed to her having fallen on the floor heating grate (EH Ex. F at 1416; EH Ex. 208 at 1395-98, 1403; EH Ex. 209 at 50-51).

Cassie also suffered additional injuries, some of which seem to have happened within minutes of her death, including bruises and wounds on her head and face (RT 926, 936-42, 952); wounds to her back (RT 938-51); missing hair (EH Ex. F at 1432); and broken ribs front and back (RT 926), some of which were recent and some of which were older healing fractures (RT 925-26, 942, 950-51; see also Doc. No. 18 at Ex. 6 at 107).

The California Supreme Court described these various injuries as follows:

> [M]ultiple bruises on the face and abrasions on the back, fractures of the ribs, abrasions to the neck and shoulder on the left side, and a bruise and abrasion on the right side of the neck . . . [¶] . . . five broken ribs on the front right side, four broken ribs on the back left side, a bruise on the right front of the scalp, a large laceration on the top left side of the head, lacerations on the inside lower lip, contusions and abrasions around the nose and mouth, contusions, abrasions, and scratches on the back of the head, contusions, bruises, and abrasions on the back, and bruising on the tip of the tongue, the right thumb, and on the back of the knee . . . [¶] . . . burns to the buttocks in a crosshatched linear grid pattern, apparently caused by a floor furnace and occurring when Cassie wore no clothing and her legs were forced wide apart. There also were burns in a grid-like pattern on the back of the right hand, third degree burns on the index and ring finger of the right hand, and burns on the back and ring finger of the left hand. Finally, burns were on the feet and third degree burns were on two of the toes.

Beames, 40 Cal. 4th at 915-16.

As Cassie suffered injury upon injury, Petitioner progressively restricted McMains's access to her; ultimately refusing to allow McMains to feed or bathe her own daughter. (EH Ex. 208 at 1347, 1441, 1574.) Petitioner would tell McMains to "[G]et the fuck out of here. What are you doing in here?" (Id. at 1425-26; see also EH Ex. F at 1420-22; EH Ex. 208 at 1347; EH Ex. 209 at 101.) Petitioner appears also to have restricted access to Cassie by others, for example telling McMains not to allow her family members into the house. (EH Ex. 208 at 1437-38.) The latter appearing consistent with Ms. Riley's above noted testimony regarding threats by Petitioner.

At one point, when Petitioner became aware of the extent of burns to Cassie's hands and feet and that the back of her hair was singed (EH Ex. 208 at 1396-98; see also EH Ex. F at 1351-80; EH Ex. 208 at 1408; EH Ex. 209 at 50-52), Petitioner grabbed Cassie away from McMains (EH Ex. 208 at 1399). He became "very disturbed and frantic" when McMains questioned him about the burns. (EH Ex. F at 1380.)

McMains also noticed that Cassie seemed to fear Petitioner. (EH Ex. 209 at 70-71, 88.) When McMains protested Petitioner's conduct with Cassie, he apparently made threats against McMains's family (EH Ex. F at 1428-30), and told McMains that he would take the children and leave (id.; see also EH Ex. 208 at 1401-02). McMains was scared of what Petitioner might do. (EH Ex. F at 1382, 1418, 1447; EH Ex. 208 at 1287-88.)

Petitioner offered explanations for some of these external injuries. (See, e.g., RT 1165-66; EH Ex. 208 at 1556-57); see also Beames, 40 Cal. 4th at 913. Dr. Ophoven's opinion, consistent with the alternative defense, that some external injuries occurred after Cassie was dead (see, e.g., EHRT 160; EH Ex. J at 13-14), and represent a skin condition of impetigo (RT 937-38; see also EH Ex. F at 1447-48); Beames, 40 Cal. 4th at 913, concurred in to some extent by Dr. Bux (EH Ex. K at 8, 13), appears to be contrary to Petitioner's own explanation that the injuries resulted from accidental impacts during Cassie's lifetime. At trial, prosecution expert Dr. Stephens opined the injuries to Cassie's mouth injuries were caused by trauma during her life. (RT 994-95.) Defense habeas expert Dr. Bux conceded that Cassie suffered blunt force trauma to her face and the inside of her mouth in the days or weeks leading up to her death. (EHRT 303-04.)

Petitioner's sister, Tammy Beames, in her interview with law enforcement, stated that Petitioner was mean in the way he talked to Cassie and in the way he handled her. (EH Ex. 211 at 6.) She stated that Petitioner would not tolerate Cassie crying. (Id.) He refused to allow others, even McMains, to hold or interact with Cassie. (Id.).

McMains, in her interviews with law enforcement, admitted she knew Petitioner had been hurting her daughter. (EH Ex. F at 1430.) She stated that she tried to keep Petitioner from

yelling at Cassie and hitting her; whereupon Petitioner would get real violent and threaten to leave with Cassie such that she did not call the authorities - she stated she was scared. (EH Ex. F at 1457-58.)

As noted, Dr. Ophoven concedes that some of Cassie's burns were incurred prior to her death (Doc. No. 18 at Ex. 6 at 106-08); that some of the rib fractures were "older, healing injur[ies]" (Doc. No. 18 at Ex. 6 at 107); and that Cassie was "handled roughly during her lifetime" (EHRT 105, 281-82; <u>see</u> <u>also</u> Doc. No. 18 at Ex. 6 at 108). Dr. Ophoven testified she used the term "handled roughly" to mean improper injuries to children. (EHRT 105.)

Dr. Cohen opines that Cassie suffered ongoing and ultimately fatal child abuse. (EHRT 377-78, 493-95; <u>see</u> <u>also</u> EH Ex. C at 5-7; EH Ex. D at 2, 5.) Dr. Cohen found the femur fracture suspicious (EHRT 343); noting that even if Cassie had mild OI (EHRT 344-45), it would have taken some amount of force to fracture her femur (EHRT 345), which left her in much pain (EHRT 391).

The noted substantial evidence suggests Petitioner's intentional ongoing physical abuse of Cassie prior to and proximal to her death and involving substantial pain.

### b.    Petitioner's Pretrial Statements and Consciousness of Guilt

The jury was aware of Petitioner's pretrial statements and testimony noted <u>ante</u>, relating to the events surrounding Cassie's death; statements which seem patently inconsistent with a death by neglect theory. Furthermore, the jury was aware of evidence of consciousness of guilt calling into question the credibility of Petitioner's statements that he attempted to resuscitate Cassie and wanted to save her life.

On January 19, 1994, after he told McMains that Cassie was dead, Petitioner asked for time before notifying the authorities, stating he "wasn't going to go alive" and that "he was going to hell for what had happened." (RT 820-21); <u>see</u> <u>also</u> <u>Beames</u>, 40 Cal. 4th at 914.

Petitioner grabbed his gun, some ammunition and his passport and left the crime scene in McMains's car taking Cassie's body with him. (RT 862-72, 893-94, 902-03); <u>see</u> <u>also</u> <u>Beames</u>, 40 Cal. 4th at 913-15.

Before he left, Petitioner made the noted tape recording for the police. (RT 819-20.) In it, he takes responsibility for Cassie's accidental death caused by the falling tool cart; this purportedly in order to protect McMains, and because he knew his prior child abuse conviction would not allow him to avoid blame. In the tape recording Petitioner states:

> I know I'll be charged for killin' my baby, but I did it unintentionally. I love her more than my own life and that's the truth. . . .I know I deserve to die for not watchin' her close enough. But not this, a one year old baby. I deserve to die. Angel, I'm ready to give my life for her, I would. I don't know what to do. I just felt her, she's so cold. I was tryin' to give her mouth to mouth, baby, but she was already dead....

(CT 1092, 1093.)

> I'm the one that took her out of the crib and sat her on that cart right there, nobody else in this world but me. . . . If there was a way to bring Cassie back I would have done it myself. I know, I administered every type of CPR there was and then some.

(RT 1149-50.)

On the morning of January 20, 1994, Sergeant John Zapalac (hereinafter "Zapalac") of the Tulare County Sheriff's Office arrested Petitioner at the residence of David Joiner where Petitioner had fled. (RT 862-63, 872, 893-94, 902-03); see also Beames, 40 Cal. 4th at 915. Petitioner told Zapalac he knew why he was there; that Cassie was inside the car; and Petitioner handed Zapalac the car keys. (RT 894-95.) Zapalac found Cassie's body inside a jacket in the back of the car. (RT 895-97.)

Later, at the Sheriff's Department, Petitioner spontaneously stated, "I was the only one with her. I'm responsible. Put me in jail. Put a .45 to my head." (RT 898); see also Beames, 40 Cal. 4th at 915.

### c. The Additional Evidence Offered in Federal Court

Petitioner claims that counsel Rothbaum's noted deficiencies kept the jury from learning of the following evidence, discussed above and presented in this proceeding:

1.  Petitioner suffered methamphetamine intoxication and related brain dysfunction and impairments.

2.      Cassie was not hung by a neck ligature to the point of asphyxiation.

3.      Cassie and her brother Darrian were severely neglected "meth orphans" and severely malnourished.

4.      Cassie had not eaten in more than 24 hours prior to her death and malnutrition contributed to her death.

5.      Cassie was dehydrated which contributed to her death.

6.      Cassie was likely septic from a necrotic scalp wound which contributed to her death.

7.      Cassie suffered from a mild form of OI, which caused her ribs and bones to easily break.

8.      Cassie was neurologically compromised and unresponsive at the time of her death, as evidenced by her aspirational pneumonia

9.      Cassie's combination of medical conditions were, or would have been, fatal to Cassie without any traumatic wound to her liver.

10.     Dr. Dollinger failed to follow proper autopsy protocols which would have documented the above noted medical conditions and alternative cause of death by neglect.

11.     Dr. Dollinger failed to document dehydration by the standard autopsy practice of taking vitreous samples.

12.     Dr. Dollinger failed to document the volume and nature of the fluid found in Cassie's abdomen.

13.     Dr. Dollinger failed to test Cassie's blood for septicemia.

14.     Dr. Dollinger failed to take x-rays and samples necessary to correctly age Cassie's rib, head, face and burn injuries.

However, for the reasons stated, summarized below, this alleged new evidence does not establish any reasonable probability of a different outcome. Strickland, 466 U.S. at 695-96; see also United States v. O'Neal, 937 F.2d 1369, 1376 (9th Cir. 1990) (no prejudice where there was

strong evidence of guilt), abrogated on other grounds by United States v. Garcia-Cruz, 40 F.3d 986, 989 (1994).

The jury was aware that while at home Darrian, Cassie's younger brother, suffered from and shortly before Cassie's death was hospitalized for a failure gain weight and failure to thrive. The jury was aware that Petitioner had used methamphetamine at McMains's home and that Rick Hager had delivered methamphetamine for him there on the morning of January 19, 1994, the apparent date of Cassie's death. Nothing in the evidence before the jury or the newly proffered evidence demonstrates that Petitioner was under the influence of methamphetamine around the time of Cassie's death on January 19, 1994.

The jury was not presented with evidence that Cassie was hung to the point of asphyxiation – failure to present additional evidence to the contrary was harmless.

Petitioner's pre-trial neuropsychological evaluation did not suggest any organic brain condition or impairment. Petitioner's suggestion on habeas that such a condition might have existed is speculative.

The jury was aware that Dr. Zorn, the geneticist on Cassie's case following her femur fracture had determined the possibility Cassie had type one OI.

The jury was aware that Cassie suffered early aspirational pneumonia at the time of her death.

The jury was aware that Cassie had not taken food during the twenty-four hours prior to her death – that she had been sick with the flu.

The jury was aware that Cassie allegedly was non-responsive at the time Petitioner stated he began resuscitation to save her life.

The additional evidence suggesting Cassie was malnourished, dehydrated and possibly septic is not inconsistent with Dr. Dollinger's stated immediate cause of death.

The additional evidence relating to Dr. Dollinger's autopsy methodology does not undermine confidence in the verdict; given Petitioner's pretrial statements and the weight of the noted substantive evidence it is not reasonably likely the result would have been different had the

jury considered this additional evidence.  See Cannedy, 706 F.3d at 1161-62.

The additional evidence relating to Cassie's conditions of malnutrition, dehydration, sepsis and/or early pneumonia does not undermine confidence in the verdict; given Petitioner's pretrial statements and the weight of the noted substantive evidence, it is not reasonably likely the result would have been different had the jury considered this additional evidence.  See Id.

## VI.

## FINDINGS AND RECOMMENDATIONS

Based on the foregoing findings and for all the reasons set forth above, IT IS HEREBY RECOMMENDED that federal habeas relief be DENIED as to claim 11 of the petition filed in this proceeding on July 27, 2011 (Doc. No. 18).

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1).  Within sixty (60) days of service of these findings and recommendations, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within twenty (20) days after service of the objections.  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **October 2, 2017**

_____
UNITED STATES MAGISTRATE JUDGE